**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| VANESSA CROWE, et al.,<br><br>          *Plaintiffs*,<br><br>          v.<br><br>FEDERAL BUREAU OF PRISONS, et al.,<br><br>          *Defendants*. | Civil Action No. 24-3582 (APM) |

**<u>DEFENDANTS' COMBINED MOTION TO DISMISS AND OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

STATUTORY AND REGULATORY BACKGROUND .................................................... 3

I.      BOP'S AUTHORITY TO DESIGNATE THE PLACE OF IMPRISONMENT. ............... 3

II.     THE FIRST STEP ACT ........................................................................................... 5

FACTUAL BACKGROUND ............................................................................................. 8

PROCEDURAL HISTORY ............................................................................................... 9

LEGAL STANDARDS ..................................................................................................... 10

ARGUMENT .................................................................................................................... 11

I.      THE COURT SHOULD DISMISS PLAINTIFFS' COMPLAINT. ................................ 11

    A.   Plaintiffs Alleged Injury is Hypothetical and Speculative. ................................. 11

    B.   Plaintiffs' Claims are Moot. ................................................................................. 16

    C.   Congress has Precluded Judicial Review over Plaintiffs' Challenge to BOP's
        Alleged Failure to Timely Transfer them to Prerelease Custody. ....................... 18

        1.   *Congress has afforded BOP substantial discretion to designate the place of
            imprisonment.* .............................................................................................. 19

        2.   *Section 3632(d)(4)(C) does not eliminate BOP's discretion.* .................... 20

        3.   *Sections 3621(b) and 3625 expressly preclude judicial review.* ............... 27

    D.   BOP Is Not Violating Any Statutory Mandate in the FSA. .............................. 28

    E.   Plaintiffs Cannot Bring Their Challenge to Their Delayed Transfer Under *Ultra Vires*
        Review. .............................................................................................................. 30

II.     PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE
       MERITS. ................................................................................................................ 33

III.   PLAINTIFFS' REQUESTED INJUNCTION SHOULD BE DENIED. .......................... 36

IV.   LOCAL CIVIL RULE 7(N) SHOULD BE WAIVED BECAUSE DEFENDANTS'
       MOTION DOES NOT RELY ON AND CAN BE DECIDED WITHOUT AN
       ADMINISTRATIVE RECORD. ............................................................................ 38

CONCLUSION ................................................................................................................. 39

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*[Redacted] v. BOP,*
   No. 23-CV-5956, 2023 WL 9530181 (S.D.N.Y. Dec. 28, 2023),
   *report and recommendation adopted sub nom.,*
   *Doe v. BOP*, 2024 WL 455309 (S.D.N.Y. Feb. 5, 2024) ........................................................ 24

*Aamer v. Obama,*
   742 F.3d 1023 (D.C. Cir. 2014) ............................................................................................. 32

*Akbar v. Cuccinelli,*
   Civ. Case No. 18-2808, 2020 WL 1287817 (D.D.C. Mar. 18, 2020) ...................................... 39

*Already, LLC v. Nike, Inc.,*
   568 U.S. 85 (2013) .................................................................................................................. 17

*Alvarez v. Smith,*
   558 U.S. 87 (2009) .................................................................................................................. 17

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.,*
   271 F.3d 262 (D.C. Cir. 2001) ............................................................................................... 39

*Am. Ctr. for L. & Just. v. U.S. Dep't of State,*
   289 F. Supp. 3d 81 (D.D.C. 2018) .......................................................................................... 38

*Am. Rd. & Transp. Builders Ass'n v. EPA,*
   No. 12-5244, 2013 WL 599474 (D.C. Cir. Jan. 28, 2013)...................................................... 32

*Am. Sch. of Magnetic Healing v. McAnnulty,*
   187 U.S. 94 (1902) .................................................................................................................. 30

*Arab v. Blinken,*
   600 F. Supp. 3d 59 (D.D.C. 2022) .......................................................................................... 39

*Arizonans for Off. Eng. v. Arizona,*
   520 U.S. 43 (1997) .................................................................................................................. 12

*Armstrong v. Exceptional Child Ctr., Inc.,*
   575 U.S. 320 (2015) ................................................................................................. 10, 27, 30

*Arpaio v. Obama,*
   797 F.3d 11 (D.C. Cir. 2015)................................................................................................... 12

*Asim v. Blinken,*
   No. 24-638 (JEB), 2024 WL 3338778 (D.D.C. July 8, 2024) ................................................ 35

*Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*,
  502 U.S. 32 (1991) ............................................................................................. 31

*Booker v. Bayless*,
  No. 5:24-CV-43, 2024 WL 3875031 (N.D. W. Va. Aug. 20, 2024) ........................................... 24

*Chamber of Commerce of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ............................................................................. 31

*City of Chicago v. Morales*,
  527 U.S. 41 (1999) ........................................................................................... 21

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................... 12, 13, 15

*Conservation Force, Inc. v. Jewell*,
  733 F.3d 1200 (D.C. Cir. 2013) ............................................................................ 17

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
  543 U.S. 157 (2004) ......................................................................................... 30

*Ctr. for Auto Safety v. Natl'l Highway Traffic Safety Admin.*,
  452 F.3d 798 (D.C. Cir. 2006) ............................................................................. 32

*Davis v. FEC*,
  554 U.S. 724 (2008) ......................................................................................... 12

*Dean v. United States*,
  556 U.S. 568 (2009) ......................................................................................... 23

*Desai v. U.S. Citizenship & Immigr. Servs.*, Civ. A.,
  No. 20-1005 (CKK), 2021 WL 1110737 n.7 (D.D.C. Mar. 22, 2021) ..................................... 39

*Doe v. BOP*,
  2024 WL 455309 (S.D.N.Y. Feb. 5, 2024) ................................................................. 25

*Ector v. Engleman*,
  No. CV 22-6044-FLA (JPR), 2023 WL 6969784 (C.D. Cal. July 28, 2023), *report and
  recommendation adopted*, 2023 WL 6130511 (C.D. Cal. Sept. 18, 2023) ........................ 17, 18

*FBI v. Fikre*,
  601 U.S. 234 (2024) ......................................................................................... 17

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ......................................................................................... 21

*Fed. Exp. Corp. v. U.S. Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022) ..................................................................... 30, 31, 36

*Frey v. Martinez*,
　　No. 2:23-cv-0822, 2024 WL 3264823 (W.D. La. June 3, 2024), *report and
　　recommendation adopted*, 2024 WL 3257126 (W.D. La. July 1, 2024) ............................ 23, 24

*Fox v. BOP*,
　　No. 2:22-cv-5199, 2023 WL 9103080 (W.D. La. Nov. 7, 2023) *report and
　　recommendation adopted*, 2024 WL 58172 (W.D. La. Jan. 4, 2024) ...................................... 24

*Frierson v. Rardin*,
　　No. 2:24-CV-12456, 2025 WL 410072 (E.D. Mich. Feb. 5, 2025) ................................... 24, 32

*Gant v. King*,
　　No. 23-CV-1766 (NEB/ECW), 2023 WL 6910771 (D. Minn. Oct. 19, 2023), *report and
　　recommendation adopted*, 2023 WL 6910771 (D. Minn. Oct. 19, 2023) ................................. 16

*Griffis v. Segal*,
　　No. 23-cv-01525 (JRT/DLM), 2023 WL 5755779 (D. Minn. June 6, 2023), *report and
　　and recommendation adopted*, 2023 WL 5447282 (D. Minn. Aug. 24, 2023) ......................... 19

*Griffith v. Fed. Lab. Rels. Auth.*,
　　842 F.2d 487 (D.C. Cir. 1988) ................................................................................................. 31

*Gutierrez v. Warden, FCI Mendoza*,
　　No. 1:23-cv-00359-HBK (HC), 2023 WL 6930926 (E.D. Cal. Oct. 18, 2023) ....................... 18

*Hassan v. Hijar*,
　　No. 23-CV-41-KC, 2023 WL 1769207 (W.D. Tex. Feb. 3, 2023),
　　*appeal dismissed*, 2023 WL 5125065 (5th Cir. Mar. 28, 2023) ............................................... 24

*Heckler v. Chaney*,
　　470 U.S. 821 (1985) ................................................................................................................. 21

*In re Barr Laboratories, Inc.*,
　　930 F.2d 72 (D.C. Cir. 1991) ....................................................................................... 34, 36, 37

*In re Ctr. for Auto Safety*,
　　793 F.2d 1346 (D.C. Cir. 1986) ............................................................................................... 34

*In re: Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*,
　　45 F. Supp. 3d 14 (D.D.C. 2014) ............................................................................................. 16

*Int'l Union, United Mine Workers of Am. v. Dep't of Lab.*,
　　554 F.3d 150 (D.C. Cir. 2009) ................................................................................................. 35

*J. Roderick MacArthur Found. v. FBI*,
　　102 F.3d 600 (D.C. Cir. 1996) ................................................................................................. 12

iv

*Jafarzadeh v. Duke,*
    270 F. Supp. 3d 296 (D.D.C. 2017) ................................................................................ 31, 32

*Kornegay v. Brown,*
    No. 5:24-CV-199, 2025 WL 415735 (N.D. W. Va. Feb. 6, 2025) ............................................ 24

*League of Women Voters v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ................................................................................................ 11

*Leedom v. Kyne,*
    358 U.S. 184 (1958) ............................................................................................................ 31

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ...................................................................................................... 11, 12

*Mashpee Wampanoag Tribal Council, Inc. v. Norton,*
    336 F.3d 1094 (D.C. Cir. 2003) ......................................................................................... 35

*McCord v. Maggio,*
    910 F.2d 1248 (5th Cir. 1990) ........................................................................................... 22

*Meachum v. Fano,*
    427 U.S. 215 (1976) ............................................................................................................ 19

*Medelius Rodriguez v. U.S. Citizenship & Immigr. Servs.,*
    605 F. Supp. 2d 142 (D.D.C. 2009) ................................................................................... 17

*Miller v. District of Columbia,*
    319 F. Supp. 3d 308 (D.D.C. 2018) .............................................................................. 10, 11

*Mukkavilli v. Jaddou,*
    Case No. 22-cv-2289 (TNM), 2023 WL 4029344 n.2 (D.D.C. June 15, 2023),
    *aff'd*, 2024 WL 1231346 (D.C. Cir. Mar. 22, 2024) ........................................................... 39

*Muwekma Tribe v. Babbitt,*
    133 F. Supp. 2d 30 (D.D.C. 2000) ..................................................................................... 34

*Nat. Res. Def. Council, Inc. v. Train,*
    510 F.2d 692  (D.C. Cir. 1974) .......................................................................................... 38

*Nat'l Ass'n for Latino Cmty. Asset Builders v. CFPB,*
    581 F. Supp. 3d 101 (D.D.C. 2022) ................................................................................... 10

*Nat'l Black Police Ass'n v. District of Columbia,*
    108 F.3d 346 (D.C. Cir. 1997) ........................................................................................... 16

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................................................ 11

*Nohria v. Renaud*,
   Civ. A. No. 20-cv-2085, 2021 WL 950511 n.3 (D.D.C. Mar. 14, 2021) .................................. 39

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ........................................................................................................ 33

*Nyunt v. Chairman, Broad. Bd. of Governors*,
   589 F.3d 445 (D.C. Cir. 2009) ...................................................................................... 36

*Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11*,
   393 U.S. 233 (1968) ...................................................................................................... 30

*Patterson v. Haaland*,
   Civ. A. No. 1:21-cv-02391 (RC), 2022 WL 4534685 (D.D.C. Sept. 28, 2022),
   *dismissing*, 2023 WL 2604280 (D.C. Cir. Mar. 21, 2023) ........................................... 39

*Proctor v. District of Columbia*,
   531 F. Supp. 3d 49 (D.D.C. 2021) ............................................................................... 16

*Pub. Citizen, Inc. v. Fed. Energy Regul.Comm'n*,
   92 F.4th 1124 (D.C. Cir. 2024) .................................................................................... 17

*Puerto Rico v. United States*,
   490 F.3d 50 (1st Cir. 2007) .............................................................................. 31, 32, 33

*Quan v. BOP*,
   402 F. App'x 181 (9th Cir. 2010) ................................................................................. 19

*Reeb v. Thomas*,
   636 F.3d 1224 (9th Cir. 2011) ...................................................................................... 27

*Reno v. American-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) ...................................................................................................... 22

*Roberts v. Cox*,
   No. 4:20-CV-4187-KES, 2022 WL 742489 (D.S.D. Mar. 11, 2022),
   *appeal dismissed*, 202 WL 4239573 (8th Cir. May 9, 2022) ....................................... 18

*Sackett v. EPA*,
   598 U.S. 651 (2023) ...................................................................................................... 21

*Sichting v. Rardin*,
   No. 24-cv-3163, 2024 WL 4785007 (D. Minn. Nov. 14, 2024) .................................. 24

*Smith v. Eischen*,
   No. 22-cv-1704 (NEB/DJF), 2023 WL 3170436 (D. Minn. May 1, 2023), *report and recommendation adopted as modified*, 2023 WL 4203165 (D. Minn. June 27, 2023), *aff'd*, 2024 WL 1479767 (8th Cir. Apr. 5, 2024),
   *cert. denied*, 2024 WL 4427444 (U.S. Oct. 7, 2024) ........................................................ 13, 14

*Sprint Commc'ns Co. v. APCC Servs., Inc.*,
   554 U.S. 269 (2008) ................................................................................................................ 12

*Taylor v. FAA*,
   895 F.3d 56 (D.C. Cir. 2018) ................................................................................................. 23

*Telecommunications Research & Action Center v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984) ..................................................................................... 33, 34, 35

*Tex. Standard Oil Co. v. Forest Oil Corp.*,
   No. G-05-490, 2008 WL 11399510 (S.D. Tex. Jan. 3, 2008) ................................................ 28

*Thye v. United States*,
   109 F.3d 127 (2d Cir. 1997) ................................................................................................... 19

*Town of Castle Rock v. Gonzales*,
   545 U.S. 748 (2005) ..................................................................................................... 21, 22, 26

*Trudeau v. FTC*,
   456 F.3d 178 (D.C. Cir. 2006) .......................................................................................... 30, 36

*Ukiah Adventist Hosp. v. FTC*,
   981 F.2d 543 (D.C. Cir. 1992) ............................................................................................... 31

*United States v. Stedman*,
   No. 21-383 (BAH), 2024 WL 3967389 (D.D.C. Aug. 28, 2024) ..................................... 24, 29

*United States v. Woods*,
   571 U.S. 31 (2013) .................................................................................................................. 28

*United Transp. Union v. Interstate Com. Comm'n*,
   891 F.2d 908 (D.C. Cir. 1989) .......................................................................................... 12, 16

*Va. Uranium, Inc. v. Warren*,
   587 U.S. 761 (2019) ................................................................................................................ 29

*Varga v. Colvin*,
   794 F.3d 809 (7th Cir. 2015) .................................................................................................. 28

*W. Coal Traffic League v. Surface Transp. Bd.*,
   216 F.3d 1168 (D.C. Cir. 2000) .............................................................................................. 35

*West Virginia v. EPA*,
  597 U.S. 697 (2002) ............................................................................ 21

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ............................................................................ 12

*Williams v. Warden, Allenwood-Low*,
  No. 3:24-cv-1321, 2024 WL 4204277 (M.D. Pa. Sept. 16, 2024) ........ 24

*Wise v. Glickman*,
  257 F. Supp. 2d 123 (D.D.C. 2003) .............................................. 31, 32

*Woodley v. Warden, USP Leavenworth*,
  No. 24-3053, 2024 WL 2660904 (D. Kan. May 15, 2024) .................... 25

*Xiaoda Liu v. Mayorkas*,
  548 F. Supp. 3d 1 (D.D.C. 2021) ........................................................ 11

*Younger v. Harris*,
  401 U.S. 37 (1971) .............................................................................. 32

**Statutes**

5 U.S.C. § 554 ......................................................................................... 4

5 U.S.C. § 706(1) .............................................................................. 32, 33

5 U.S.C. § 706(2)(A) ............................................................................. 10

8 U.S.C. § 1231(a)(1)(A) ....................................................................... 22

18 U.S.C. § 3621 ..................................................................................... 5

18 U.S.C. § 3621(a) ................................................................................. 3

18 U.S.C. § 3621(b) ...................................................................... 3, 19, 25

18 U.S.C. § 3624(b) ......................................................................... 14, 19

18 U.S.C. § 3624(c) ........................................................................ 20, 26

18 U.S.C. § 3624(c)(1) ................................................................... 1, 4, 20

18 U.S.C. § 3624(c)(4) ............................................................................. 9

18 U.S.C. § 3624(g) ............................................................................... 13

18 U.S.C. § 3624(g)(1)(A) .................................................................... 6, 7

18 U.S.C. § 3624(g)(1)(D)(i) ................................................................................ 14

18 U.S.C. § 3624(g)(2) ........................................................................................ 22

18 U.S.C. § 3624(g)(3) ................................................................................... 22, 37

18 U.S.C. § 3624(g)(10) ...................................................................................... 23

18 U.S.C. § 3624(g)(11) ................................................................................ 29, 37

18 U.S.C. § 3625 ........................................................................... 4, 13, 19, 27

18 U.S.C. § 3632 .................................................................................................. 5

18 U.S.C. § 3632(a)(1) .......................................................................................... 6

18 U.S.C. § 3632(d)(4)(C) ........................................................................ 6, 21, 28, 29

18 U.S.C. § 3632(d)(4)(D) ..................................................................................... 7

18 U.S.C. § 3632(e) ...................................................................................... 6, 14

18 U.S.C. § 3635(5) .............................................................................................. 5

18 U.S.C. § 4083 (1948) .................................................................................. 3, 19

21 U.S.C. § 333 .................................................................................................. 22

42 U.S.C. § 1997e ................................................................................................ 9

Pub. L. No. 110-199, 122 Stat. 657 (2008) ........................................................ 4

Pub. L. No. 115-391, 132 Stat. 5194 (2018) ............................................. 5, 19, 23

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ......................................................... 10

Federal Rule of Civil Procedure 23(b)(2) ......................................................... 10

**Regulations**

28 C.F.R. § 523.41(a) ........................................................................................... 5

28 C.F.R. § 523.41(c)(4) ..................................................................................... 14

28 C.F.R. § 523.42(c) ........................................................................................... 6

28 C.F.R. § 523.43 ......................................................................................... 6, 14

28 C.F.R. § 523.44 ..................................................................................... *passim*

28 C.F.R. § 523.44(b)............................................................................... 29

28 C.F.R. § 541.1 ..................................................................................... 14

87 Fed. Reg. 2,705 (Jan. 19, 2022) ......................................................... 6

**Other Authorities**

1A *Sutherland Statutory Constructions* § 21:14 (7th ed.)........................... 28

Bryan A. Garner, *Dictionary of Modern Legal Usage* 624 (2d ed. 1995) ................................... 29

## <u>INTRODUCTION</u>

For nearly a century, Congress has vested the Federal Bureau of Prisons (BOP) with broad authority to manage the imprisonment of federal inmates to best serve the penological purposes of imprisonment, public safety, and the needs of prisoners. Incumbent within that authority is the discretion to designate the place in which any individual prisoner should be held in custody. The need for discretion is particularly acute when it comes to prerelease custody—transfer to custody within a Residential Reentry Center (RRC), commonly known as a "halfway house," or home confinement—which requires an individualized analysis to determine whether and to where any particular prisoner should be transferred in order to "afford that prisoner a reasonable opportunity to adjust and prepare for the reentry of that prisoner into the community." 18 U.S.C. § 3624(c)(1). In making that determination, BOP must consider a host of factors—whether the prisoner's residential circumstances could support home confinement, whether there is available monitoring capacity for home confinement, whether there is available bed space in an RRC proximate to the prisoner's community, whether there are any safety concerns in placing the prisoner at that particular RRC, and whether there are state laws that restrict the prisoner's transfer to prerelease custody—to ensure that the transfer of a particular prisoner will actually serve the intended purposes of prerelease custody. And in recognition that BOP's weighing of these considerations should not be subject to second-guessing, Congress expressly provided that "[n]otwithstanding any other provision of law, a designation of a place of imprisonment . . . is not reviewable by any court." *Id.* § 3621(b).

Plaintiffs argue, however, that Congress fundamentally upended this statutory regime in the First Step Act of 2018 (FSA). The FSA instructs BOP to establish a system through which federal prisoners may earn "time credits" for successfully participating in certain programming or activities that are intended to reduce their risk of recidivating. These time credits can then be applied by BOP to allow certain prisoners to be transferred to prerelease custody or to be given up to 12 months of early supervised release, provided that the amount of their earned time credits

equals the remainder of their terms of imprisonment and the prisoners meet other eligibility requirements. Plaintiffs acknowledge that BOP is providing prisoners with the maximum permissible amount of time in supervised release. However, they claim BOP is violating an unconditional obligation to transfer all eligible prisoners to prerelease custody immediately upon the date they have earned sufficient time credits to first become eligible for transfer—regardless of any of the individualized circumstances BOP considers when making prerelease custody designations. That claim suffers from significant flaws and does not justify extraordinary class-wide preliminary injunctive relief.

As a threshold matter, this Court lacks jurisdiction to hear Plaintiffs' claims. Plaintiffs lack standing because they concede that they brought suit when they were not eligible for transfer to prerelease custody or supervised release. Even if not, their claims are now moot, as Plaintiffs have either been moved to a prerelease custody or will be by the eligibility date. Accordingly, there is no relief the Court can grant to Plaintiffs.

In addition, this Court lacks jurisdiction to review Plaintiffs' claims because, in § 3621(b), Congress expressly precluded judicial review of BOP's designations of the place of imprisonment. Plaintiffs' claims that they should have been more promptly placed in an RRC or home confinement, which are forms of custodial confinement, fall squarely within this jurisdictional bar. Plaintiffs' argument to the contrary rests on the FSA's use of the word "shall" in conferring on BOP the authority to transfer eligible prisoners to prerelease custody or supervised release, which they argue creates a mandatory, unconditional obligation. But that reading is at odds with the broader statutory context and the Supreme Court's repeated recognition that even mandatory seeming language like "shall" does not necessarily impose unconditional obligations in areas that are traditionally committed to the Executive's discretion. It is also at odds with the purpose of prerelease custody, which requires BOP to determine, for each eligible prisoner, whether there is a prerelease custodial situation that would foster the prisoner's reintegration into his community.

These threshold flaws warrant dismissal of Plaintiffs' claims and a denial of Plaintiffs' motion for a preliminary injunction. But Plaintiffs' motion fails for additional reasons. They

cannot show a likelihood of success on the merits because they have not alleged facts sufficient to demonstrate that BOP's alleged failure to timely transfer Plaintiffs constitutes an unreasonable delay. Even if they could make this showing, an injunction requiring BOP to immediately release all eligible prisoners would be unwarranted. Because BOP's prerelease placement designations must be made on an individualized basis to ensure prisoners have a meaningful opportunity to readjust to their communities, an unconditional requirement to transfer all prisoners immediately could require the transfer of prisoners to RRCs without adequate space, to home confinement without adequate monitoring, or to far-flung locations that would not support the prisoners' reentry into their post-release communities.

BOP takes seriously its responsibilities under the FSA and Congress's purposes in enacting the FSA. But it also takes seriously its obligations to ensure that prerelease custody places prisoners in situations that will best enable them to readjust to their communities. The Court should decline Plaintiffs' invitation to superintend how BOP utilizes its resources to ensure that the public and prisoners are best served through the use of prerelease custody.

## STATUTORY AND REGULATORY BACKGROUND

### I.    BOP'S AUTHORITY TO DESIGNATE THE PLACE OF IMPRISONMENT.

BOP was established in 1930 "to provide more progressive and humane care for federal inmates, to professionalize the prison service, and to ensure consistent and centralized administration of federal prisons." About Us, Federal Bureau of Prisons, https://www.bop.gov/about/ (last visited Feb. 11, 2025). Persons who are sentenced "to a term of imprisonment" in federal court (and the District of Columbia Superior Court) are "committed to the custody" of BOP "until the expiration of the term imposed, or until earlier released for satisfactory behavior." 18 U.S.C. § 3621(a).

Congress has long conferred on the Executive Branch the discretion over where to imprison individuals convicted of crimes in federal court. See, e.g., 18 U.S.C. § 4083 (1948). That traditional deference continues to this day. Under 18 U.S.C. § 3621(b), Congress has tasked BOP with "designat[ing] the place of the prisoner's imprisonment" and authorized it to "designate any

available penal or correctional facility" meeting "minimum standards of health and habitability" that BOP "determines to be appropriate and suitable." Congress has only saw fit to cabin that broad discretion by instructing BOP, when making that discretionary designation, to consider "the resources of the facility contemplated," "the nature and circumstances of the offense," "the history of the prisoner," any statement by the sentencing court about the "purposes" of imprisonment or the "type of penal or correctional facility," and policy statements by the Sentencing Commission. *Id.* § 3621(b)(1)-(5). BOP is also instructed to place prisoners at facilities close to the prisoner's primary residence, where possible. *Id.* § 3621(b).

In recognition of the Executive's traditional discretion over placement designations, Congress has expressly shielded those decisions from judicial oversight. "Notwithstanding any other provision of law, a designation of a place of imprisonment under [§ 3621(b)] is not reviewable by any court." *Id.* Congress further stipulated that the provisions of the Administrative Procedure Act (APA), 5 U.S.C. §§ 554, 555, and 701-06, "do not apply to the making of any determination, decision, or order" under Subchapter C of Title 18, Part II, Chapter 229, which contains the provisions governing BOP's placement designations. 18 U.S.C. § 3625.

BOP's broad discretion over placement designations extends to prerelease custody.[1] Under the Second Chance Act of 2007, Pub. L. No. 110-199, 122 Stat. 657 (2008), Congress has directed that BOP "shall, to the extent practicable, ensure" that prisoners "spend[] a portion of the final months" of their term of imprisonment in prerelease custody. 18 U.S.C. § 3624(c)(1). In general, prerelease custody under the Second Chance Act is limited to a maximum of 12 months in total, with a maximum of the shorter of 10 percent of the term of imprisonment or six months in home confinement. *See id.* § 3624(c)(1)-(2).

---

[1] Relevant to this case, prerelease custody includes placement in RRCs and home confinement. Declaration of Bianca Shoulders ¶ 6 ("Shoulders Decl."). RRCs are structured residential living programs that offer job placement, counseling, mental health programming, substance abuse testing and treatment, and other reentry support to assist prisoners in finding employment, securing a residence, and reestablishing and strengthening family ties. *Id.* ¶ 7. Home confinement allows prisoners to complete their sentence from an approved residence, while still utilizing the case management and programming offerings available at RRCs. *Id.* ¶ 9.

Congress's stated goal in authorizing transfers to prerelease custody is to afford prisoners "a reasonable opportunity to adjust to and prepare for reentry . . . into the community." *Id.* § 3624(c)(1). The statutory provisions governing prerelease custody may not "be construed to limit or restrict" BOP's general discretion over placement designations under § 3621(b). *Id.* § 3624(c)(4).

## II.    THE FIRST STEP ACT

In 2018, Congress enacted the FSA, Pub. L. No. 115-391, 132 Stat. 5194 (2018) (codified at 18 U.S.C. §§ 3621, 3624, and 3631-35), which altered the framework applicable to BOP's placement decisions. Among other things, the FSA established a system for prisoners to earn "time credits" by participating in "evidence-based recidivism reduction programs" (EBRR programs) and "productive activities" (PAs), which can then be applied toward transfer to prerelease custody or toward early supervised release. *See generally* 18 U.S.C. § 3632.[2]

Congress required a phased approach to implementation. First, within 210 days after the FSA's enactment, the Attorney General was required to develop "a risk and needs assessment system" to enable BOP to evaluate an individual prisoner's unique profile, recidivism risk, and needs. *See id.* § 3632(a). On July 19, 2019, the Department of Justice established the Prisoner Assessment Tool Targeting Estimated Risk and Needs, or PATTERN. That triggered another deadline, under which, within 180 days after PATTERN's release, BOP was required to conduct an initial risk and needs assessment of every prisoner within BOP custody and begin assigning prisoners to appropriate EBRR programs. *Id.* § 3621(h)(1)(A). BOP completed that process on January 15, 2020. That date once again triggered another two-year implementation deadline to allow all prisoners to participate in EBRR programs and PAs, *id.* § 3621(h)(2), which was met by

---

[2] An EBRR program is a "group or individual activity" that has been demonstrated "by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism" and "is designed to help prisoners succeed in their communities upon release from prison." *Id.* § 3635(3)(A)-(B); *see also id.* § 3635(3)(C) (listing examples of EBRR programs); 28 C.F.R. § 523.41(a). A PA is a "group or individual activity that is designed to allow prisoners" with a "minimum or low risk of recidivating to remain productive and thereby maintain a minimum or low risk of recidivating." 18 U.S.C. § 3635(5).

BOP's announcement of a final rule codifying BOP's procedures regarding the implementation of the FSA time credit system. *See* FSA Time Credits, 87 Fed. Reg. 2,705 (Jan. 19, 2022) (codified at 28 C.F.R. parts 523 and 541).

Under the FSA's framework, as implemented by BOP, BOP periodically evaluates each prisoner's unique profile under PATTERN and classifies each prisoner as having a minimum, low, medium, or high risk of recidivism. *See* 18 U.S.C. § 3632(a)(1)-(2), (4). Based on the PATTERN assessments, BOP assigns to each prisoner appropriate EBRR programs and PAs to address the prisoner's "specific criminogenic needs" and to provide a "meaningful opportunity" to reduce his recidivism risk. *Id.* § 3632(a)(3), (5)(A); *id.* § 3632(b). Prisoners are provided "incentives and rewards" for successful participation in EBRR programs and PAs, including additional phone privileges, additional visitation time, and consideration for transfer to an institution closer to the prisoner's primary residence. *Id.* § 3632(d)(1)-(2).

Among those incentives is the ability to earn time credits. Certain prisoners can earn 10 days of time credits for every 30 days of "successful participation" in EBRR programs or PAs based on their needs assessment and can earn five additional days for every 30 days of successful participation if they have maintained a consistent minimum or low risk for recidivating over two consecutive assessments. *Id.* § 3632(d)(4)(A); 28 C.F.R. § 523.42(c). Prisoners may also lose time credits based on violations of prison rules. *See* 18 U.S.C. § 3632(e); 28 C.F.R. § 523.43.

The FSA further provides that time credits "shall be applied toward time in prerelease custody or supervised release" and that BOP "shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C); *see also* 28 C.F.R. § 523.44. A prisoner must meet the requirements of § 3624(g) to be eligible for transfer to prerelease custody or supervised release. First, he must have earned time credits "in an amount that is equal to the remainder of [his] imposed term of imprisonment." 18 U.S.C. § 3624(g)(1)(A). Second, he must have either shown a "demonstrated recidivism risk reduction" or "maintained a minimum or low recidivism risk." *Id.* § 3624(g)(1)(B). Third, he must have had the remainder of his term of imprisonment "computed under applicable law." *Id.* § 3624(g)(1)(C).

A prisoner is only eligible for early supervised release if his sentence included a term of supervised release, *id.* § 3624(g)(3), and he has been assessed as having a minimum or low recidivism risk on his last assessment, *id.* § 3624(g)(1)(D)(ii). A prisoner is only eligible for prerelease custody if he has been assessed as having a minimum or low recidivism risk on his last two assessments or has had a transfer petition approved by the warden. *See id.* § 3624(g)(1)(D)(i).

The FSA authorizes two forms of prerelease custody—transfer to an RRC or home confinement. Eligible prisoners can be placed in home confinement, provided they are subject to 24-hour monitoring, remain in the residence with limited exceptions approved by the Director of BOP, and comply with any other conditions BOP "determines appropriate." *See id.* § 3624(g)(2)(A). They can also be placed in an RRC, "subject to such conditions" as BOP "determines appropriate." *Id.* § 3624(g)(2)(B). The FSA instructs the Director of BOP to "ensure there is sufficient prerelease custody capacity to accommodate all eligible prisoners." *Id.* § 3624(g)(11). In addition, though time credits can be applied toward early supervised release (if supervised release is included in the prisoner's sentence), the FSA caps the additional time at a maximum of 12 months. *Id.* § 3624(g)(3).

Certain prisoners are excluded from the FSA time credit system. Prisoners serving a sentence for one of 68 enumerated offenses are ineligible to receive time credits. 18 U.S.C. § 3632(d)(4)(D). In addition, prisoners who are subject to a final order of removal are barred from applying time credits. *Id.* § 3632(d)(4)(E).

For a prisoner eligible to earn credits under the FSA, BOP calculates the date that, assuming he continues earning FSA time credits throughout the remainder of his sentence and does not lose any credits as a penalty, his time credits will equal the remainder of his sentence, after any good time credits are taken into account. Shoulders Decl. ¶ 15. This date is called the FSA Conditional Placement Date and reflects the maximum amount of FSA time credits the prisoner can earn towards prerelease custody or supervised release, given his current PATTERN risk level. *Id.* The FSA Conditional Placement Date is used for planning purposes and is not considered final until the time credits are applied and a prerelease custody placement is approved. *Id.* This date is

subject to change based on the prisoner's behavior, programming participation, or changes in eligibility. *Id.* For prisoners who otherwise meet the eligibility criteria for transfer, at least 60 days prior to the FSA Conditional Placement Date, BOP Unit Teams submit referrals for prerelease custody placement to a Residential Reentry Management (RRM) office. *Id.* ¶ 16.

## **FACTUAL BACKGROUND**

Plaintiff Vanessa Crowe is a federal prisoner serving a term of imprisonment for a conviction for aiding and abetting possession with intent to distribute methamphetamine. Compl. ¶ 3, ECF No. 1. In or around March 2024, Ms. Crowe was referred for a potential RRC placement designation. Declaration of Vanessa Crowe ¶ 6, ECF No. 2-1 ("Crowe Decl."). When RRM staff assessed her potential transfer placement, they did so based on the FSA time credits she had earned to date, without factoring in the time credits she was projected to earn after March 2024, and accordingly she was informed that BOP would be unable to transfer her to prerelease custody until May 7, 2025. *See* Shoulders Decl. ¶ 23; *see also* Compl. ¶ 3. On December 24, 2024—after this case was filed—Ms. Crowe earned a sufficient amount of time credits to equal the remainder of her sentence, and because Ms. Crowe satisfied the other requirements under § 3624(g), she became eligible for transfer to prerelease custody or supervised release. Compl. ¶ 3. When BOP subsequently reassessed Ms. Crowe's time credits in light of the credits she had earned after March 2024, she was provided an updated anticipated transfer date of January 15, 2025. Shoulders Decl. ¶ 29. On that date, Ms. Crowe was transferred to an RRC. *Id.* Ms. Crowe has since been granted clemency, and she will be released from BOP custody on April 17, 2025. *Id.*

Plaintiff Glen Galemmo is a federal prisoner serving a term of imprisonment for wire fraud and money laundering. Compl. ¶ 4. In or around April 2024, Mr. Galemmo was referred for a prerelease custody placement. Declaration of Glen Galemmo ¶ 4, ECF No. 2-2 ("Galemmo Decl."). When RRM staff assessed his potential transfer placement, they did so based on the FSA time credits he had earned to date, without factoring in the time credits he was projected to earn after April 2024, and accordingly he was informed that BOP would be unable to transfer him to prerelease custody until May 22, 2025. *Id.*; *see also* Shoulders Decl. ¶ 23. When BOP

subsequently reassessed his time credits in light of the time credits he has earned or is projected to earn after April 2024, it provided him with an updated transfer date of February 26, 2025, which is the date on which Mr. Galemmo would first be eligible for transfer to prerelease custody, provided he continues to participate in programming, does not lose time credits, and continues to satisfy the other requirements for eligibility. *See id.* ¶ 28; *see also* Compl ¶ 4.  In addition, BOP has indicated to Mr. Galemmo that it intends to apply the statutory maximum of 365 days of time credits toward supervised release.  ECF No. 2-11.[3]

Defendants do not contest Plaintiffs' compliance with the requirement to exhaust administrative remedies under the Prison Litigation Reform Act, 42 U.S.C. § 1997e.

## PROCEDURAL HISTORY

Plaintiffs Ms. Crowe and Mr. Galemmo filed suit individually and on behalf of a putative class.  Plaintiffs moved for a preliminary injunction on these claims.  *See* Pls.' Mot. for Prelim. Inj., ECF No. 16 ("Pls.' Mem.").

Their core contention is that the FSA imposes on BOP a mandatory, unconditional obligation to transfer all eligible prisoners to prerelease custody or supervised release "no later than the date upon which their earned time credits are equal to the remainder of their sentence." Compl. p. 17 (prayer for relief).  Plaintiffs do not dispute that BOP provides eligible prisoners with the maximum amount of early supervised release permissible under the statute, *i.e.*, 365 days. *See* Pls.' Mem. 4 n.2.  However, they argue that BOP violates the FSA each time it does not transfer an eligible prisoner with more than 365 earned time credits to prerelease custody upon the date he

---

[3] Both Ms. Crowe and Mr. Galemmo indicate that they were informed by BOP officials that they could be transferred to prerelease custody even earlier than their eligibility dates, in May and July 2024, respectively.  *See* Crowe Decl. ¶ 6; Galemmo Decl. ¶ 3.  As Ms. Crowe acknowledges, *see* Crowe Decl. ¶ 6, any transfer dates earlier than the dates Plaintiffs first became eligible based on their FSA time credits would have depended upon BOP's authority to transfer prisoners under the Second Chance Act.  Plaintiffs do not contend that BOP has anything less than unreviewable discretion to transfer or not transfer prisoners to prerelease custody under the Second Chance Act. *See* 18 U.S.C.§ 3624(c)(4).

first becomes eligible, and that BOP has no discretion not to immediately transfer such prisoners. *See id.* at 13-16.

Thus, Plaintiffs allege that BOP's failure to timely transfer them to prerelease custody violates the FSA. *See* Compl. ¶ 49. Plaintiffs bring this claim under the Court's equitable jurisdiction to enjoin violations of federal law. *Id.* ¶ 51 (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015)). Plaintiffs also argue that BOP's regulation governing application of time credits, 28 C.F.R. § 523.44, violates the FSA for the same reason, as it provides that BOP "may apply" time credits toward prerelease custody or supervised release. *See* Compl. ¶¶ 41-42. Plaintiffs bring this claim under the APA. *See id.* ¶ 46 (citing 5 U.S.C. § 706(2)(A), (2)(C)).

In addition, Plaintiffs have moved under Federal Rule of Civil Procedure 23(b)(2) to certify a class of plaintiffs consisting of all eligible prisoners who (1) have earned sufficient time credits to equal the remainder of their sentence but were not transferred to prerelease custody on or before the date they first became eligible, or (2) will earn sufficient time credits to equal the remainder of their sentence in the future and will not be transferred to prerelease custody on or before the date they first become eligible. *See* Pls.' Mot. for Class Cert. 1, ECF No. 2. Plaintiffs have also asked the Court to certify a provisional class for the purposes of their preliminary injunction motion. *See* Pls.' Mem. 30-31.

## LEGAL STANDARDS

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a court must grant a motion to dismiss if it lacks subject-matter jurisdiction to hear a claim. *See, e.g.*, *Nat'l Ass'n for Latino Cmty. Asset Builders v. CFPB*, 581 F. Supp. 3d 101, 104 (D.D.C. 2022). Courts "may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case." *Id.* (citation omitted). Under Rule 12(b)(6), a court must dismiss a complaint that "fail[s] to state a claim upon which relief can be granted." The Court must "accept a plaintiff's factual allegations as true and construe the complaint in favor of the plaintiff." *Miller v. District of Columbia*, 319 F. Supp. 3d 308, 312 (D.D.C. 2018) (cleaned up) (internal citation

omitted). "The court need not accept as true, however, a legal conclusion couched as a factual allegation . . . or inferences unsupported by the facts set out in the complaint." *Id.* (cleaned up).

A preliminary injunction is an "extraordinary remed[y] that should be granted only when the moving party, by a clear showing, carries the burden of persuasion." *Xiaoda Liu v. Mayorkas*, 548 F. Supp. 3d 1, 3 (D.D.C. 2021) (cleaned up). The party seeking the injunction must show (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent preliminary relief, (3) that the balance of equities tip in its favor, and (4) that the public interest is served by preliminary relief. *See, e.g.*, *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). The latter two factors "merge" when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

## ARGUMENT

Plaintiffs contend that the FSA imposes a mandatory obligation on BOP to transfer every eligible prisoner to prerelease custody or supervised release immediately once their earned time credits equal the remainder of their term of imprisonment. Although BOP is committed to applying time credits to the maximum extent possible, consistent with its resources and the purposes of prerelease custody, Plaintiffs' contention has numerous flaws. Their claims suffer from threshold jurisdictional defects, are barred by Congress's decision to shield BOP's designation of the place of imprisonment from judicial review, and fail to establish a likelihood of success on the merits. Moreover, Plaintiffs' requested injunction is unwarranted and would undermine the purpose of prerelease custody placements.

## I.    THE COURT SHOULD DISMISS PLAINTIFFS' COMPLAINT.

### A.    Plaintiffs Alleged Injury is Hypothetical and Speculative.

By their own admission, at the time Plaintiffs filed the complaint, they were not eligible for prerelease transfer under the FSA. *See* Compl. ¶¶ 3-4. Because their eligibility was not yet certain, a chain of possibilities stood between them and their anticipated injury.

Article III's case-or-controversy requirement mandates that the plaintiff bears the burden of establishing his or her standing to sue. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

11

The "irreducible constitutional minimum of standing contains three elements." *Id.* A plaintiff must demonstrate that he or she is suffering (1) "an injury in fact," (2) causally connected to the "alleged conduct of the defendant," and (3) "likely" to "be remedied by the relief plaintiff seeks." *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 273-74 (2008). To have standing, the plaintiff must have set out the three constitutional elements for standing at the time of the complaint. *See Davis v. FEC*, 554 U.S. 724, 732-33 (2008) ("To qualify as a case fit for federal-court adjudication an actual controversy must be extant at all stages of review. . . .") (quoting *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67 (1997)).

If the injury is not actual at the time of the complaint, it must be "imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citation omitted); *see also J. Roderick MacArthur Found. v. FBI*, 102 F.3d 600, 606 (D.C. Cir. 1996) ("It is not enough for the [plaintiff] to assert that it might suffer an injury in the future, or even that it is likely to suffer an injury at some unknown future time. Such 'someday' injuries are insufficient." (quoting *Lujan*, 504 U.S. at 564)). As the Supreme Court has repeatedly stated, a "threatened injury must be *certainly impending* to constitute injury in fact;" "]a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted); *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (holding that "an objectively reasonable likelihood" of harm "at some point in the future" is too speculative to satisfy the standing requirements of Article III).

Plaintiffs do not allege that they were eligible for transfer under the FSA at the time the Complaint was filed. Rather, the injury they identify is BOP's anticipated failure to transfer them to prerelease custody when they become eligible for such a transfer. Compl. ¶¶ 27-28. Courts, when faced with this type of anticipated injury, approach the standing analysis by identifying the specific parts in the chain of possibilities to determine whether the injury is certainly impending. *See Clapper*, 568 U.S. at 410; *United Transp. Union v. Interstate Com. Comm'n*, 891 F.2d 908, 913 (D.C. Cir. 1989); *Arpaio v. Obama*, 797 F.3d 11, 19-20 (D.C. Cir. 2015). In the present case, identifying the specific parts of the chain starts with text of the FSA.

Under the FSA, a prisoner's eligibility for transfer is a multi-factor calculation made by BOP, s*ee* 18 U.S.C. § 3624(g), and not subject to judicial review, *id.* § 3621(b); *id.* § 3625; *see also infra* Part I.C. *First*, the prisoner must show that he "has earned time credits . . . in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment." *Id.* § 3624(g)(1)(A). *Second*, he must have shown, through PATTERN, "a demonstrated recidivism risk reduction or [that he] has maintained a minimum or low recidivism risk, during the prisoner's term of imprisonment." *Id.* § 3624(g)(1)(B). *Third*, he must have "had the remainder of [his] imposed term of imprisonment computed under applicable law." *Id.* § 3624(g)(1)(C). *Fourth*, for prerelease custody, he must have "been determined under the [risk assessment system] to be a minimum or low risk to recidivate pursuant to the last 2 reassessments," or "had a petition to be transferred to prerelease custody or supervised release approved by the warden of the prison" subject to the warden's enumerated determinations; or in the case of placement in supervised release, "been determined" under PATTERN to be a minimum or low risk to recidivate pursuant to the last reassessment." *Id.* § 3624(g)(1)(D)(i). *Finally*, the prisoner must not be the subject of a final order of removal under any provision of the immigration laws. *Id.* § 3632(d)(4)(E).

For each FSA eligible prisoner, BOP generates an FSA Conditional Placement Date, which is the earliest possible date the prisoner could be eligible for transfer to prerelease custody based on FSA time credits. The FSA Conditional Placement Date is calculated assuming that (1) the prisoner will continue to earn FSA credits through the remainder of their sentence, and (2) the prisoner's release date will not change for any reason, such as a loss of good time credits. Shoulders Decl. ¶ 15. BOP makes the FSA Conditional Placement Date available to prisoners, and it is that date that plaintiffs Crowe and Galemmo cite in their Complaint as establishing their future injury. *Compare id.* ¶ 15, *with* Compl. ¶¶ 3-4.

However, at no time is the FSA Conditional Placement Date final because both of the assumptions on which it rests are subject to change at any time until the prisoner is actually eligible for transfer to prerelease custody. *See Smith v. Eischen*, No. 22-cv-1704 (NEB/DJF), 2023 WL 3170436, at *5 (D. Minn. May 1, 2023) ("The number of FSA Time Credits [Plaintiff] ultimately

will be entitled to apply towards early release is at this point entirely speculative, and will remain speculative until his earned FSA Time Credits equal the remainder of time on his sentence"), *report and recommendation adopted as modified*, 2023 WL 4203165 (D. Minn. June 27, 2023), *aff'd*, 2024 WL 1479767 (8th Cir. Apr. 5, 2024), *cert. denied*, 2024 WL 4427444 (U.S. Oct. 7, 2024). First, there are various reasons why a prisoner would not continue to earn FSA credits through the remainder of his sentence. *See* 28 C.F.R. § 523.41(c)(4) (defining various statuses that preclude an inmate from successful participation in EBRR programs and PAs and earning time credits). Some are within the prisoner's control, such as the prisoner could choose to stop participating. *Id*. Some are outside the prisoner's control, such as if the prisoner is temporarily transferred to a hospital for extended treatment of a serious medical condition. *Id*. And some are a combination of the two, such as if a prisoner is placed in a special housing unit. Second, a prisoner could lose previously earned good time credits for a violation of prison rules which would require him to need to earn more FSA time credits to equal the time remaining on his sentence than previously estimated. *Id*. § 3624(b); 28 C.F.R. §§ 541.1-541.4.[4]

Even when the prisoner's FSA time credits equal the time remaining on his sentence, the prisoner is not guaranteed to be eligible for transfer to prerelease custody unless he has a recidivism risk rating of minimum or low at the time his time credits equal the time remaining on his sentence. 18 U.S.C. § 3624(g)(1)(D)(i). Like the variables already identified, this third variable cannot be determined with finality until the inmate's FSA time credits equals the time remaining.

For example, suppose a prisoner assaults another prisoner on the date immediately prior to his FSA Conditional Placement Date. The program is designed to react so that this act can be considered with regard to the prisoner's eligibility for prerelease custody through a reduction in good time credits, *see* 18 U.S.C. § 3624(b), a reduction in FSA time credits, *see* 18 U.S.C. § 3632(e), or through an increase in the prisoner's recidivism risk rating, *see id.* § 3632(a)(4). If this hypothetical prisoner is penalized by a reduction of good time credits, the prisoner's FSA

---

[4] A prisoner could also lose previously earned FSA time credits. 18 U.S.C. § 3632(e); 28 C.F.R. § 523.43.

Conditional Placement Date will move back, and the prisoner's anticipated transfer date will be pushed back. And if the prisoner's recidivism risk rating is subsequently raised above a low or minimum, the prisoner may not be eligible for transfer to prerelease custody on their FSA Conditional Placement Date even if he does not incur any additional penalties and continues to earn FSA time credits throughout that period.

The final variable for prisoners who have not yet become eligible for transfer to prerelease custody is BOP's anticipated transfer date. As illustrated above, a prisoner's anticipated transfer date can move back in the event a prisoner's eligibility date is pushed back. But that transfer date can also move forward, as both Plaintiffs have experienced. Ms. Crowe saw her transfer date move up by 112 days, and Mr. Galemmo had his anticipated transfer date moved up to match the date of his current FSA Conditional Placement Date.[5] *Compare* Compl ¶¶ 3-4 *with* Shoulders Decl. ¶¶ 28-29. BOP's change of a prisoner's anticipated transfer date is consistent with BOP's traditional discretion regarding the placement of prisoners. *See infra* Part I.C. And moving up the anticipated transfer date is consistent with BOP's efforts to place every FSA transfer eligible inmate into home confinement or RRC. Shoulders Decl. ¶ 19.

Thus, to experience the injury described by Plaintiffs, a prisoner would need to: (1) stay in FSA time credit earning status until their eligibility date; (2) not incur any time credit reductions through penalties; (3) have a recidivism risk rating of minimum or low at the time his FSA time credits equal the time remaining on his sentence; and (4) have BOP fail to transfer him to prerelease custody on or before their eligibility date. This is exactly the type of chain of possibilities that is too speculative to establish a certainly impending injury. *See Clapper,* 568 U.S. at 410; *United*

_____

[5] Until October 2024, when RRM received a referral, its internal practice was to determine the prisoner's conditional prerelease custody placement by using the FSA time credits the prisoner had earned at the time of referral and did not account for any FSA time credits the prisoner was projected to earn after the referral. Shoulders Decl. ¶ 23. This is how Plaintiffs' anticipated transfer dates were initially calculated. Since October 2024, upon receipt of a referral, RRM designates a prisoner's conditional prerelease custody placement using both time credits earned and credits the prisoner is projected to earn during the remainder of his sentence (assuming no changes to his status or participation). *Id.* Plaintiffs' anticipated transfer dates were readjusted in line with this change.

15

*Transp. Union*, 891 F.2d at 912 ("When considering any chain of allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events."); *Proctor v. District of Columbia*, 531 F. Supp. 3d 49, 58 (D.D.C. 2021) (rejecting standing of current homeless individuals seeking to challenge D.C.'s protocol for clearing encampments as too speculative); *In re: Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 25 (D.D.C. 2014) (concluding that the chain of possibilities was too attenuated for standing where plaintiffs' data had been stolen and plaintiffs alleged an increased likelihood of identity theft); *Gant v. King*, No. 23-CV-1766 (NEB/ECW), 2023 WL 6910771, at *3 (D. Minn. Oct. 19, 2023) ("Given the contingent nature of the application of FSA time credits to prerelease custody, they cannot reasonably be regarded as an entitlement."), *report and recommendation adopted*, 2023 WL 6910771 (D. Minn. Oct. 19, 2023).  Some of the necessary events are within the control of Plaintiffs and some are outside their control.  And for the events in their control, such as continued participation in EBRR Programs and PAs, Plaintiffs did not allege their intent to effectuate them.  *See generally* Compl.  Thus, for any prisoner bringing suit before his FSA Conditional Placement Date, the Court must make a series of predictions about a possible future harm at some unknown date based on a speculative chain of possibilities.[6]  That is not sufficient for standing, and Plaintiffs' claims must be dismissed.

### B.    Plaintiffs' Claims are Moot.

Even if Plaintiffs had standing to bring their claims, they are now moot.  Article III "restricts the federal courts to deciding only actual, ongoing controversies," and "a federal court has no power to render advisory opinions [or] . . . decide questions that cannot affect the rights of litigants in the cases before them."  *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997) (citation omitted).  "A case is moot if a decision will neither presently affect the parties' rights nor have a more-than speculative chance of affecting them in the future."  *Pub.*

---

[6] The fact that Crowe was not transferred to prerelease custody on the date of her eligibility does not cure her lack of standing because standing is assessed at the time of the filing of the complaint and, at the time of the Complaint, Ms. Crowe was not yet eligible for transfer to prerelease custody.

*Citizen, Inc. v. Fed. Energy Regul. Comm'n*, 92 F.4th 1124, 1128 (D.C. Cir. 2024) (citation omitted).  The Supreme Court has "repeatedly held that an 'actual controversy' must exist not only 'at the time the complaint is filed,' but through 'all stages' of the litigation."  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90-91 (2013) (quoting *Alvarez v. Smith*, 558 U.S. 87, 92 (2009)).  Accordingly, when events outside the litigation provide a plaintiff with "all the relief he might have won in it . . . a federal court must dismiss the case as moot."  *FBI v. Fikre*, 601 U.S. 234, 240 (2024); *accord Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (case is moot where "the court can provide no effective remedy" to plaintiff).

Here, Ms. Crowe and Mr. Galemmo's claims are grounded entirely on their contention that BOP has failed or will fail to transfer them to prerelease custody on the date that they have earned time credits in an amount equal to the remainder of their terms of imprisonment.  *See* Pls.' Mem. 5-6.  However, Ms. Crowe has already been transferred to an RRC, and Mr. Galemmo will be transferred to home confinement no later than the first date that he is eligible for transfer (provided he remains eligible).  Shoulders Decl. ¶¶ 28-29.  Moreover, Ms. Crowe's sentence will be commuted as of April 17, 2025, and Mr. Galemmo will receive the maximum available amount of early supervised release.  *Id.*

In other words, the stated injuries undergirding Plaintiffs' claims no longer exist, and Plaintiffs have received all the relief they could have won in this suit.  Any additional forms of relief Plaintiffs have requested—namely a declaration that BOP's "administration of the earned time credit program violates the First Step Act" and vacatur of 28 C.F.R. § 523.44—would have no practical effect on Plaintiffs' injuries.  *See, e.g.*, *Medelius Rodriguez v. U.S. Citizenship & Immigr. Servs.*, 605 F. Supp. 2d 142, 146 (D.D.C. 2009) ("A declaratory judgment that the defendant violated plaintiff's rights . . . coupled with no other remedy . . . provides no relief for this plaintiff.").  Accordingly, Plaintiffs' claims are moot.  *See, e.g.*, *Ector v. Engleman*, No. CV 22-6044-FLA (JPR), 2023 WL 6969784, at *4, *6 (C.D. Cal. July 28, 2023) (habeas petition to calculation of prisoner's FSA time credits was moot where BOP "applied the maximum of 12 months of FSA time credits toward Petitioner's early placement on supervised release" and

17

Petitioner was "already in prerelease custody"), *report and recommendation adopted*, 2023 WL 6130511 (C.D. Cal. Sept. 18, 2023); *see also Gutierrez v. Warden, FCI Mendoza*, No. 1:23-cv-00359-HBK (HC), 2023 WL 6930926, at *3 (E.D. Cal. Oct. 18, 2023) (habeas petition challenging application of FSA time credits was mooted when prisoner was transferred to supervised release after filing of petition); *Roberts v. Cox*, No. 4:20-CV-4187-KES, 2022 WL 742489, at *3 (D.S.D. Mar. 11, 2022) (similar), *appeal dismissed*, 202 WL 4239573 (8th Cir. May 9, 2022).

That is particularly the case because any delay or potential delay in Plaintiffs' transfer dates appears to have been due to the fact that BOP initially determined their anticipated transfer dates based on the time credits that Plaintiffs had earned at the time of their referral, without factoring in time credits that Plaintiffs were projected to earn in the future. *See* Shoulders Decl. ¶ 23. Once those dates were recalculated based on the credits Plaintiffs earned since the referral date or would earn on an ongoing basis, they received updated transfer dates. *See id.* ¶¶ 28-29. Notably, since October 2024, BOP has been determining anticipated transfer dates based on the projected amount of time credits prisoners are expected to earn. *See id.* ¶ 23.

### C.    Congress has Precluded Judicial Review over Plaintiffs' Challenge to BOP's Alleged Failure to Timely Transfer them to Prerelease Custody.

Plaintiffs' claims also should be dismissed because Congress has precluded judicial review over challenges to BOP's prerelease custody placements. Plaintiffs' theory is that the FSA does away with BOP's longstanding discretion to determine a prisoner's place of imprisonment and mandates that BOP immediately transfer a prisoner to prerelease custody on the date he first becomes eligible because § 3632(d)(4)(C) says that BOP "shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release." However, Plaintiffs' heavy reliance on the use of the word "shall" places more weight on that word than it can bear and ignores the broader statutory context, which confirms that the FSA was not intended to displace BOP's discretion over placement designations. And because Congress has expressly shielded such decisions from judicial review, the Court should dismiss Plaintiffs' claims.

       1.     *Congress has afforded BOP substantial discretion to designate the place of imprisonment.*

The starting point for the analysis is BOP's well-established discretion to designate a prisoner's place of imprisonment.   Section 3621(b) provides that BOP "may designate any available penal or correctional facility" satisfying minimum standards of health and habitability that BOP "determines to be appropriate and suitable" based on its consideration of several discretionary factors, including resources, the nature and circumstances of the offense, and the characteristics of the prisoner.   Under this provision, BOP has "extensive latitude in assigning prisoners to correctional facilities."  *Thye v. United States*, 109 F.3d 127, 129-30 (2d Cir. 1997). Notably, that broad discretion is firmly established, and Congress has long entrusted the Executive Branch to make placement decisions as it sees fit.  *See* 18 U.S.C. § 4083 (1948); *cf. Meachum v. Fano*, 427 U.S. 215, 224 (1976) (holding that the "decision to assign the convict to a particular institution is not subject to audit under the Due Process Clause, although the degree of confinement in one prison may be quite different from that in another").   Indeed, in the FSA, Congress cemented that discretion by making placement designations "not reviewable by any court," "[n]otwithstanding any other provision of law."  Pub. L. No. 115-391 § 601, 132 Stat. at 5237 (codified at 18 U.S.C. § 3621(b)); *cf.* 18 U.S.C. § 3625 (providing that APA "do[es] not apply to the making of any determination, decision, or order under" §§ 3621-3624).

That traditional discretion applies to transfers to prerelease custody, as the placement of a prisoner in an RRC or home confinement is a custodial confinement.  *See, e.g.*, *id.* § 3624(c)(4) (providing that prerelease custody designations are committed to BOP's discretion under § 3621(b)); *Quan v. BOP*, 402 F. App'x 181, 183 (9th Cir. 2010) (rejecting claim that RRC placement was required "because § 3621(b) provides the BOP with *discretionary* authority" over RRC placements); *Griffis v. Segal*, No. 23-cv-01525 (JRT/DLM), 2023 WL 5755779, at *2 (D. Minn. June 6, 2023) ("Federal courts consider claims related to a prisoner's placement in home confinement or at an RRC as claims concerning the *place* of the prisoner's confinement."), *report and recommendation adopted*, 2023 WL 5447282 (D. Minn. Aug. 24, 2023).

Congress had ample reason to leave prerelease custody decisions up to BOP. Because the goal of prerelease custody is to "afford [a] prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community," 18 U.S.C. § 3624(c)(1), BOP must make placement designations with an eye toward identifying the environment that will best support a particular prisoner's reentry. That requires consideration of several individualized factors. BOP must consider whether home confinement is a suitable option for the prisoner, including whether the prisoner's home is proximate to an RRC with the capacity to monitor the prisoner and provide services, whether the prisoner has a residence that can support him throughout the rest of his term, and whether the prisoner has transportation resources to connect him with the services and programming at the RRC. Shoulders Decl. ¶ 20; *see also id.* ¶¶ 9-11.[7] With respect to RRC placements, BOP must consider if there is an RRC proximate to the prisoner's post-release residence that has availability, whether there are any security or safety concerns with placement in that RRC (such as the presence of another prisoner from whom the FSA-eligible prisoner needs to be separated), and whether there are any state or local laws that might restrict the RRC from housing the prisoner. *Id.* ¶¶ 19, 22. Even when it has concluded that prerelease custody is appropriate, BOP has the discretion to decide which of home confinement or RRC placement would better assist the prisoner. 18 U.S.C. § 3624(c); Shoulders Decl. ¶ 21.

### 2.    *Section 3632(d)(4)(C) does not eliminate BOP's discretion.*

Plaintiffs argue that the FSA displaces BOP's discretion to designate a place of imprisonment whenever a prisoner is eligible for prerelease custody due to his earned time credits. Their statutory hook for that argument is § 3632(d)(4)(C), which says that time credits "shall be applied toward time in prerelease custody or supervised release" and that BOP "shall transfer

---

[7] Prisoners on home confinement are typically monitored by RRC staff members, who operate RRCs pursuant to a contract with BOP. *Id.* ¶ 10. Other than food and housing, RRC staff members provide the same monitoring, programming, testing, and counseling services as they do for prisoners housed at the RRC. *Id.* ¶ 11. RRC contracts contain maximum numbers of prisoners that can be housed in the facility and can be supported in home confinement. *Id.* ¶ 12. In addition, a small number of prisoners are monitored by U.S. Probation and Pretrial Services (USPPS) pursuant to an arrangement between USPPS and BOP. *Id.* ¶ 13.

eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C); *see also* Pls.' Mem. 13. Plaintiffs contend that the use of the word "shall" imposes an unconditional, judicially-enforceable mandate on BOP to transfer eligible prisoners immediately when they become eligible. *See id.* However, Plaintiffs ignore the broader context of the statute, which belies Plaintiffs' suggestion that the use of "shall" eliminates BOP's discretion over placement. *See, e.g.*, *Sackett v. EPA*, 598 U.S. 651, 674-75 (2023) ("[W]e do not view [a statutory] provision in isolation. The meaning of a word 'may only become evident when placed in context . . . .'" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000)); *West Virginia v. EPA*, 597 U.S. 697, 721 (2002) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (citation omitted)).

**i.** The Supreme Court has long recognized that the use of the word "shall" does not impose mandatory obligations in contexts traditionally committed to the Executive's discretion. In the analogous context of law enforcement, the Court has held on several occasions that the "deep-rooted nature of law-enforcement discretion" persists "even in the presence of seemingly mandatory legislative commands." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005). Thus, in *Castle Rock*, the Supreme Court held that a statute's command that law enforcement "shall arrest . . . or . . . seek a warrant" for the arrest of any individual violating a restraining order did not impose "a true mandate of police action." *Id.* (citation omitted). Similarly, in *City of Chicago v. Morales*, the Court rejected an argument that an ordinance's use of the word "shall" left police officers with "no discretion," concluding that, as a matter of "common sense," police officers "must use some discretion in deciding when and where to enforce city ordinances." 527 U.S. 41, 62 n.32 (1999); *Heckler v. Chaney*, 470 U.S. 821, 835 (1985) (agency had "complete discretion . . . to decide how and when [enforcement authority] should be exercised," even though the statute stated that any person who violated the law "shall be imprisoned . . . or fined" (quoting 21 U.S.C. § 333)). And in the immigration enforcement context, the Supreme Court concluded that "the Executive has discretion to abandon" removal of a deportable alien at any stage, *Reno v. American-*

21

*Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999), even though the Immigration and Naturalization Act directed that the government "shall remove the alien."    8 U.S.C. § 1231(a)(1)(A).

These cases stand for the principle that when a statute uses the word "shall" in governing the conduct of the Executive in a context that has a deep-rooted tradition of deference to the Executive, that does not necessarily mean the Legislature intended to impose a mandatory obligation that eliminates the Executive's discretion. *Cf. McCord v. Maggio*, 910 F.2d 1248, 1250 (5th Cir. 1990) ("[I]t is well settled that prison official must have broad discretion, free from judicial intervention, in classifying prisoners in terms of their custodial status." (cleaned up)). Indeed, the Supreme Court has interpreted "shall" to preserve background principles of discretion even when the Legislature has used discretionary language like "may" in a related statute. *See Castle Rock*, 545 U.S. at 752; *contra* Pls.' Mem. 14 (citing 18 U.S.C. § 3624(g)(3), (c)).[8]

**ii.**  The broader statutory context indicates that § 3632(d)(4)(C) does not displace BOP's discretion over transfers to prerelease custody under § 3621(b).  Nothing in the FSA expressly carves out § 3621(b)'s application to transfers to prerelease custody under the FSA.  Indeed, Plaintiffs concede that § 3621(b) has at least *some* application to FSA transfers.  *See* Pls.' Mem. 18 (acknowledging that in making transfer determinations under § 3632(d)(4)(A), BOP "retains its usual discretion to designate the *place* to which a person is transferred").  But if Congress intended to apply some parts of § 3621(b) to FSA transfers, while simultaneously excluding others, one would have expected it to say so—yet there is no statutory language referencing when, how, or which parts of § 3621(b) apply.  Congress's silence on that score suggests that it did not intend

---

[8] Plaintiffs' reliance on § 3624(g)(3) is particularly misplaced.  Plaintiffs point to the fact that § 3624(g)(3) provides that BOP "*may* transfer" a prisoner to supervised release based on time credits, while § 3624(g)(2) provides that "[a] prisoner *shall* be placed in prerelease custody."  Pls.' Mem. 14.  But they ignore the full text of § 3624(g)(2), which provides that "[a] prisoner shall be placed in prerelease custody *as follows*," and then sets out a list of statutory conditions that must be satisfied for placement in home confinement or an RRC.  18 U.S.C. § 3624(g)(2) (emphasis added).  Far from being a command to mandatorily transfer eligible prisoners to prerelease custody, § 3624(g)(2) in fact *limits* when and how BOP can transfer such prisoners.

to eliminate BOP's discretion over the place of imprisonment for any prisoner. *See Dean v. United States*, 556 U.S. 568, 572 (2009) ("[W]e ordinarily resist reading words . . . into a statute that do not appear on its face." (citation omitted)). And, in fact, the FSA itself added the language in § 3621(b), reaffirming BOP's unreviewable discretion to designate the place of imprisonment, "[n]otwithstanding any other provision of law." *See* Pub. L. No. 115-391 § 601, 132 Stat. at 5237.

Moreover, the FSA contains an additional textual cue indicating that Congress intended for BOP to retain its discretion over placement designations. As Plaintiffs concede, § 3632(d)(4)(C) incorporates by reference § 3624(g). Pls.' Mem. 14. Section 3624(g) expressly carves out one portion of § 3624(c)—which generally governs transfers to prerelease custody—stating that "[t]he time limits" under § 3624(c) "shall not apply to prerelease custody under this subsection." 18 U.S.C. § 3624(g)(10); *see also id.* § 3624(c) (providing for a maximum of 12 months of prerelease custody, with a maximum time in home confinement of the shorter of 10 percent of the term of imprisonment or six months). Section § 3624(c), however, contains more than just those time limits; it also contains a provision *expressly incorporating* BOP's discretion under § 3621. *See id.* § 3624(c)(4) ("Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621."). Tellingly, however, Congress did *not* expressly carve out § 3624(c)(4) from transfers under § 3624(g). Accordingly, Congress's specific instruction that one provision of § 3624(c), *i.e.*, the time limits, does not apply to transfer to prerelease custody under § 3624(g) indicates that the other provisions of § 3624(c), *e.g.*, the express incorporation of BOP's discretion under § 3621(b), do. *See, e.g., Taylor v. FAA*, 895 F.3d 56, 65 (D.C. Cir. 2018) ("[T]he expression of one thing implies the exclusion of others." (citation omitted)). The natural conclusion is that transfers to prerelease custody under § 3624(g) and § 3632(d)(4)(C) are still subject to BOP's discretion under § 3621(b).

Consistent with this understanding of the FSA, numerous courts have recognized that the transfer of eligible prisoners to prerelease custody based on their earned time credits, "as with all [placement] designations . . . necessarily implicates section 3621(b)." *Frey v. Martinez*, No. 2:23-cv-0822, 2024 WL 3264823, at *5 (W.D. La. June 3, 2024), *report and recommendation adopted*,

2024 WL 3257126 (W.D. La. July 1, 2024); *see also, e.g.*, *Williams v. Warden, Allenwood-Low*, No. 3:24-cv-1321, 2024 WL 4204277, at *5 (M.D. Pa. Sept. 16, 2024) (finding that "[t]he First Step Act did not alter" the standard rule that the decision to place an eligible prisoner in prerelease custody is "solely within the discretion of the BOP"); *Hassan v. Hijar*, No. 23-CV-41-KC, 2023 WL 1769207, at *3 (W.D. Tex. Feb. 3, 2023) ("[U]nder the applicable statutory scheme, the Director retains the discretion to determine whether a prisoner will (1) receive time credits toward the completion of his sentence, and (2) be placed in prerelease custody or supervised release."), *appeal dismissed*, 2023 WL 5125065 (5th Cir. Mar. 28, 2023); *accord Frierson v. Rardin*, No. 2:24-CV-12456, 2025 WL 410072, at *5 (E.D. Mich. Feb. 5, 2025); *Booker v. Bayless*, No. 5:24-CV-43, 2024 WL 3875031, at *4 (N.D. W. Va. Aug. 20, 2024). As a result, the FSA should not be read to impose a mandatory, unconditional obligation to transfer eligible prisoners to an RRC or home confinement immediately once their earned time credits equal the remainder of their term of imprisonment. *See, e.g.*, *United States v. Stedman*, No. 21-383 (BAH), 2024 WL 3967389, at *12 (D.D.C. Aug. 28, 2024) ("[J]udicial supplanting of BOP's statutorily delegated command does not appear to have been Congress's intention regarding application of FSA earned time credits."); *Kornegay v. Brown*, No. 5:24-CV-199, 2025 WL 415735, at *3 (N.D. W. Va. Feb. 6, 2025) ("Section 3632 does not impose on the BOP a specific and discrete duty amenable to review by this Court."); *Fox v. BOP*, No. 2:22-cv-5199, 2023 WL 9103080, at *8 (W.D. La. Nov. 7, 2023) (rejecting claim that BOP violated the FSA by failing to release prisoner to an RRC where delay was due to unavailable bed space, which was "within BOP's discretion, and beyond judicial review"), *report and recommendation adopted*, 2024 WL 58172 (W.D. La. Jan. 4, 2024).[9]

---

[9] Plaintiffs cite a handful of cases reaching the opposite conclusion. *See* Pls.' Mem. 15. The Court should decline to adopt the reasoning of these cases as unpersuasive. *See [Redacted] v. BOP*, No. 23-CV-5956, 2023 WL 9530181, at *5 (S.D.N.Y. Dec. 28, 2023) (concluding that status of habeas petitioner in witness protection program did not mean BOP could refuse to apply time credits to prerelease custody), *report and recommendation adopted sub nom.*, *Doe v. BOP*, 2024 WL 455309 (S.D.N.Y. Feb. 5, 2024); *Sichting v. Rardin*, No. 24-cv-3163, 2024 WL 4785007, at *3 (D. Minn. Nov. 14, 2024) (noting in dicta, but not deciding, that habeas petitioner "may have a valid argument that 18 U.S.C. § 3632(d) requires the BOP to transfer him into prerelease custody"); *Woodley v. Warden, USP Leavenworth*, No. 24-3053, 2024 WL 2660904, at *4 (D. Kan. May 15, 2024)

**iii.**  Ensuring that BOP retains some discretion to transfer eligible prisoners to prerelease custody aligns with Congress's broader mandate to BOP to use prerelease custody to afford prisoners "a reasonable opportunity to adjust to and prepare for . . . reentry . . . into the community." 18 U.S.C. § 3624(c)(1).  In order to advance that goal, BOP cannot mechanically match a prisoner with any available spot in an RRC nationwide or blindly transfer the prisoner to home confinement. Rather, it must consider whether the prisoner has a residence that can support home confinement, if there is an available RRC bed or home confinement monitoring capacity in the geographic region appropriate for that prisoner, if there are any safety concerns present, and if any applicable state or local laws limit the ability of an RRC to house the prisoner.  Shoulders Decl. ¶¶ 18-22; *see also* 18 U.S.C. § 3621(b) (BOP must consider a range of factors in making placement decisions, including "the resources of the facility contemplated" and "the history and characteristics of the prisoner"); *id.* § 3624(g)(2)(A)(i) (imposing conditions on home confinement, including "24-hour electronic monitoring" and a requirement that the prisoner "remain in [his] residence" except for limited purposes and subject to BOP approval); *Fox*, 2023 WL 9103080, at *5, 8 (BOP had discretion to transfer prisoner to RRC several months after date he first became eligible where "Tennessee state law precludes the RRC from accepting more than two sex offenders at any given time").

Contrary to Plaintiffs' suggestion, considering whether placement in prerelease custody would in fact assist the prisoner in question is not "far afield" from the considerations underlying the FSA, Pls.' Mem. 18, but instead goes to why the FSA expands prerelease custody in the first place.  If Plaintiffs were correct that the FSA affords BOP no discretion in making transfer determinations, BOP would need to place prisoners in situations without regard to the ultimate goal of fostering their reintegration into society.  For example, if an eligible prisoner from Baltimore has residential circumstances that allow for home confinement and BOP has sufficient monitoring capacity or if there is an available bed in an RRC relatively close to Baltimore, BOP

---

(concluding that § 3632 required transfer of habeas petitioner, based in part on respondent's "failure to address" authority and court's understanding that no "court . . . has interpreted" § 3632(d)(4)(C) "in any other way").

will place that prisoner in one of those situations.  However, if neither option is available, under Plaintiffs' reading of the FSA, rather than waiting for a spot to open up near Baltimore, the FSA would require BOP to transfer that prisoner to, for instance, an RRC in Montana or Arizona simply because bed space may be available there—regardless of whether the prisoner has any support system there or whether placement in that location would help the prisoner readjust to his community in Baltimore.  It is "hard to imagine" that Congress intended BOP to ignore its "competing duties" to use prerelease custody to enable prisoners to better reintegrate into their communities.  *Castle Rock*, 545 U.S. at 761.

Moreover, Plaintiffs overstate any conflict between preserving BOP's traditional discretion and the FSA's purpose of incentivizing participation in EBRR programs and PAs.  *See* Pls.' Mem. 16.  BOP makes every effort to ensure that eligible prisoners obtain the benefits of participation in EBRR programs and PAs, consistent with its resources and the purposes of prerelease confinement. BOP is providing eligible prisoners with the maximum permissible amount of early supervised relief based on their time credits.  *See id.* at 4 n.2.  In addition, BOP is transferring all eligible prisoners to prerelease custody when a placement is available.  Shoulders Decl. ¶ 19.

In sum, reading the FSA to mandate an immediate and unconditional transfer of all eligible prisoners as soon as they first become eligible would undermine the purposes of prerelease custody.  It could harm prisoners' efforts to reintegrate into their community, by resulting in their transfer to far-flung RRCs or to home confinement without the necessary monitoring or support capacity by RRC staff.  It could compromise the safety of prisoners and the public, as BOP would need to transfer prisoners whether or not it had the ability to properly monitor them.  And it also could harm other prisoners, whose time-limited opportunity for prerelease custody under the Second Chance Act, 18 U.S.C. § 3624(c), could be superseded by the need to immediately transfer FSA-eligible prisoners, who may spend many months and even years in prerelease custody.

There is no reason to believe Congress intended to undermine the purposes of prerelease custody in such a fashion.  Congress vested in BOP the responsibility to manage prerelease custody and ensure the successful reintegration of prisoners.  Plaintiffs' contrary interpretation of the FSA

would upend that decision, putting Plaintiffs and federal courts in the position of second-guessing how BOP should best fulfill its mission in light of its limited resources.

>        3.        *Sections 3621(b) and 3625 expressly preclude judicial review.*

Because the FSA does not eliminate BOP's discretion under § 3621(b), judicial review of Plaintiffs' challenge to the timeliness of their transfers to prerelease custody is precluded.  Section 3621(b) expressly provides that "[n]otwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."  That language bars Plaintiffs from invoking the Court's "inherent equitable power" to enjoin an *ultra vires* action.  *See* Pls.' Mem. 17 (citing *Armstrong*, 575 U.S. at 327); *see also Armstrong*, 575 U.S. at 327-28 (holding that "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations," and "[c]ourts of equity can no more disregard statutory and constitutional requirements and provisions that can courts of law" (citation omitted)).

That language also precludes Plaintiffs' claim under § 706(1) of the APA.  For starters, Plaintiffs have failed to adequately plead any § 706(1) claim, as they only invoke the APA to challenge BOP's regulation regarding application of time credits.  *Compare* Compl. ¶¶ 41-46, *with id.* ¶¶ 47-51.  Even if Plaintiffs had invoked § 706(1), judicial review would be precluded not only by the unambiguous language of § 3621(b), but also by that of § 3625.  The latter states that "[t]he provisions of sections 554 and 555 and 701 through 706 of title 5, United States Code, do not apply to the making of any determination, decision, or order under this subchapter."  18 U.S.C. § 3625.  Plaintiffs argue that § 3625 does not come into play because it is limited to determinations, decisions, and orders "*under this subchapter*"—that is Subchapter C of Chapter 229 of Title 18— whereas transfer designations based on time credits arise under § 3632(d)(4)(C)—which is found in in Subchapter D.  *See* Pls.' Mem. 22.  But, as Plaintiffs rightly concede, *see id.* at 14, § 3632(d)(4)(C) expressly incorporates § 3624(g), which *is* found in Subchapter C.  Thus, decisions to transfer eligible prisoners based on their time credits fall under the ambit of § 3625. *See, e.g.*, *Reeb v. Thomas*, 636 F.3d 1224, 1227 (9th Cir. 2011) ("plain language" of § 3625

"specifies that the judicial review provisions of the APA . . . do not apply to any determination, decision, or order made pursuant to 18 U.S.C. §§ 3621-3624") (citation omitted).

*       *       *

Although BOP retains discretion to transfer prisoners to prerelease custody even when they are eligible based on earned time credits, that does not mean that BOP is disregarding the FSA. BOP makes every effort to apply time credits to the greatest permissible extent, in light of BOP resources, an individualized assessment of each prisoner, and the purposes of prerelease custody. BOP maximizes the application of time credits toward early supervised release and is committed to transferring all eligible prisoners referred for a prerelease custody transfer to an RRC or home confinement upon their eligibility date, provided there is an appropriate placement available. Shoulders Decl. ¶¶ 14, 19. That BOP retains some modicum of discretion—to ensure that the placement of a prisoner in prerelease custody is statutorily permissible, logistically possible, and consistent with the purposes of prerelease custody—violates neither the letter nor the spirit of the FSA.

### D.       BOP Is Not Violating Any Statutory Mandate in the FSA.

Even if Plaintiffs are correct that § 3632(d)(4)(C) displaces BOP's discretion over the placement of prisoners in prerelease custody whenever time credits are involved, the plain text of the FSA should not be read to impose a mandate on BOP to transfer prisoners to *prerelease custody*. The FSA directs that time credits "shall be applied toward time in prerelease custody *or* supervised release" and that BOP "shall transfer eligible prisoners . . . into prerelease custody *or* supervised release." 18 U.S.C. § 3632(d)(4)(C) (emphases added). The word "or" is generally "disjunctive" in nature, used to "indicat[e] that either of the separated words or phrases may be employed without the other." 1A *Sutherland Statutory Constructions* § 21:14 (7th ed.); *see also United States v. Woods*, 571 U.S. 31, 45 (2013) ("ordinary use" of or "is almost always disjunctive"). The disjunctive "'or' has an inclusive sense (A or B, or both) as well as an exclusive one (A or B, not both)." *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015). "'The meaning of *or* is usually inclusive.'" *Tex. Standard Oil Co. v. Forest Oil Corp.*, No. G-05-490, 2008 WL 11399510, at *4

28

(S.D. Tex. Jan. 3, 2008) (quoting Bryan A. Garner, *Dictionary of Modern Legal Usage* 624 (2d ed. 1995)).

Thus, BOP can satisfy § 3632(d)(4)(C) in one of three ways:  applying time credits to supervised release, applying time credits to prerelease custody, or applying time credits to supervised release and prerelease custody.  Which one to pick is within BOP's discretion.  *See Stedman*, 2024 WL 3967389, at *12 ("Under the [FSA's] plain terms, the authority to determine a prisoner's eligibility for and *application of* FSA earned time credits is left to BOP."  (emphasis added)); *cf.* Compl. ¶ 16 (alleging that BOP has "discretion in deciding among the release options").  And here, as Plaintiffs recognize, BOP is applying the maximum permissible amount of time credits toward supervised release for eligible prisoners.  *See* Pls.' Mem. 4 n.2.  That complies with the plain text of § 3632(d)(4)(C).

To be sure, whenever possible, BOP applies time credits toward *both* supervised release and prerelease custody.  But the statute does not *require* BOP to do so.  Though Plaintiffs read § 3632(d)(4)(C) as requiring BOP to apply 365 earned time credits toward supervised release and then any additional time credits toward prerelease custody, *see id.* at 14-15, that reading effectively rewrites § 3632(d)(4)(C) as providing that BOP must apply time credits toward prerelease custody *and* supervised release.  *See, e.g.*, *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 765 (2019) (court has "duty to respect not only what Congress wrote but, as importantly, what it didn't write").  Plaintiffs also try to ground their reading of § 3632(d)(4)(C) in a separate statutory provision commanding BOP to "ensure there is sufficient prerelease custody capacity to accommodate all eligible prisoners," Pls.' Mem. 14 (quoting 18 U.S.C. § 3624(g)(11)), but nothing in that language purports to require BOP to utilize prerelease custody in addition to supervised release.

The same goes for Plaintiffs' challenge to 28 C.F.R. § 523.44.  *See id.* at 23-25.  That regulation provides that BOP "may apply FSA Time Credits toward prerelease custody or early transfer to supervised release . . . only if an eligible inmate" satisfies the eligibility criteria under § 3624(g)(1) and (3), as applicable.  *See* 28 C.F.R. § 523.44(b)-(d).  It is consistent with the proper

reading of the statute, affording BOP discretion to choose to apply time credits toward prerelease custody, supervised release, or both.[10]

### E.    Plaintiffs Cannot Bring Their Challenge to Their Delayed Transfer Under *Ultra Vires* Review.

If Plaintiffs are correct that the FSA creates a legal entitlement to placement in prerelease custody upon eligibility that can be reviewed notwithstanding § 3621(b), Plaintiffs' challenge to their alleged untimely transfers still cannot proceed.  Plaintiffs cannot invoke the Court's inherent equitable power to enjoin a federal officer from an *ultra vires* action because Plaintiffs could proceed under a habeas petition, and they have not pleaded an APA claim challenging BOP's alleged failure to timely transfer them.  Thus, their claim fails on the merits.

Courts have recognized an implied equitable authority to enjoin the actions of federal officials that exceed their statutory authority.  *See Armstrong*, 575 U.S. at 327 (citing *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902)).  This implied authority—commonly referred to as *ultra vires* or nonstatutory review, *see, e.g.*, *Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006)—is an "exacting standard of review" that is "confined to extreme agency error where the agency has stepped so plainly beyond the bounds of its statutory authority, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court," *Fed. Exp. Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (cleaned up).  The challenged action must "go beyond mere legal or factual error and amount to a 'clear departure by the [agency] from its statutory mandate' or be 'blatantly lawless' agency action."  *Id.* (quoting *Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11*, 393 U.S. 233, 238 (1968)).  "Only error that is 'patently a misconstruction of the Act,' that 'disregard[s] a specific and unambiguous statutory directive,' or

---

[10] In fact, Plaintiffs' identification of a conflict between the use of "may" in 28 C.F.R. § 523.44 and the use of "shall" in § 3624(g) is mistaken.  Section 523.44 provides that BOP "may" transfer eligible prisoners "only if" the eligibility criteria are met.  28 C.F.R. § 523.44(b).  Given that "may . . . only if" construction, *id.*, the "natural meaning" of the use of the word "may" is to make BOP's transfer authority "subject to the specified conditions," *i.e.*, the statutory eligibility criteria.  *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 166 (2004).  Thus, the regulation is best read as simply stating that BOP has the authority to transfer eligible prisoners to prerelease custody or supervised release only if they satisfy the eligibility criteria.

that 'violate[s] some specific command of a statute' will support relief." *Id.* (quoting *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)).

*Ultra vires* review is grounded in the principle that where Congress has given a right, it follows that plaintiffs should be able to access the Courts if failing to do so would mean the sacrifice or obliteration of that right. *See Leedom v. Kyne*, 358 U.S. 184, 190 (1958). The Supreme Court has clarified that the principles articulated in *Kyne* do not "authoriz[e] judicial review of any agency action that is alleged to have exceeded the agency's statutory authority." *Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991). Rather, it was "central" to *Kyne* that interpreting the relevant act to preclude judicial review "would wholly deprive [plaintiff] of a meaningful and adequate means of vindicating its statutory rights." *Id.* Thus, nonstatutory review is a cause of action of last resort that is unavailable where review of the action is available through alternative means. *See id.* at 43-44; *see also Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 311 (D.D.C. 2017) (recognizing that *ultra vires* review "is only available when 'the plaintiff ha[s] *no* other means of obtaining review of the agency action" (quoting *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 550 (D.C. Cir. 1992))); *Wise v. Glickman*, 257 F. Supp. 2d 123, 127 n.1 (D.D.C. 2003) ("Nonstatutory review actions may be proper only when 'a plaintiff is unable to bring his case predicated on either a specific or general statutory review provision[.]'" (quoting *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996))).

As discussed, Plaintiffs' challenge to the timeliness of their transfers to prerelease custody fails because there is no mandatory entitlement to such transfers, and those decisions are committed to BOP's unreviewable discretion. But assuming *arguendo* that Plaintiffs do have such a legal entitlement, *ultra vires* review would be unavailable because Plaintiffs could seek review through a habeas petition. *See MCorp.*, 502 U.S. at 43 (*ultra vires* review is only available only where precluding judicial review "would wholly deprive [plaintiff] of a meaningful and adequate means of vindicating its statutory rights"); *Puerto Rico v. United States*, 490 F.3d 50, 59-60 (1st Cir. 2007) (holding that nonstatutory review was inappropriate where the APA provided plaintiff a cause of action); *Jafarzadeh*, 270 F. Supp. 3d at 311 (same). If Plaintiffs' contention that the FSA

creates a legal entitlement to placement in prerelease custody is correct, Plaintiffs' alleged denial of that entitlement can, as a matter of D.C. Circuit authority, be challenged through a habeas petition. *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014) ("Our precedent establishes that one in custody may challenge the conditions of his confinement in a petition for habeas corpus."); *Frierson*, 2025 WL 410072, at *5 (rejecting inmate's habeas challenge to BOP's failure to transfer him to prerelease custody on the merits of his claim); *see also supra* pp. 23-24 (collecting cases addressing habeas petitions involving FSA time credits); Pls.' Mem. 15 (similar). This conclusion is consistent with the longstanding "doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law." *Younger v. Harris*, 401 U.S. 37, 43 (1971); *see Am. Rd. & Transp. Builders Ass'n v. EPA*, No. 12-5244, 2013 WL 599474, at *1 (D.C. Cir. Jan. 28, 2013) (relying on this principle to summarily affirm a district court order "declining to exercise its general equity jurisdiction" where a statutory cause of action existed under the Clean Air Act.). Thus, Plaintiffs' second count cannot proceed because it is brought under *ultra vires* review and must be dismissed.

Similarly, if Plaintiffs are correct that judicial review of a challenge to a transfer decision is not precluded by § 3621 or § 3625, *see id.* at 18, 22, then nonstatutory review would also be unavailable to Plaintiffs because they would have been able to bring that claim under the APA. *See Puerto Rico*, 490 F.3d at 59-60; *Wise*, 257 F. Supp. 2d at 127 n.1. Indeed, Plaintiffs' nonstatutory claim alleges that agency inaction, namely the purported failure to issue a transfer order at the time required by the FSA, is the source of their injury, and they assert in briefing— but, as discussed, not in their Complaint—an APA claim under 5 U.S.C. § 706(1) based on the exact same theory. *See* Pls.' Mem. 13-23. Plaintiffs cannot "assert the same claim through the APA" and "through the Court's inherent power to review *ultra vires* agency actions." *Jafarzadeh*, 270 F. Supp. 3d at 311. To be sure, Plaintiffs' APA claim would have failed because BOP's anticipated transfer dates cannot represent the consummation of the agency's decisionmaking process, *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006), as BOP cannot determine an inmate's eligibility for transfer prior to their actual eligibility,

*see supra* Part I.A.  But that flaw still would not allow them to seek *ultra vires* review.  *See Puerto Rico*, 490 F.3d at 60 (declining to allow Plaintiffs to obtain the more favorable standard of review found in an *ultra vires* action when Plaintiffs could have proceeded under the APA.).

## II.    PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS.

The same defects that require dismissal of Plaintiffs' claims also require denial of Plaintiffs' motion for a preliminary injunction.  Even if Plaintiffs could surmount those hurdles, however, they still fail to show a likelihood of success on the merits because they cannot demonstrate that any delay in transferring Plaintiffs to prerelease custody was unreasonable.

The APA authorizes federal courts to compel agency action if the agency has a duty to act and it has "unlawfully withheld" or "unreasonably delayed" the action.  5 U.S.C. § 706(1); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64-65 (2004).  As noted above, Ms. Crowe has already been transferred to an RRC, and Mr. Galemmo is set to be transferred to home confinement on the day he is first eligible.  Shoulders Decl. ¶¶ 28-29.  Accordingly, there is nothing to compel, and Plaintiffs' § 706(1) claim should fail for that reason.  *See supra* Part I.B.  Regardless, Plaintiffs have not shown that any delay was unreasonable.

**i.** As an initial matter, Plaintiffs contend that their challenge to BOP's alleged failure to timely transfer Ms. Crowe, which arises under § 706(1), is a challenge to an agency action "unlawfully withheld," not one that is "unreasonably delayed."  Pls.' Mem. 20 n.20.  Relying principally on a single out-of-circuit authority, Plaintiffs argue that because the FSA sets forth a mandatory deadline for transfer—purportedly the date upon which a prisoner first becomes eligible for transfer—the six-factor balancing test for unreasonable delay under *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*") does not apply.  Pls.' Mem. 20 n.20.  However, Plaintiffs' attempt to recast their argument as a failure to take action cannot be squared with the allegations they raise in the Complaint, which are based on a contention that BOP is not transferring individuals as *promptly* as Plaintiffs contend is required.  *See* Compl. ¶ 3 (alleging that Ms. Crowe would be transferred on May 7, 2025, but that she should have been

transferred by December 24, 2025); *id.* ¶ 4 (alleging that Mr. Galemmo would be transferred on May 22, 2025, but that he should be transferred on February 26, 2025); *see also* Pls.' Mem. 1 (describing this case as concerning BOP's "failure to transfer eligible people out of prison *within the time required* by the [FSA]" (emphasis added)).

In any event, Plaintiffs' argument misstates the law within this Circuit. Courts within the D.C. Circuit apply the *TRAC* factors to assessing § 706(1) claims even where Congress "designates a specific deadline for" agency action. *In re Ctr. for Auto Safety*, 793 F.2d 1346, 1353 (D.C. Cir. 1986). In *In re Barr Laboratories, Inc.*, the D.C. Circuit applied the *TRAC* factors to a claim that the Food and Drug Administration was violating a statutory requirement to decide generic drug applications within 180 days. 930 F.2d 72, 74-75 (D.C. Cir. 1991). Here, then, even if Plaintiffs were correct that the FSA sets a mandatory deadline, that would at most be relevant to the *TRAC* analysis, but it would not displace it. *See, e.g.*, *Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 30, 38 (D.D.C. 2000) ("If a specific deadline for final agency action is provided by Congress, the reasonableness of the delay can be measured in relation to this deadline.").

**ii.** Under *TRAC*, courts in this Circuit evaluate claims under § 706(1) by looking to six factors:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is "unreasonably delayed."

*TRAC*, 750 F.2d at 80 (citations omitted). That standard is highly deferential, and a court will "compel[] an agency" to take a particular action only in "exceptionally rare cases." *Barr Lab'ys*, 930 F.2d at 76. Plaintiffs make no attempt to demonstrate that any delay by BOP was unreasonable under the *TRAC* factors, and accordingly, they have forfeited their claim under § 706(1), *see, e.g.*,

*Asim v. Blinken*, No. 24-638 (JEB), 2024 WL 3338778, at *4 (D.D.C. July 8, 2024) (plaintiff bears "burden of establishing unreasonable delay")—which, as discussed, they have not actually pled, *see supra* p. 27.  In any event, BOP acted reasonably.

Rule of Reason (first and second factors):  The first *TRAC* factor requires evaluating the reasonableness of the agency's timetable based on "consideration of the particular facts and circumstances before the court."  *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003); *see also TRAC*, 750 F.2d at 80 ("[T]he time agencies take to make a decision *must be governed by a rule of reason*." (emphasis added) (citation omitted)).  As discussed, BOP determines the placement of prisoners in prerelease custody weighing several individualized considerations about the prisoner's circumstances and BOP's prerelease custody capacity.  *See supra* 20.  In light of the need to balance those considerations, the Court should decline to second-guess BOP's timetable for its placement designations.  Moreover, while the language of § 3632(d)(4)(C) "may supply content" for the rule of reason, *TRAC*, 750 F.2d at 80, it does not follow that any transfer beyond that date is automatically unreasonable.  *See Int'l Union, United Mine Workers of Am. v. Dep't of Lab.*, 554 F.3d 150, 155 (D.C. Cir. 2009) ("an agency's failure to meet a statutory deadline" is "itself not automatically indicative of unreasonable delay"); *cf. W. Coal Traffic League v. Surface Transp. Bd.*, 216 F.3d 1168, 1173 (D.C. Cir. 2000) (noting that courts have "uph[eld] agency decisions to defer actions mandated by statute . . . where doing so is administratively necessary in order to realize the broader goals of the same statute").

Human health and welfare/Interests prejudiced by delay (third and fifth factors):  These two factors overlap in this context, as Plaintiffs' interests in earlier transfer implicate their welfare.  But these factors are not dispositive here.  The considerations underlying BOP's placement designations, which go to ensuring that prerelease custody actually affords eligible prisoners a reasonable opportunity to readjust to their communities, also implicate human welfare.

Competing agency priorities (fourth factor):  BOP's placement designations take place in a context where BOP has finite prerelease custody capacity, including limits on RRC bed space and monitoring capacity for prisoners in home confinement.  Accordingly, transfers to prerelease

custody may also limit the opportunity for other prisoners to receive time in prerelease custody under the Second Chance Act, as prerelease capacity could be monopolized by FSA-eligible prisoners, who may spend months or years in prerelease custody.  *See Barr Lab'ys*, 930 F.2d at 75 (declining to find delay in processing applications unreasonable where "a judicial order putting [plaintiff] at the head of the queue simply moves all others back one space and produces no net gain").  Moreover, a transfer to a location not suited to or capable of assisting the prisoner with readjusting to his community would not serve the purposes of prerelease custody and, due to limited staffing and resources, could even jeopardize the prisoner's welfare or public safety.

Agency impropriety (six factor):  Plaintiffs do not assert any impropriety on the part of BOP.  Nor could they.  As discussed, BOP is making good faith efforts—consistent with the purposes of prerelease custody and BOP's limited capacity—to ensure that eligible prisoners obtain substantial benefits from their time credits.

Accordingly, Plaintiffs cannot establish unreasonable delay under the *TRAC* factors.

**iii.** That conclusion also dooms Plaintiffs' invocation of the Court's implied equitable jurisdiction.  *See* Pls.' Mem. 16-18.  Because BOP has not unreasonably delayed in transferring Plaintiffs to prerelease custody, *a fortiori*, Plaintiffs' nonstatutory claim based on the exact same theory necessarily fails.  *See, e.g.*, *Fed. Exp.*, 39 F.4th at 765 (holding that if a "plaintiff's claims would have failed under the APA, then those same claims necessarily could not succeed under *ultra vires* review" (citation omitted)); *Trudeau*, 456 F.3d at 190 (nonstatutory review is "a more difficult course" for a plaintiff than review under the APA); *see also Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.) (*ultra vires* claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds").

**III.    PLAINTIFFS' REQUESTED INJUNCTION SHOULD BE DENIED**.

Plaintiffs' request for injunctive relief should also be denied because they cannot establish that all of the other preliminary injunction factors justify extraordinary relief.  While the interest of eligible prisoners in transfer to prerelease custody as soon as possible is undoubtedly great, the balance of equities does not support Plaintiffs' request for an injunction requiring the immediate

transfer of all eligible prisoners upon the date they first become eligible, *see* Compl. p. 17.  Such an injunction would impose a blunt framework on a nuanced, resource-intensive question that requires BOP to balance its competing statutory obligations, its limited resources, the individual circumstances of each prisoner, and the purposes of prerelease custody.  *See Barr Lab'ys*, 930 F.2d at 74 (recognizing that "[e]quitable relief, particularly mandamus, does not necessarily follow a finding of a violation" of a congressionally-imposed deadline, and "respect for the autonomy and comparative institutional advantages of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities").

While the FSA instructs BOP to ensure there is sufficient prerelease custody to accommodate FSA-eligible prisoners, 18 U.S.C. § 3624(g)(11), just because BOP may have RRC bed space or home confinement monitoring capacity somewhere in the country does not mean that it has capacity to place all FSA-eligible prisoners immediately in the locations they need to readjust to their communities.  The number of eligible prisoners, their geographic makeup, and the portion of the eligible-prisoner population that can support home confinement all fluctuate, and BOP needs to balance those considerations—along with safety and security considerations and state law restrictions on transfers—when making individually-focused prerelease custody placements. Shoulders Decl. ¶ 18-22.  Moreover, BOP does not have the unilateral ability to expand its capacity, as BOP contracts with third parties to operate RRCs and monitor prisoners on home confinement (and, in limited circumstances, receives support from USPPS), and these contracts cap the number of available RRC beds and home confinement slots.  *See id.* ¶¶ 4, 11-13.  And although BOP has expanded capacity since the FSA's enactment, its increased capacity does not cover every eligible prisoner in the particular community in which he must be placed.  *See id.* ¶ 24.

Nevertheless, BOP is making good faith efforts to maximize the application of time credits. As Plaintiffs acknowledge, BOP is placing eligible prisoners in supervised release for the maximum amount of time possible under the FSA.  *See* 18 U.S.C. § 3624(g)(3) (permitting supervised release only if the prisoner's sentence contains a term of supervised release and for a maximum of 12 months); *see also* Pls.' Mem. 4 n.2.  In addition, BOP is committed to transferring

every prisoner who receives a prerelease custody referral based on his earned time credits as soon as there is available capacity in an appropriate RRC or for home confinement.  Shoulders Decl. ¶ 19.

Thus, any delay between a prisoner's eligibility date and the date of transfer reflects not BOP's recalcitrance but unavoidable limitations stemming from its limited resources, the geographical mismatch between its prerelease custody capacity and the fluctuating makeup of the eligible-prisoner population, and its obligation to ensure prerelease custody offers prisoners a reasonable opportunity for successful reentry.  Accordingly, the Court should decline to impose Plaintiffs' requested injunction requiring immediate transfer of all eligible prisoners and should allow BOP, in the first instance, to balance its competing statutory responsibilities.  *See, e.g.*, *Nat. Res. Def. Council, Inc. v. Train*, 510 F.2d 692 710, 712 (D.C. Cir. 1974) (court could not "responsibly mandate flat . . . deadlines" for publishing certain guidelines where "budgetary commitments and manpower" would render performance "beyond the agency's capacity or would unduly jeopardize the implementation of other essential programs"); *see also Am. Ctr. for L. & Just. v. U.S. Dep't of State*, 289 F. Supp. 3d 81, 91 (D.D.C. 2018) (finding "no need for an injunction" where agency had engaged in "good-faith efforts to come up with ways to reduce its backlog and respond [to FOIA requests] promptly, as well as the absence of malice in its delays").[11]

## IV.   LOCAL CIVIL RULE 7(N) SHOULD BE WAIVED BECAUSE DEFENDANTS' MOTION DOES NOT RELY ON AND CAN BE DECIDED WITHOUT AN ADMINISTRATIVE RECORD.

Defendant respectfully requests that the Court waive compliance with Local Civil Rule 7(n) because the Court can decide Defendants' Motions to Dismiss without reference to the administrative record.  Plaintiffs have informed Defendants that they do not object this request.

---

[11] Plaintiffs also have moved for preliminary class certification in connection with their motion for preliminary injunction.  *See* Pls.' Mem. 30-31.  Plaintiffs incorporate by reference their motion for class certification, *see id.* at 31, which is being briefed in parallel with Plaintiffs' motion for preliminary injunction, *see* Minute Order of Jan. 22, 2025.  Accordingly, Defendants incorporate their forthcoming response to Plaintiffs' motion for class certification, which, by Court order, is due March 3, 2025.

Local Civil Rule 7(n)(1) directs an agency to "file a certified list of the contents of the administrative record with the Court within 30 days following service of the answer to the complaint or simultaneously with the filing of a dispositive motion, whichever occurs first." The D.C. Circuit has long recognized that a court can resolve claims at the motion to dismiss stage without the administrative record where the record is not germane to the issues presented in the motion to dismiss. *See Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266-67 (D.C. Cir. 2001) (affirming dismissal of plaintiff's claims and rejecting argument that the district court erred in refusing to compel production of the administrative record before deciding motion to dismiss); *see also Arab v. Blinken*, 600 F. Supp. 3d 59, 65 n.2 (D.D.C. 2022) (noting "the general practice in this Court" to waive compliance with Local Civil Rule 7(n) where "the administrative record is not necessary for [the court's] decision" (citation omitted)).

Defendant has moved to dismiss on raised various grounds, and the Court need not review an administrative record to resolve this motion. In such cases, courts in this District routinely grant relief from Local Civil Rule 7(n). *See, e.g., Mukkavilli v. Jaddou*, Case No. 22-cv-2289 (TNM), 2023 WL 4029344, at *5 n.2 (D.D.C. June 15, 2023) ("[p]roduction of the record [was] unnecessary to resolve the arguments" in the motion to dismiss), *aff'd*, 2024 WL 1231346 (D.C. Cir. Mar. 22, 2024); *Patterson v. Haaland*, Civ. A. No. 1:21-cv-02391 (RC), 2022 WL 4534685, at *1 (D.D.C. Sept. 28, 2022) (similar), *dismissing*, 2023 WL 2604280 (D.C. Cir. Mar. 21, 2023); *Desai v. U.S. Citizenship & Immigr. Servs.*, Civ. A. No. 20-1005 (CKK), 2021 WL 1110737, at *5 n.7 (D.D.C. Mar. 22, 2021) (similar); *Nohria v. Renaud*, Civ. A. No. 20-cv-2085, 2021 WL 950511, at *4 n.3 (D.D.C. Mar. 14, 2021) (similar); *Akbar v. Cuccinelli*, Civ. Case No. 18-2808, 2020 WL 1287817, at *4 (D.D.C. Mar. 18, 2020) (similar).

## **CONCLUSION**

For the foregoing reasons, this Court should deny Plaintiffs' motion for a preliminary injunction and grant Defendants' motion to dismiss the complaint for lack of subject matter jurisdiction.

Dated: February 12, 2025        Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division

ANDREW I. WARDEN
Assistant Branch Director

*/s/ Chetan A. Patil*
CHETAN A. PATIL (D.C. Bar No. 999948)
Senior Trial Counsel
SAMUEL B. BEAN (MD)
Trial Attorney
Civil Division, Federal Programs Branch
P.O. Box 883
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 305-4968
chetan.patil@usdoj.gov

*Attorneys for the United States of America*