UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VANESTRA CROWE, ET AL. ) | |
| ) | |
| v. ) | Case No. 1:24-cv-03582 |
| ) | |
| FEDERAL BUREAU OF PRISONS, ET AL. ) | |
| ) | |
| **Defendant.** ) | |

VANESSA CROWE, ET AL.        )
                             )
v.                           )   Case No. 1:24-cv-03582
                             )
FEDERAL BUREAU OF PRISONS, ET AL.  )
                             )
        **Defendant.**       )

**DECLARATION OF BIANCA SHOULDERS**

I, Bianca Shoulders, declare as follows:

1. I am employed by the United States Department of Justice, Federal Bureau of Prisons (BOP), as the Administrator in the Residential Reentry Management Branch (RRMB), Reentry Services Division, in the BOP's Central Office in Washington, D.C. I have held this position since December of 2024. Prior to this role, I served as an Assistant Administrator in RRMB from March of 2021 through December of 2024. I have been employed by the BOP since January of 2006.

2. As part of my official duties, I have access to records maintained by the BOP in the ordinary course of business, including but not limited to, information maintained in the SENTRY[1] database and inmate central files. All records attached to this declaration are true and accurate copies of BOP records maintained in the ordinary course of business.

---

[1] SENTRY is the BOP's national database that tracks various data regarding an inmate's confinement, including, but not limited to, an inmate's institutional history, sentencing information, participation in programs, administrative remedies, and discipline history.

3.      The RRMB is headquartered at BOP's Central Office and consists of three sector management teams and twenty-three field offices spread across the United States. Each field office is responsible for residential reentry activities within its assigned judicial districts.

4.      RRMB staff members develop and administer contracts for community-based programs, including residential reentry centers (RRCs) (also known as halfway houses), home confinement, and work release programs operated by local or county jails. BOP does not own or operate any RRCs. All RRCs are operated by and staffed with contract employees with RRMB staff providing oversight of the contractors. While inmates live at RRCs, contract staff working at RRCs also monitor those inmates that are on home confinement.

5.      The effective management and operation of RRCs is complex and involves numerous components, including coordinating with BOP staff; following BOP policies and program statements; complying with various federal, state, and local regulations; effectively allocating resources for staffing, budgeting, and funding; addressing safety concerns; and implementing reentry programs and services to assist inmates transitioning back into society.

6.      There are two types of prerelease custody designations under the First Step Act (FSA). BOP can transfer inmates to home confinement or an RRC, which could include a work release center. *See* 18 U.S.C. § 3624(g)(2).

7.      RRCs are structured residential programs that provide job placement, counseling, and reentry support through monitored activity. They also offer mental health programming, as well as drug testing and counseling for alcohol and drug-related problems. Inmates placed in RRCs are expected to make use of programs designed to assist with finding employment, securing a residence, and reestablishing and strengthening family ties. RRCs help inmates gradually rebuild

ties to the community through supervised activities. The intent of RRCs is to provide tools needed for reentry success.

8. Whether an RRC placement successfully assists an inmate's readjustment to his or her community depends on the specific circumstances of each inmate transferred to an RRC. Some inmates need help finding a job, while others need continued assistance with job training or education. Other inmates may need continued mental healthcare or substance abuse counseling. Some inmates need assistance getting proper identification or finding a suitable place to live after release. Because each inmate has different needs, all RRCs must provide a full offering of reentry resources and assistance.

9. Home confinement allows inmates to complete their sentences from an approved residence, while maintaining the benefits of case management and program offerings available at RRCs. The FSA statutorily limits the daily life activities of inmates placed on home confinement. *See* 18 U.S.C. § 3624(g)(2)(A)(i). All inmates on home confinement are subject to 24-hour electronic monitoring and must primarily remain in their residence, except for certain statutorily prescribed activities, such as working at a job, participating in FSA programming, performing community service, participating in crime victim restoration activities, receiving medical treatment, attending religious services, or participating in certain family-related activities. *See id.* Inmates can also request passes from RRC staff so that they can go to locations outside of the statutorily authorized places (*i.e.* to a gym or a restaurant with family). Essentially, home confinement allows inmates to assume increasing levels of responsibility while conveying the sanctioning value of the sentence and providing sufficient restrictions to promote community safety.

10. The primary method of maintaining safety of inmates on home confinement is through 24-hour electronic monitoring, which requires oversight by RRC staff twenty-four hours per day and seven days per week. RRC staff must notify RRMB staff within fifteen minutes of a home confinement inmate violating the restrictions of electronic monitoring. Thus, adequate RRC staffing is essential for public safety in home confinement.

11. Typically, inmates on home confinement are served by contracted RRC staff members in accordance with the contract between the BOP and the RRC. Other than feeding and housing, RRC staff members provide the same services for inmates on home confinement as those in RRCs, including monitoring, programming, drug testing, and otherwise assisting with reentry needs like job placement, finding employment, or continuing education.

12. Each contract for an RRC has a maximum number of inmates that can be placed in the RRC or on home confinement. With respect to home confinement, BOP can only exceed that amount with the RRC contractor's consent and willingness to accept the placement while operating within an approved annual budget.

13. The Federal Location Monitoring (FLM) Program is an agreement between BOP and the Administrative Office of the U.S. Courts that allows BOP, in limited circumstances, to ask the U.S. Probation and Pretrial Services (USPO) to accept inmates for monitoring while they complete their term of incarceration. Under the FLM, the USPO retains authority to refuse monitoring of an inmate. Typically, those placed in the FLM program bypass RRC placement and are considered the lowest security and risk levels with few needs for transitioning into the community. FLM is also used in situations where a home confinement eligible inmate lives in a geographic area that is not serviced by an RRC contractor. Most RRC contracts only require RRC

staff members to travel up to 100-150 miles in order to monitor inmates who are on home confinement.

14.     The FSA permits BOP to provide an eligible inmate with up to 12 months of early supervised release, if supervised release is included as a term of his or her sentence of imprisonment. For any inmate that is eligible to earn and apply time credits under the FSA and has included in their sentence a term of supervised release, BOP applies the first 365 days of time credits towards early release to supervised release.

15.     For FSA eligible inmates, BOP calculates the date that an inmate's time credits are equal to the remainder of his or her sentence, reflecting any good time credits earned by the inmate. This date is called the FSA Conditional Placement Date and reflects the maximum amount of FSA time credits an FSA eligible individual can earn towards pre-release confinement (RRC or home confinement) given their current PATTERN risk level. Although the FSA Conditional Placement Date is communicated to inmates, it is used for planning purposes and is not considered final until the time credits are applied and a prerelease placement is approved. These dates may change based on inmate behavior, programming participation, or changes in eligibility, and it is crucial for unit teams to clearly communicate this to both inmates and staff.

16.     The process to transfer an inmate from a secure BOP facility to prerelease custody involves multiple levels of review and is guided by BOP Program Statement 7310.04, Community Corrections Center (CCC) Utilization and Transfer Procedure, attached hereto as **Exhibit A**. The inmate's unit team staff will prepare form BP-A0210, Institutional Referral for CCC Placement, attached hereto as **Exhibit B**, with a prerelease custody recommendation for the Warden's review. If the Warden agrees with the referral, they will forward it to the RRMB office that oversees the geographic area to where the inmate is to be transferred. For inmates who otherwise meet the

eligibility criteria for transfer to prerelease custody, this referral is submitted to the RRMB office at least 60 days prior to the FSA Conditional Placement Date.

17. RRMB staff review prerelease custody referrals pursuant to P.S. 7310.04 and 18 U.S.C. § 3621(b). Each referral must be reviewed individually to ensure that the inmate is placed in a custodial situation that will foster his or her reintegration into society. Placement decisions must be made based on resource availability, whether that is the availability of bed space at an RRC or of home confinement slots.

18. The primary considerations for RRC placement are geography, bed space availability, and safety. RRMB staff make every effort to transfer inmates to prerelease custody in the geographic area where they will ultimately release in order to best ensure that inmates receive a reasonable opportunity to adjust to their communities. For example, if an inmate is going to release in Baltimore, Maryland, but there is no bed space available in the Baltimore RRC or any nearby RRC and no available home confinement slots, RRMB staff will not send that inmate to an available space at an RRC in, for example, Casper, Wyoming. This is because such a placement would not benefit the inmate's reentry to the community. The inmate could not adequately prepare for life in Baltimore from an RRC in Casper. A primary safety concern when making prerelease custody placements is whether the RRC has any current residents that are a danger to the transferring inmate, or vice versa. For example, if Inmate A and Inmate B had previously gotten into a fight at a secure facility and had been ordered to "keep away" from each other, RRMB staff will not send Inmate A to an RRC where Inmate B is a resident.

19. When it appears a prerelease custody placement cannot be made at a preferred location, RRMB staff are encouraged to review nearby RRCs and FLMs for availability. RRMB staff are advised to explore all available options prior to denying or delaying a placement, and

RRMB staff also seek to maximize the use of home confinement to free up RRC beds whenever possible. The number of inmates in prerelease custody fluctuates daily, as does the locations that have availability.

20. When assessing whether home confinement is possible, BOP must first consider whether home confinement is appropriate for an inmate. Inmates may not have a suitable home where they could return or remain during the entirety of their term in prerelease custody, and they also could lack reliable access to transportation, which could hinder monitoring or other essential home confinement services. In addition, BOP must assess whether home confinement is available, considering any nearby RRC's capacity to monitor the inmate and provide services. For example, the RRC contractor in the inmate's geographic area may not have space to accommodate the inmate, or his or her home may be located in a remote location outside of the geographic area of any contractor.

21. Further, when making a prerelease custody referral, unit team staff from the BOP facility will recommend transfer to an RRC or home confinement. The unit team staff know each inmate and their individual situation and reentry needs and are therefore best positioned to recommend an RRC or home confinement, as appropriate. While RRMB staff typically follow the unit team's recommendation, if RRC space is not available, but home confinement could be a suitable option, RRMB staff will explore that option and look to place that inmate in home confinement.

22. Additionally, some contracts restrict inmates who have committed certain types of crimes from staying at a particular halfway house. For example, in the State of Florida, the only RRC that can accept sex offenders is located in Tampa. Thus, if an influx of sex offender inmates

require RRC services in Florida at the same time, BOP's options are severely limited because only one RRC is available for those inmates.

23. Prior to October 2024, when a referral for prerelease custody placement was made for an inmate capable of earning FSA time credits, RRMB staff would make conditional placement designations reflecting the FSA credits that the inmate had earned up to that point, as well as any additional time in prerelease custody that BOP may choose to apply in its discretion under the Second Chance Act. Since October 2024, however, BOP has been making conditional placement designations reflecting the FSA credits that the inmate has earned up to the time of the referral and all FSA credits that the inmate is projected to earn in the future, assuming no changes to the inmate's behavior, program participation, and eligibility. *See* Exhibit C, October 4, 2024, Memorandum re: "First Step Act (FSA) Planning Dates."

24. BOP does not currently have unlimited prerelease custody capacity to accommodate every inmate's needs in the proper geographic area under the FSA, however, since January of 2019, BOP has added approximately 1,200 slots to its prerelease custody capacity. As noted above, geography, availability, and safety are the primary concerns for prerelease custody determinations. If a "nearby" RRC is too far from the inmate's geographic location, reentry services cannot be adequately provided, and RRMB staff will not make that transfer.

25. RRCs are costly to operate and have gotten progressively more expensive. Several factors contribute to these increasing costs, including higher expenses for staffing, facility maintenance, increased minimum wage rates for federal contractors (from $10.35 per hour in 2018 to $17.75 per hour in 2025), and compliance with regulatory requirements. General inflation and market fluctuations also play a role in driving up prices. In 2021, the average daily cost per inmate in an RRC was $118.38, and by 2023, that number jumped to $133.48 per inmate per day.

26. The primary driver limiting RRC expansion is a lack of funding, particularly in light of rising operating costs. RRMB currently operates at a deficit simply to maintain the current prerelease custody capacity, let alone expand the RRC capacity sufficient to accommodate every eligible inmate's needs in the appropriate geographical location. Adding RRC capacity would also require additional RRMB staffing to ensure that RRCs can continue to provide high-quality services, manage larger caseloads, provide the necessary support for successful reentry, and to maintain oversight of contractors. The current RRMB budget cannot support additional staffing levels.

27. Even if BOP had the necessary funding to expand RRC capacity, there is no guarantee that such capacity could be increased. Because RRCs and home confinement placements are supported through private contractors, BOP's RRC capacity depends on whether contractors choose to submit bids, what the terms of those bids are, and whether contractors face any local hurdles that could prevent construction, including zoning and "Not In My Back Yard" challenges. BOP also cannot compel private contractors to open or operate new RRCs.

28. Attached as **Exhibit D** is a true and accurate copy of the SENTRY database "Inmate History Destination" form, generated on January 28, 2025, for Plaintiff inmate Glen Galemmo, Reg. No. 72083-061. Mr. Galemmo is currently housed at the Federal Correctional Institution in Williamsburg, South Carolina ("FCI Williamsburg"). Mr. Galemmo is projected to transfer to home confinement on February 26, 2025, under the supervision of the Residential Reentry Manager in Raleigh, North Carolina. *See* **Exhibit E,** a true and accurate copy of Mr. Galemmo's Transfer Order, dated February 3, 2025. Attached as **Exhibit F** is a true and accurate copy of Mr. Galemmo's Furlough Application – Approval and Record. On January 29, 2025, Mr. Galemmo received notification of his projected February 26, 2025, transfer to home confinement. *See* Ex. F

at 1 and 5. Mr. Galemmo is projected to release from FBOP custody on February 11, 2027, with the application of 365 days of FSA time credits applied towards his early release to supervised release. *See* https://www.bop.gov/inmateloc/ (last accessed February 6, 2025) ("Find an Inmate" "Glen Galemmo" "Reg. No. 72083-061" "Release date: 02/11/2027").

29.     Plaintiff inmate Vanessa Crowe, Reg. No. 15427-002 is currently housed at an RRC under the supervision of the Residential Reentry Manager in Montgomery, Alabama. *See* https://www.bop.gov/inmateloc/ (last accessed February 6, 2025). ("Find an Inmate" "Vanessa Lee Crowe" "Reg. No. 15427-002" "Located at: Montgomery RRM" "Release Date: 04/17/2025"). Attached as **Exhibit G** is a true and accurate copy of Ms. Crowe's Furlough Application – Approval and Record. On or around January 2, 2025, Ms. Crowe received notification of her January 15, 2025, transfer to RRC placement. *See* Ex. G at 1, and 5. Attached as **Exhibit H** is a true and accurate copy of the Executive Grant of Clemency for Vanessa Crowe, Reg. No. 15427-002, commuting her total sentence to expire on April 17, 2025. Ms. Crowe is projected to release from BOP custody on April 17, 2025.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 12th day of February, 2024, in Washington, D.C.

_____
Bianca Shoulders