**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| VANESSA CROWE, et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 24-3582 (APM) |
| FEDERAL BUREAU OF PRISONS, et al., | |
| *Defendants*. | |

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

   I.   PLAINTIFFS, WHO WERE NOT ELIGIBLE FOR TRANSFER WHEN THE
       COMPLAINT WAS FILED, LACK STANDING ............................................................ 2

   II.  PLAINTIFFS' CLAIMS ARE MOOT BECAUSE THEY HAVE BEEN TRANSFERRED
       TO PRERELEASE CUSTODY. ...................................................................................... 6

   III. TRANSFERS TO PRERELEASE CUSTODY UNDER THE FSA ARE NOT
       JUDICIALLY REVIEWABLE. ...................................................................................... 11

       A.  Plaintiffs' Challenge to Alleged Delayed Transfers is Nonreviewable. ................. 11

       B.  Sections 3621(b) and 3625 Bar Judicial Review of Transfer Decisions. ............... 19

       C.  BOP Is Complying With Any Statutory Mandate. ................................................. 21

   IV. PLAINTIFFS CANNOT SEEK NONSTATUTORY REVIEW OF ALLEGED
       DELAYED TRANSFERS TO PRERELEASE CUSTODY. ........................................... 22

CONCLUSION .................................................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

C ASES

*Aero Corp. v. Dep't of Navy,*
   540 F. Supp. 180 (D.D.C. 1982) ......................................................................... 14

*Am. Sch. of Magnetic Healing v. McAnnulty,*
   187 U.S. 94 (1902) ............................................................................................. 22

*Armstrong v. Exceptional Child Ctr., Inc.,*
   575 U.S. 320 (2013) ..................................................................................... 22, 23

*Bailey v. United States,*
   516 U.S. 137 (1995) ........................................................................................... 14

*Bannister v. U.S. Parole Comm'n,*
   No. 18-cv-01397 (APM), 2020 WL 85229 (D.D.C. Jan. 7, 2020) ......................... 21

*Better Gov't Ass'n v. Dep't of State,*
   780 F.2d 86 (D.C. Cir. 1986) ............................................................................ 7, 8

*City of Chicago v. Morales,*
   527 U.S. 41 (1999) ............................................................................................. 12

*City of Houston v. Dep't of Hous. & Urb. Dev.,*
   24 F.3d 1421 (D.C. Cir. 1994) ........................................................................... 6, 7

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ............................................................................................... 7

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ................................................................................. 2, 3, 4, 8

*Cmty. for Creative Non-Violence v. Unknown Agents of U.S. Marshals Serv.,*
   791 F. Supp. 1 (D.D.C. 1992) .............................................................................. 5

*Conservation Force, Inc. v. Jewell,*
   733 F.3d 1200 (D.C. Cir. 2013) ............................................................................ 6

*Cooper Indus., Inc. v. Aviall Servs., Inc.,*
   543 U.S. 157 (2004) ........................................................................................... 23

*Dalton v. Specter,*
   511 U.S. 462 (1994) ........................................................................................... 23

*Dart v. United States*,
   848 F.2d 217 (D.C. Cir. 1988) ................................................................. 23

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) .............................................................................. 5

*Dorman v. Thornburgh*,
   955 F.2d 57 (D.C. Cir. 1992) ................................................................. 10

*FBI v. Fikre*,
   601 U.S. 234 (2024) .............................................................................. 6

*Fed. Express Corp. v. U.S. Dep't of Com.*,
   39 F.4th 756 (D.C. Cir. 2022) ........................................................... 22, 24

*Fla. Audubon Soc'y v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996) ................................................................. 4

*Golden v. Zwickler*,
   394 U.S. 103 (1969) .............................................................................. 7

*Hernandez v. Mesa*,
   589 U.S. 93 (2020) ............................................................................... 23

*In re Idaho Conservation League*,
   811 F.3d 502 (D.C. Cir. 2016) ................................................................ 5

*In re Sealed Case*,
   809 F.3d 672 (D.C. Cir. 2016) ............................................................ 8, 9

*Jones & Assocs. v. District of Columbia*,
   797 F. Supp. 2d 129 (D.D.C. 2011) ........................................................ 2

*Kelleher v. Dream Catcher, L.L.C.*,
   263 F. Supp. 3d 322 (D.D.C. 2017) ....................................................... 20

*King v. Burwell*,
   576 U.S. 473 (2015) ............................................................................. 14

*Kingman Park Civic Ass'n v. Gray*,
   27 F. Supp. 3d 142 (D.D.C. 2014) ........................................................ 20

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .................................................................. 2, 20, 21

*Mathis v. U.S. Parole Comm'n*,
    749 F. Supp. 3d 8 (D.D.C. 2024) ................................................................. 23

*Melot v. Bergami*,
    970 F.3d 596 (5th Cir. 2020) ...................................................................... 9

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) .................................................................................... 5

*N.Y. Republican State Comm. v. Sec. & Exch. Comm'n*,
    927 F.3d 499 (D.C. Cir. 2019) ................................................................. 2, 4

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
    26 F.4th 960 (D.C. Cir. 2022) ................................................................... 23

*Nat'l Black Police Ass'n v. District of Columbia*,
    108 F.3d 346 (D.C. Cir. 1997) ................................................................... 6

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ................................................................................. 5, 20

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) ................................................................. 22

*Obama v. Klayman*,
    800 F.3d 559 (D.C. Cir. 2015) ................................................................... 4

*Payne Enters. v. United States*,
    837 F.2d 486 (D.C. Cir. 1988) ................................................................... 7

*Reeb v. Thomas*,
    636 F.3d 1224 (9th Cir. 2011) ................................................................. 20

*Scott v. District of Columbia*,
    139 F.3d 940 (D.C. Cir. 1998) ................................................................... 7

*Sierra Club v. Jewell*,
    764 F.3d 1 (D.C. Cir. 2014) ....................................................................... 5

*Smith v. Eischen*,
    No. 22-cv-1704 (NEB/DJF), 2023 WL 3170436 (D. Minn. May 1, 2023) ............... 2

*Super Tire Eng'g Co. v. McCorkle*,
    416 U.S. 115 (1974) .................................................................................... 7

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) .......................................................................... 5

*Town of Castle Rock v. Gonzalez*,
   545 U.S. 748 (2005) ........................................................................ 12

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) .......................................................................... 2

*Trudeau v. FTC*,
   456 F.3d 178 (D.C. Cir. 2006) ...................................................... 22

*United States v. Epps*,
   707 F.3d 337 (D.C. Cir. 2013) ............................................... 8, 9, 10

*United States v. Ketter*,
   908 F.3d 61 (4th Cir. 2018) ............................................................ 9

*United States v. Ko*,
   739 F.3d 558 (10th Cir. 2014) ...................................................... 9

*United States v. Lopez-Pastrana*,
   889 F.3d 13 (1st Cir. 2018) ............................................................ 9

*United States v. Saunders*,
   986 F.3d 1076 (7th Cir. 2021) ...................................................... 9

*Valladares v. Ray*,
   No. 23-6932, 2025 WL 595560 (4th Cir. Feb. 25, 2022) ............... 13

*Webster v. Fall*,
   266 U.S. 507 (1925) ........................................................................ 23

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ........................................................................ 12

**STATUTES**

5 U.S.C. § 706 ................................................................................. 19

18 U.S.C. § 3553(a) ......................................................................... 8

18 U.S.C. § 3582 ....................................................................... 10, 14

18 U.S.C. § 3583 ............................................................................. 8

18 U.S.C. § 3621 ................................................................... *passim*

18 U.S.C. § 3624 ................................................................................................ *passim*

18 U.S.C. § 3625 ................................................................................ 19, 20, 21, 24

18 U.S.C. § 3632 ................................................................................................ *passim*

First Step Act,
   Pub. L. No. 115-391, 132 Stat. 5194 (2018) ........................................ 13

**REGULATIONS**

28 C.F.R. § 523.41 ............................................................................................ 3

28 C.F.R § 523.44 ...................................................................................... 2, 19

87 Fed. Reg. 2,705 (Jan. 19, 2022) ................................................................ 15

**OTHER AUTHORITIES**

33 Charles A. Wright & Arthur R. Miller,
   Fed. Prac. & Proc. § 8307 (3d ed. Apr. 2020 update) ...................... 23, 24

164 Cong. Rec. S7,739 (2018) ........................................................................ 15

164 Cong. Rec. S7,745 (2018) ........................................................................ 15

164 Cong. Rec. S7,746 (2018) ........................................................................ 15

## **INTRODUCTION**

In the First Step Act of 2018 (FSA), Congress authorized the Federal Bureau of Prisons (BOP) to establish a system to incentivize federal prisoners to participate in recidivism-reduction programs and activities by expanding access to prerelease custody and supervised release.  In doing so, Congress intended to build upon BOP's existing system of prerelease custody, which is centered on the goal of assisting prisoners' reintegration into their communities after their release from BOP custody.  Plaintiffs, however, misconstrue the FSA as fundamentally supplanting Congress's goals underlying prerelease custody.  That flawed premise leads them to overlook how BOP's longstanding discretion informs the statutory interpretation analysis; brush past contrary language in 18 U.S.C. § 3624 that confirms BOP's discretion when it comes to transfers to prerelease custody; and ignore how their interpretation of the FSA is inconsistent with Congress's goals, BOP's finite resources, and the needs of prisoners.

Plaintiffs' claims run into a series of insurmountable jurisdictional hurdles that warrant dismissal of the Complaint.  As Defendants have explained, Plaintiffs lacked standing to assert their claim when the Complaint was filed, and, even if not, their claims were mooted by their transfers to prerelease custody.  Moreover, because the proper reading of the FSA preserves BOP's discretion over the placement of prisoners in prerelease custody, judicial review of their challenge to their alleged untimely transfers to prerelease custody is expressly precluded.

Notwithstanding its discretion under the statute, BOP remains committed to ensuring that eligible prisoners can reap the benefits of transfers to prerelease custody under the FSA, consistent with the statute, the purposes of prerelease custody, BOP's policies and resources, and the needs of prisoners and the public.  As a result, BOP has commenced a review of all eligible prisoners who have not yet been transferred to prerelease custody—including those who, like Plaintiffs, previously received anticipated transfer dates based only on the time credits they had earned at the time of referral—to determine whether, consistent with the aforementioned considerations, BOP can accelerate the transfer of any such prisoners.

1

**ARGUMENT**

I.    **PLAINTIFFS, WHO WERE NOT ELIGIBLE FOR TRANSFER WHEN THE COMPLAINT WAS FILED, LACK STANDING.**

Until a prisoner is actually eligible for transfer to prerelease custody, the date upon which the prisoner will become eligible remains too speculative to establish standing.  *See Smith v. Eischen*, No. 22-cv-1704 (NEB/DJF), 2023 WL 3170436, at *5 (D. Minn. May 1, 2023) ("The number of FSA Time Credits [Plaintiff] ultimately will be entitled to apply towards early release is at this point entirely speculative, and will remain speculative until his earned FSA Time Credits equal the remainder of time on his sentence"), *report and recommendation adopted as modified*, 2023 WL 4203165 (D. Minn. June 27, 2023), *aff'd*, 2024 WL 1479767 (8th Cir. Apr. 5, 2024), *cert. denied*, 2024 WL 4427444 (U.S. Oct. 7, 2024).  Thus, until a prisoner becomes eligible for transfer to prerelease custody, the prospect of BOP's failure to transfer them on the date they are eligible is merely "conjectural or hypothetical."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted)*.*  "Potential harms and possible placement in jeopardy are precisely the type of conjectural and hypothetical injuries that fail to satisfy Article III standing requirements." *Jones & Assocs. v. District of Columbia*, 797 F. Supp. 2d 129, 134 (D.D.C. 2011) (cleaned up).

Plaintiffs seek declaratory relief, vacatur of 28 C.F.R § 523.44, and injunctive relief compelling future action to address their alleged, then-anticipated injury of an untimely transfer to prerelease custody.  *See* Class Action Compl. for Declaratory & Injunctive Relief ("Compl.") 17, ECF No. 1.  "Plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  Whether Plaintiffs seek to establish standing under a theory of "substantial risk" or "certainly impending" future injury, the "harm cannot be based upon a 'highly attenuated chain of possibilities.'"  *N.Y. Republican State Comm. v. Sec. & Exch. Comm'n,* 927 F.3d 499, 504 (D.C. Cir. 2019) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)).  Plaintiffs do not contest that a prisoner who files suit before his eligibility date based on a mismatch between his FSA Conditional

Placement date[1] and his anticipated transfer date will suffer harm only if he: (1) stays in FSA time credit earning status until his eligibility date; (2) does not incur any time credit reductions through penalties; (3) has a recidivism risk rating of minimum or low at the time his FSA time credits equal the time remaining on his sentence; and (4) is not transferred to prerelease custody by BOP on or before the date he is eligible.  Rather, Plaintiffs argue that these links are not "mere possibilities" because three of them are "within Plaintiffs' control" and they have previously met those conditions.  Pls.' Combined Mem. in Opp'n to Defs.' Mot. to Dismiss & Reply in Supp. of Pls.' Mot. for Prelim. Inj. ("Pls.' Opp'n") 9, ECF No. 41.  But this contention has a fatal flaw—the first three links in the chain are not within any prisoner's sole control.

There are various reasons outside a prisoner's control that would prevent him from becoming eligible on his FSA Conditional Placement date.  Most significantly, a prisoner can lose good time credits or FSA time credits as a penalty for misconduct, which necessarily would alter the date at which he is first eligible for transfer to prerelease custody.  That decision is within BOP's authority, and courts "have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment."  *Clapper*, 568 U.S. at 413.  Moreover, a change to a prisoner's recidivism risk, placement in a Special Housing Unit, or temporary transfer to the custody of another Federal or non-Federal government agency all would affect a prisoner's eligibility for transfer, *see* 28 C.F.R. § 523.41(c)(4)—all of which are, at least in part, within BOP's control.  A prisoner may also lose the ability to earn time credits due

---

[1] For a prisoner eligible to earn credits under the FSA, BOP calculates the date that, assuming he continues earning FSA time credits throughout the remainder of his sentence and does not lose any credits as a penalty, his time credits will equal the remainder of his sentence, after any good time credits are taken into account.  Declaration of Bianca Shoulders ("Shoulders Decl.") ¶ 15, ECF No. 34-1.  This date is called the FSA Conditional Placement date and reflects the maximum amount of FSA time credits the prisoner can earn towards prerelease custody or supervised release, given his current PATTERN risk level.  *Id.*  The FSA Conditional Placement Date is used for planning purposes and is not considered final until the time credits are applied and a prerelease custody placement is approved.  *Id.*  This date is subject to change based on the prisoner's behavior, programming participation, or changes in eligibility.  *Id.*

to a transfer to a hospital or placement in a mental health/psychiatric hold, *id.*, which are entirely outside the prisoner's control.

Because there are multiple links in the chain of possibilities, all of which are either entirely or partially outside Plaintiffs' control, the cases cited by Plaintiffs are easily distinguished. In those cases, the D.C. Circuit emphasized that there was not a chain of possibilities but just a single inference necessary for the alleged injury to result. *See Obama v. Klayman*, 800 F.3d 559, 562-64 (D.C. Cir. 2015) (finding standing for subscribers of wireless telephone company where the plaintiffs had set forth specific evidence showing the government operated a bulk-telephone metadata program that collected subscriber information from domestic telecommunications providers, including the wireless telephone company to which they subscribed); *N.Y. Republican State Comm.*, 927 F.3d at 504-05 (plaintiff's standing to challenge law banning placement agents from accepting compensation for soliciting government business from certain candidates or elected officials "requires only the single inference that at least one of [the placement agent's] family, friends, or contacts would have donated a few dollars to the NYGOP had [the placement agent] asked him or her to do so.") By contrast, this case is more akin to *Clapper*, where the Supreme Court concluded that a speculative, multi-step chain of possibilities was too attenuated to satisfy the injury in fact requirement. *See Clapper*, 568 U.S. at 410-14.

The conjectural and hypothetical nature of Plaintiffs' alleged injuries, and the alleged injuries of all members of the proposed class who are not yet eligible for transfer to prerelease custody, is illustrated by examining the Court's ability to grant the injunctive remedy Plaintiffs seek. Plaintiffs seek injunctive relief ordering Defendants to transfer prisoners to prelease custody. *See* Compl. at 17. But for prisoners who are not yet eligible for transfer to prerelease custody, like both named Plaintiffs at the time they filed suit, the Court cannot issue an injunction compelling their transfer because they have no statutory right to a transfer. Thus, the injunctive relief sought by Plaintiffs will not "alleviate the particularized injury" they allege. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996).

Moreover, here, unlike in the cases on which Plaintiffs rely, the alleged anticipated injury would arise from agency *inaction*, rather than agency action.[2]  Thus, at the time the Complaint was filed, neither the injury nor the precipitating action, or lack thereof, had occurred.  In nearly all the cases cited by Plaintiffs, the agency action that would allegedly cause the injury had already occurred, but the injury had yet to happen.  *See Dep't of Com. v. New York*, 588 U.S. 752 (2019) (Secretary of Commerce had already decided to add a census question about citizenship to the census questionnaire); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) (Ohio had passed a statute prohibiting certain false statements during the course of a political campaign); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) (Animal and Plant Health Inspection Service had deregulated a variety of genetically engineered alfalfa without first completing an assessment of the environmental consequences); *Sierra Club v. Jewell*, 764 F.3d 1, 8 (D.C. Cir. 2014) (Blair Mountain had been removed from the National Register of Historic Places); *Cmty. for Creative Non-Violence v. Unknown Agents of U.S. Marshals Serv.*, 791 F. Supp. 1, 4-5 (D.D.C. 1992) (U.S. Marshals who executed a warrantless entry and search of a D.C. homeless shelter were acting in accordance with an official law enforcement policy).  In all those cases, the plaintiffs could specifically identify injunctive relief the court could grant to redress their injury—namely, to enjoin the action that had already been taken.

Defendants do not suggest that there is no standing in every case where the alleged injury follows from inaction and the alleged inaction has yet to occur.  But where, as here, a future injury is anticipated to arise from alleged inaction and both the injury and inaction are based on contingent future events that are not guaranteed to occur, the Court is left without injunctive relief it can

---

[2] For most cases where the injury follows from inaction, the moment where the action was legally required has already occurred.  *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) (agency action unlawfully withheld can only "be compelled under the APA" if it is legally required) ("*SUWA*"); *In re Idaho Conservation League*, 811 F.3d 502 (D.C. Cir. 2016) (the EPA was required to promulgate the sought-after regulations more than 30 years prior).

award.  Thus, for Plaintiffs and all potential members of the proposed class who are not yet eligible for transfer to prerelease custody, there is no standing to pursue injunctive relief.

## II.     PLAINTIFFS' CLAIMS ARE MOOT BECAUSE THEY HAVE BEEN TRANSFERRED TO PRERELEASE CUSTODY.

As Defendants have explained, Plaintiffs' claims have been mooted by their transfer to prerelease custody.  Article III "restricts the federal courts to deciding only actual, ongoing controversies," and "a federal court has no power to render advisory opinions [or] . . . decide questions that cannot affect the rights of litigants in the cases before them."  *Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997) (citation omitted).  Plaintiffs do not appear to dispute that Mr. Galemmo's claim has been mooted.  Moreover, neither *City of Houston v. Dep't of Housing & Urban Development*, 24 F.3d 1421 (D.C. Cir. 1994), nor the highly speculative prospect that declaratory relief could strengthen Ms. Crowe's argument for an early termination of her period of supervised release can alter the fact that Ms. Crowe has been provided with "all the relief [s]he might have won in [this case.]"  *FBI v. Fikre*, 601 U.S. 234, 240 (2024); *accord Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (case is moot where "the court can provide no effective remedy" to plaintiff).[3]

Ms. Crowe argues that her claim for vacatur of the regulation and declaratory relief is not moot despite her transfer to an RRC because a "challenge to [an agency's] policy is not necessarily mooted merely because the challenge to the particular agency action is moot."  *See* Pls.' Opp'n 11 (quoting *City of Houston*, 24 F.3d at 1428).  But *City of Houston* does not provide a mootness exception for vacatur of the regulation, only for declaratory relief.   *See* 24 F.3d at 1429. Additionally, Plaintiff omits that *City of Houston* requires that a plaintiff have "standing to attack *future applications* of that policy."  *Id*. at 1430 (emphasis added).  Ms. Crowe lacks standing to attack future applications of the regulation because she is no longer subject to it due to her transfer

---

[3] Defendants do not contest, and have never contested, that, assuming Plaintiffs have standing and assuming a class could be certified, their putative class claims would not be moot under the inherently transitory exception to mootness.  *See* Pls.' Opp'n 12-15.

to prerelease custody, and it is unlikely she will ever be subject to it again.  *See Golden v. Zwickler*, 394 U.S. 103 (1969) (rejecting standing to challenge a statute prohibiting anonymous handbills directly relating to election campaigns because it was speculative that the plaintiff would ever be subject to it again); *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again . . . ."); *Scott v. District of Columbia*, 139 F.3d 940, 941 (D.C. Cir. 1998) ("Normally, a prisoner's transfer or release from a prison moots any claim he might have for equitable relief arising out of the conditions of his confinement in that prison.") (citations omitted).

The cases on which *City of Houston* relies reinforce that conclusion because the plaintiffs' "continuing injury due to [the] practice," *Payne Enters. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988) (citation omitted), was central to each court's holding that plaintiffs' claims against the policy had not been mooted.  *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115 (1974), initiated the line of cases concluding that the mootness of the plaintiff's individual challenge did not necessarily bar a continued challenge to the offending policy.  *City of Houston*, 24 F.3d at 1428-29.  There, an employer sought declaratory and injunctive relief to prevent New Jersey from granting state welfare benefits to striking workers on the ground that it violated federal labor laws. *Super Tire Eng'g Co.*, 416 U.S. at 116-17.  Key to the Supreme Court's conclusion that the claim seeking declaratory relief was not moot was the challenged policy's impact on subsequent relations between the employer and the union even after the strike that prompted receipt of the complained-about benefits ended.  *See id.* at 123-24.  That same dynamic was in play in *Payne* and *Better Government Ass'n v. Dep't of State*, 780 F.2d 86 (D.C. Cir. 1986), the two D.C. Circuit cases cited favorably in *City of Houston*.  In both cases, the plaintiffs were regular FOIA requestors whose regular conduct was likely to be affected by the challenged practice.  *See City of Houston*, 24 F.3d at 1430 (describing *Payne*, 837 F.2d at 493-94, as involving plaintiffs that "were 'frequent FOIA requesters' whose 'primary conduct' was affected by the practice at issue," and *Better Gov't*, 780

7

F.2d at 93-94 as involving "nonprofit organization plaintiffs [that] 'routinely made FOIA requests,' and alleged they had a 'statutory entitlement' to FOIA fee waivers").

Ms. Crowe seeks to get around the future standing requirement in *City of Houston* by speculating that a declaration from this Court—which is not the district court that sentenced her and is not even in the same circuit as her sentencing court (the Middle District of Alabama)—that she was not timely transferred to prerelease custody "would enhance [her] prospects" of requesting "a reduced term of supervised release" pursuant to 18 U.S.C. § 3583(e). Pls.' Opp'n 12. That claim is highly conjectural. Termination of supervised release under § 3583(e) is not a legal entitlement. Section 3583(e)(1) provides that a district court, after one year of supervised release has been served, may in its discretion terminate the remainder of the term after considering the factors set forth in 18 U.S.C. § 3553(a) and if it finds that such a reduction is warranted in the interests of justice. Thus, Plaintiffs' argument rests on the contention that a ruling by this Court that Ms. Crowe's transfer to an RRC was delayed by three weeks would cause a different court, not bound by this Court's interpretation of the FSA, to make, more than a year from now, a series of highly discretionary findings resulting in an early termination of her term of supervised release. That is too thin a reed to rest this Court's jurisdiction on, *see Clapper*, 568 U.S. at 413 ("[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment.")—particularly given that Ms. Crowe received a commutation from the President shortening her sentence by more than a year but explicitly leaving her full term of supervised release in place. Shoulders Decl. ¶ 29.

The cases Ms. Crowe cites in support of her argument, both of which addressed only declaratory relief, are readily distinguishable. They stand for the rule that a challenge to the length of a prisoner's sentence is not mooted by the prisoner's release to supervised release. *See United States v. Epps*, 707 F.3d 337 (D.C. Cir. 2013) (allowing prisoner's suit seeking a sentence reduction based on the crack-powder cocaine Guidelines amendments to proceed despite his release to supervised release); *In re Sealed Case*, 809 F.3d 672 (D.C. Cir. 2016) (allowing prisoner's substantive and procedural challenges to his sentence to proceed despite his release to supervised

release).  That rule does not keep Ms. Crowe's claim alive because she does not challenge the length of her sentence but rather her conditions of confinement.  *See Melot v. Bergami*, 970 F.3d 596, 600 (5th Cir. 2020) (finding a release from institutional custody to home confinement implicates conditions of confinement); *see also* 18 U.S.C. § 3624(g) (defining both home confinement and placement in an RRC as "custody" and differentiating placement in those conditions from supervised release); *United States v. Ko,* 739 F.3d 558, 561 (10th Cir. 2014) (18 U.S.C. § 3624 makes clear that, "even though a prisoner is living at a halfway house or in home confinement, he is still serving a term of imprisonment." (citation omitted)); *United States v. Lopez-Pastrana,* 889 F.3d 13, 18-19 (1st Cir. 2018) ("Home confinement . . . is a form of 'custody' under federal law."); *United States v. Saunders*, 986 F.3d 1076, 1078 (7th Cir. 2021) ("An inmate in home confinement remains in custody of the Bureau [of Prisons].").[4]

Moreover, the D.C. Circuit's conclusions in *Epps* and *In re Sealed Case* were driven by the relationship between a custodial sentence and supervised release.  *See Epps*, 707 F.3d at 345; *In re Sealed Case*, 809 F.3d at 674; *see also United States v. Ketter*, 908 F.3d 61, 65-66 (4th Cir. 2018) ("Incarceration and supervised release constitute complementary tools" and have a "reciprocal relationship." (citing *In re Sealed Case*, 809 F.3d at 674-75)).  In *Epps*—Plaintiffs' principal authority—the plaintiff, who had been sentenced by the United States District Court for the District of Columbia, sought to avail himself of the amendments to the Sentencing Guidelines addressing the crack-cocaine powder sentencing disparity through the only mechanism available to him to do so, a motion to his sentencing court for a modification of his term of imprisonment under 18 U.S.C.

---

[4] Plaintiffs' misconception of prerelease custody as something other than a form of custodial confinement results in overheated rhetoric declaring that BOP is "systematically incarcerat[ing] people longer than the law allows." Pls.' Opp'n 45; *see also id.* at 26 (claiming that reading "'shall' as permissive would . . . sanction[] prolonged incarceration"); *id. passim* (asserting that prisoners are being "overheld").  To be clear, BOP is not incarcerating anyone longer than the law allows, even under Plaintiffs' reading of the statute.  Prerelease custody is (quite literally) *not* release from custody, and thus individuals in prerelease custody are still *held* in BOP custody.  Indeed, by applying the maximum permissible amount of time credits toward supervised release—which, in contrast to prerelease custody, does in fact constitute release from custodial confinement—BOP is actually systematically incarcerating eligible prisoners *less* than the law allows.

§ 3582(c)(2).  707 F.3d at 340-41.  During the five years his case wove through the courts, he was released from prison into supervised release.  *Id*.  In concluding that the plaintiff's claim was not mooted by his release to supervised release, the D.C. Circuit highlighted that the claim at issue was whether the plaintiff's sentence had been too long and reasoned that "because of the relationship between a prison sentence and supervised release, . . . there seems to be a very substantial likelihood that a [favorable] ruling" would impact the consideration to reduce his term of supervised release.  *Id*. at 345.

Because Ms. Crowe does not challenge the length of her sentence, the reasoning behind the holdings in *Epps* and *In re Sealed Case* does not save her claim from being moot.  There is no basis for the Court to extend the holdings of *Epps* and *In re Sealed Case* to circumstances where prisoners challenge their conditions of confinement.  To do so would run afoul of the rule that a prisoner's claims for relief from conditions of confinement become moot when the prisoner is no longer subject to those conditions.  *See Dorman v. Thornburgh*, 955 F.2d 57, 58 (D.C. Cir. 1992) (challenges to conditions of confinement brought by a prisoner are moot and the prisoner lacks standing once the prisoner is released).

In addition, in both *Epps* and *In re Sealed Case*, the plaintiff brought his claims before his sentencing court, so any ruling he obtained would either be from the court that would consider his motion for a reduction in supervised release or from the appellate court in that circuit.  In contrast, Ms. Crowe brought her claim in a different circuit from where she was sentenced and can only speculate as to whether her sentencing court would credit a ruling from a different court in a separate, later proceeding.  The Court should not extend those cases to preserve a plainly moot dispute based solely on the hypothetical prospect that the ruling might inform some future collateral proceeding in a different court in another circuit.[5]

---

[5] Finding that her claim is moot does not foreclose Ms. Crowe from invoking the alleged three-week delay in her transfer to prerelease custody in any request to her sentencing court to terminate her term of supervised release early under § 3583(e).  But that speculative prospect does not entitle her to continue to litigate her now-mooted claim.

III.    **TRANSFERS TO PRERELEASE CUSTODY UNDER THE FSA ARE NOT JUDICIALLY REVIEWABLE**.

    A.    **Plaintiffs' Challenge to Allegedly Delayed Transfers is Nonreviewable.**

Defendants do not dispute that the use of the word "shall" usually connotes a mandatory obligation. However, as Plaintiffs acknowledge, that is not an ironclad rule. *See* Pls.' Opp'n 23. Here, in light of BOP's longstanding discretion over the placement of prisoners, the full statutory text of § 3624(g), and the purposes of prerelease custody, the Court should not read the use of "shall" in 18 U.S.C. § 3632(d)(4)(C) to carry its usual connotation.

Plaintiffs' argument starts from the flawed premise that there is a clear distinction between "where" a prisoner is sent and "whether" a prisoner is transferred to prerelease custody. *See* Pls.' Opp'n 17-18. Thus, Plaintiffs say, BOP has discretion to decide "*where* to transfer someone (*i.e.*, 'a designation of a place of imprisonment')," but it lacks discretion "about *whether* to transfer someone to prerelease custody once they are eligible." *Id.*; *see also id.* at 27. However, in the context of prerelease custody, the distinction between "where" and "whether" is a false one. As noted above, placement in prerelease custody—whether in an RRC or in home confinement—constitutes a custodial confinement. *See supra* p. 9. Thus, the decision about *whether* to transfer someone to prerelease custody is in fact a decision about *where* the prisoner should be confined. As such, it is subject to BOP's discretion under 18 U.S.C. § 3621(b) to designate a place of imprisonment. *See id.*

The only question, then, is whether the FSA eliminates that discretion. As explained, it does not. *See* Defs.' Combined Mot. to Dismiss & Opp'n to Pls.' Mot. for Prelim Inj. ("Defs.' Mem.") 18-27, ECF No. 34.

**i.** While Plaintiffs point to the fact that the word "shall" usually conveys a mandatory duty, as even Plaintiffs acknowledge, that presumption can be rebutted in certain circumstances. *See* Pls.' Opp'n 23. One such circumstance is where a statute uses "shall" to govern the Executive's conduct in a context that has a long tradition of deference to the Executive. *See* Defs.' Mem. 21-22 (collecting cases). In those circumstances, courts rightfully pause before assuming that "shall"

means must, even when the Legislature has used discretionary language in a related statute. *See id.* at 22; *contra* Pls.' Opp'n 23-24 (citing use of "may" in § 3624(g)); *id.* at 31 (citing use of phrase "to the extent practicable" in § 3624(c)). The Court should do the same here.

Plaintiffs argue that these cases arise in different contexts than transferring a prisoner out of prison to prerelease custody. *See* Pls.' Opp'n 26. True enough, but there is no reason to believe the principle underlying these decisions is so hidebound. Rather, consistent with the requirement that courts must interpret statutes "in their context and with a view to their place in the overall statutory scheme," *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (citation omitted), the Court must look to the broader background of longstanding BOP discretion over the placement of prisoners in custodial settings when interpreting the FSA. *See* Defs.' Mem. 19-20. And that background of discretion conflicts with Plaintiffs' mandatory reading of § 3632(d)(4)(C).

Plaintiffs nowhere dispute that the placement of prisoners in custodial settings has long been committed to BOP's discretion. Instead, they try to constrain the analysis to whether there is a "tradition of BOP discretion to apply Earned Time Credits under the First Step Act." Pls.' Opp'n 24. But it would make little sense to answer the question of whether the FSA should be read to afford BOP discretion by looking only to whether BOP has a tradition of discretion under the FSA. Rather, the Court must look more broadly to BOP's longstanding (and undisputed) general discretion over the placement of prisoners in particular custodial circumstances when evaluating whether the FSA's use of the word "shall" overrides that background principle. That is consistent with the approach taken by the Supreme Court in, for example, *City of Chicago v. Morales*, where it declined to interpret "shall" as imposing a mandatory duty based on police officers' general discretion in deciding when and where to enforce city ordinances, without confining its analysis to officers' discretion under the specific statute in question. *See* 527 U.S. 41, 62 n.32 (1999); *see also Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 761 (2005) (citing "deep-rooted nature of law-enforcement discretion" generally, not tied to specific statute at issue). Plaintiffs also attempt to distinguish these cases on the basis that they all involve exercises of leniency by the government. *See* Pls.' Opp'n 26. But they cite nothing in the cases relying on that reasoning.

Accordingly, Plaintiffs' interpretation of the FSA as setting a mandatory and unconditional obligation on BOP is in tension with BOP's longstanding discretion to designate the place of imprisonment for prisoners in BOP custody. That tension casts doubt on Plaintiffs' singular focus on the use of the word "shall."

**ii.** Plaintiffs' construction of the FSA is also at odds with the broader context of the FSA and its surrounding statutory provisions. *See* Defs.' Mem. 22-23. Notably, Plaintiffs fail to meaningfully respond to the provision in § 3624(g)(10) that expressly carves out only one portion of § 3624(c) from transfers to prerelease custody under the FSA, thereby indicating that the remainder of § 3624(c) continues to apply—including § 3624(c)(4)'s express preservation of BOP's discretion under § 3621(b). *See* Defs.' Mem. 23. The most Plaintiffs muster is an assertion that transfers under § 3632(d)(4)(C) are "outside the scope of § 3621(b)," Pls.' Opp'n 27-28 n.5, but that is tautological. As Plaintiffs concede, § 3632(d)(4)(C) incorporates by reference § 3624(g), *see, e.g.*, Pls.' Opp'n 23-24, and in excluding one, and only one, provision of § 3624(c), § 3624(g) in turn incorporates by reference the remaining provisions of § 3624(c). Thus, § 3624(c)(4)'s instruction that nothing in § 3624(c) "shall be construed to limit or restrict" BOP's authority under § 3621(b) applies with full force to transfers to prerelease custody pursuant to § 3624(g) and § 3632(d)(4)(C).

For that reason, Plaintiffs' attempts to rely on the Fourth Circuit's interpretation of § 3632(d)(4)(A), *see* Pls.' Opp'n 25 (citing *Valladares v. Ray*, No. 23-6932, 2025 WL 595560, at *3 (4th Cir. Feb. 25, 2022)), falls flat. Unlike § 3632(d)(4)(C), that provision does not incorporate any statutory language that expressly retains BOP's discretion under a separate statutory authority. Plaintiffs' reliance on a provision within the FSA requiring the Comptroller General to conduct biennial audits, *see* Pls.' Opp'n 25, is similarly misplaced. That Congress instructed the Comptroller General to report on the extent to which BOP is "transfer[ring] prisoners to prerelease custody or supervised release as soon as they are eligible for such a transfer," FSA, Pub. L. No. 115-391 § 103(7), 132 Stat. 5194, 5213-14 (2018), does not speak to BOP's discretion at all. Defendants have never disputed that the FSA reflects Congress's intent that BOP apply time credits

to the greatest extent it can, consistent with its resources, the needs of prisoners, and the purposes of prerelease custody. *See, e.g.*, Defs.' Mem. 28. It is unsurprising that, despite BOP's discretion, Congress might have an interest in assessing how BOP is exercising that discretion, including to evaluate whether further legislative changes or appropriations may be warranted. *Cf.* 18 U.S.C. § 3582(d)(3) (requiring BOP to annually submit to Congress a report on the number and outcomes of requests for sentence reductions, which are discretionary); *Aero Corp. v. Dep't of Navy*, 540 F. Supp. 180, 205 (D.D.C. 1982) (discussing Comptroller General's "important duty" to inform Congress on issues that "may require legislative responses").

iii.    As Defendants pointed out, numerous courts have held that transfers of eligible prisoners to prerelease custody pursuant to FSA time credits are still subject to BOP's discretion under § 3621(b). *See* Defs.' Mem. 23-24. To be sure, Plaintiffs have cited non-binding cases reaching a contrary conclusion, *see* Pls.' Opp'n 19; Pls.' Notice of Suppl. Auth., ECF No. 44, but for the reasons Defendants have explained, the Court should decline to follow them. Plaintiffs curiously chide Defendants for not providing a reason not to follow Plaintiffs' cited cases, *see* Pls.' Opp'n at 20, but that overlooks the fact that these cases—like Plaintiffs—misread the FSA in light of the broader statutory context, *see* Defs.' Mem. 18-27.

iv.    BOP's retention of discretion under the FSA to place a prisoner in prerelease custody, in light of the prisoner's individual circumstances and BOP's finite resources, ensures that transfers under the FSA will actually serve the purposes of prerelease custody. *See id.* at 25-27; *see also King v. Burwell*, 576 U.S. 473, 498 (2015) ("A fair reading of legislation demands a fair understanding of the legislative plan."); *Bailey v. United States*, 516 U.S. 137, 145 (1995) ("We consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme."). The central goal of prerelease custody is to provide the prisoner "a reasonable opportunity to adjust to and prepare for" reentry and reintegration into his community. 18 U.S.C. § 3624(c)(1). Reading the FSA to eliminate BOP's discretion to make transfers to prerelease custody would jeopardize BOP's ability to place prisoners in circumstances that can enable them to successfully reintegrate after their release from custody.

Surprisingly, Plaintiffs dispute that prerelease custody under the FSA is intended to assist prisoners' reintegration into their communities. Rather, they argue that that goal applies to prerelease custody only under the Second Chance Act, and not the FSA, which is focused instead on incentivizing prisoners to participate in recidivism-reduction programs and activities. *See* Pls.' Opp'n 26-27; *see also id.* at 43. But the former does not follow from the latter. Plaintiffs point to nothing indicating that Congress viewed prerelease custody under the FSA as fundamentally distinct from or unrelated to the goals of prerelease custody in general. Rather, in incentivizing expanded access to prerelease custody in the FSA, Congress was reemphasizing the goal of using prerelease custody to support prisoners' reintegration into their communities—consistent with the purposes underlying § 3624. *See, e.g.*, 164 Cong. Rec. S7,739 (2018) (statement of Sen. Schumer) ("It is in the interest of both currently incarcerated individuals and the communities to which they will eventually return to ensure we are doing everything in our power to set them up for successful reintegration into our society so that they don't commit another crime."); *id.* S7,745 (statement of Sen. Blumenthal) (discussing time credits as providing an incentive for "prisoners to prepare *for reentry*" (emphasis added)); *id.* S7,746 (statement of Sen. Cornyn) (explaining that the FSA is designed to enable "low-risk offenders to lead productive lives in their communities"); *see also* Shoulders Decl. ¶¶ 7-8, 17-18; 87 Fed. Reg. 2,705, 2,716 (Jan. 19, 2022) (recognizing that time credits "provid[e] significant incentives to encourage inmates to participate in evidence-based programs intended to reduce their risk of recidivism and help facilitate their successful reentry back into society after they have served their time"). Indeed, the FSA itself makes clear that PATTERN—BOP's risk and needs assessment, which determines prisoners' recidivism risk level and, therefore, their eligibility for transfer under the FSA—is intended to assist BOP in "determin[ing] when a prisoner is ready to transfer into prerelease custody . . . in accordance *with section 3624*," 18 U.S.C. § 3632(a)(7) (emphasis added), indicating that Congress contemplated that prerelease custody under FSA would be consistent with the goals of prerelease custody in general.

15

Notably, those goals cannot be served by treating a transfer to home confinement or an RRC as an end in and of itself, as Plaintiffs suggest. *See* Pls.' Opp'n 45. A prisoner who is from Baltimore and intends to reside in Baltimore upon his release from custody cannot reintegrate into his post-release community from an RRC in North Dakota or Oklahoma. *See* Defs.' Mem. 25-26. Plaintiffs remarkably brush these concerns aside, suggesting that any geographic incompatibility between BOP's prerelease custody capacity and prisoners' needs is a "self-imposed consequence" on *BOP*. Pls.' Opp'n 27. But any consequences in fact fall on eligible prisoners, who may lose a chance to be transferred to home confinement or an RRC in their community, albeit at a later date, in exchange for immediate transfers to prerelease custody under circumstances that will not set them up for successful reintegration. Moreover, though Plaintiffs imply that any geographical constraints flow from BOP's failure to obtain the necessary prerelease custody capacity, *id.* (citing 18 U.S.C. § 3624(g)(11)), BOP has not violated § 3624(g)(11), and in fact has expanded its capacity by approximately 1,200 slots since the FSA's enactment. Shoulders Decl. ¶ 24. But simply because BOP has capacity somewhere does not mean it has capacity for each prisoner in the place or places that will best support his reintegration into his community. And nothing in § 3624(g)(11) could be read to require that, particularly given that the eligible prisoner population and its geographic makeup fluctuates daily. *See* Shoulders Decl. ¶ 19.

Plaintiffs next proclaim that the FSA does not "require that an eligible person be placed in a halfway house or home confinement in a *particular community*." Pls.' Opp'n 45 (emphasis added) (citation omitted). But again, that cannot be squared with the goals of prerelease custody. Indeed, Plaintiffs do not even appear to believe their own position. The harms they cite from allegedly delayed transfers—namely, the inability to spend time "reconnecting with family, earning income, and reintegrating back into their communities," *id.* at 2—all depend on placement *in a particular community* suited for each individual prisoner's reintegration. *See also* Declaration of Vanessa Crowe ¶¶ 30-31, ECF No. 2-1 (citing harms stemming from lost time with family and her "home church"); Declaration of Glen Galemmo ¶¶ 7-8, ECF No. 2-2 (citing harms stemming from inability to "provide direct support to [his] family").

16

Moreover, Plaintiffs overlook that BOP must weigh other individualized considerations in making transfer determinations that could affect timing, including safety concerns and state law restrictions. *See* Defs.' Mem. 20; Shoulders Decl. ¶¶ 18-22. BOP's transfer decision for Jamie Sigmon is illustrative. As Plaintiffs allege, Ms. Sigmon first became eligible for transfer to prerelease custody as of January 6, 2025. *See* Compl. ¶ 29.d. Ms. Sigmon was originally slated for transfer to home confinement, but complications arose pre-transfer because of the presence of firearms in the house. Second Declaration of Bianca Shoulders ¶ 2 ("Second Shoulders Decl."). Although RRM staff sought to resolve the issue, they had to pivot to placing Ms. Sigmon at an RRC, where she was transferred on February 19, 2025. *Id.* Other prisoners similarly have highly-individualized considerations, such as medical care needs that cannot be met in an RRC, that can limit where and in what circumstances BOP can transfer them to prerelease custody. The need to factor in these prisoner-specific circumstances conflicts with the contention that the FSA gives BOP no discretion when it comes to transferring prisoners to prerelease custody.

In addition, Plaintiffs make much of the fact that BOP advanced Ms. Crowe's and Mr. Galemmo's anticipated transfer dates, implying that this disproves the existence of any geographic limitations on BOP's capacity. *See* Pls.' Opp'n at 44. As explained, Ms. Crowe and Mr. Galemmo initially received later anticipated transfer dates due to an internal practice of determining transfer dates based on the number of credits as of the date of *referral*, without factoring in the number of credits that would be earned after that date. *See* Defs.' Mem. 15 n.5.[6] Once BOP recalculated their

---

[6] Under that practice, for example, a prisoner referred in March 2024 for a transfer to an RRC may have had his transfer date calculated by (i) taking his projected release date after subtracting good time credits, (ii) reducing that by 365 days to reflect the application of FSA time credits toward supervised release, and then (iii) using any remaining FSA time credits earned by March 2024 to calculate an anticipated transfer date. However, that same prisoner would continue to earn time credits after March 2024 (*e.g.*, up to 105 additional time credits through 2024). Thus, factoring in projected time credits could result in an anticipated transfer date months earlier than under the prior practice—which is what happened to Ms. Crowe and Mr. Galemmo. Notably, in October 2024, BOP issued a memorandum clarifying that Residential Reentry Management staff are to make conditional placement designations factoring in time credits projected to be earned. *See* Shoulders Decl. ¶ 23, Ex. C.

transfer dates to include time credits earned (or projected to be earned) after the date of referral, consistent with BOP's present policy for determining anticipated transfer dates, both Ms. Crowe and Mr. Galemmo received earlier transfer dates.

Thus, any supposed delay in Ms. Crowe's or Mr. Galemmo's transfer date was not due to capacity limitations, *contra* Pls.' Opp'n 44, and BOP's ability to resolve any alleged delay for these Plaintiffs says nothing about whether geographic mismatches between BOP's capacity and prisoners' needs limit BOP's ability to immediately match prisoners with prerelease custody placements that will in fact promote their successful reintegration into society. Shoulders Decl. ¶¶ 18-22. Indeed, consistent with its commitment to implementing the FSA, BOP has commenced a review of all currently eligible prisoners who remain in prison to assess whether BOP can accelerate the transfer of any such prisoners, consistent with its resources, BOP policies, and the needs of those prisoners.[7]

In sum, Plaintiffs' apparent disregard for BOP's need to place prisoners in the appropriate setting underlies Plaintiffs' erroneous conclusion that § 3632(d)(4)(C) imposes an unconditional and mandatory obligation on BOP to transfer prisoners to prerelease custody on the date they become eligible. The point stands—"[t]here is no reason to believe Congress intended to undermine the purposes of prerelease custody in such a fashion." Defs.' Mem. 26. At a minimum, Plaintiffs' position is irreconcilable with their requested relief of an injunction requiring a blanket transfer of all eligible prisoners to prerelease custody. Many putative class members may well

---

[7] For example, Kay Gow—a putative class member referenced in the Complaint, *see* Compl. ¶ 29— received a pre-October 2024 referral and, as a result, had her anticipated referral date calculated without including projected time credits. *See* Second Shoulders Decl. ¶ 3. After the Complaint was filed, Ms. Gow was transferred to a work release center on March 11, 2025, which was in fact earlier than her FSA Conditional Placement date, as she was separately granted additional time in prerelease custody under the Second Chance Act. *Id.* For their part, the other prisoners mentioned by name in the Complaint either have been or will soon be transferred to prerelease custody. Danyell Roberts is expected to transfer to an RRC on or around March 19, 2025. *Id.* ¶ 4. Richard Rudisill is expected to transfer to home confinement on or around March 26, 2025, and due to his receipt of a grant of clemency, will be release from BOP custody on April 17, 2025. *Id.* ¶ 5. Richard Williams is also expected to transfer to an RRC on or around March 26, 2025. *Id.* ¶ 6.

prefer placement in prerelease custody in their community, even with a short wait, over an immediate placement in an RRC in some far-flung locale, hundreds of miles away from their families and support systems, where they may spend months or even years. Any blanket injunction could also result in transfers in circumstance where prisoners cannot be adequately monitored or cannot receive the necessary support, jeopardizing the interests of both prisoners and the public. Thus, even if the Court were to agree with Plaintiffs' reading of the FSA, any resulting relief would need to be carefully calibrated to ensure that prisoners are in fact afforded a reasonable opportunity to readjust to their communities through prerelease custody.[8]

**B.    Sections 3621(b) and 3625 Bar Judicial Review of Transfer Decisions.**

As explained, the FSA does not override BOP's discretion to designate the placement of prisoners in prerelease custody, and accordingly, judicial review of Plaintiffs' challenge to the timeliness of their transfers to prerelease custody is barred by § 3621(b). *See* Defs.' Mem. 27. In addition, Plaintiffs' supposed challenge under 5 U.S.C. § 706(1) is additionally barred by 18 U.S.C. § 3625. *See id.* at 27-28.

Plaintiffs claim that their APA challenge to "BOP's policy of not applying First Step Act Earned Time Credits" is not precluded by § 3625. Pls.' Opp'n 21. They do not distinguish between their challenge to 28 C.F.R. § 523.44, Compl. ¶¶ 41-46, and their (theoretical) claim under 5 U.S.C. § 706(1) challenging the discrete, non-transfer of individual prisoners to prerelease custody, *see id.* ¶¶ 47-51 (not invoking § 706(1) in asserting challenge). As to the latter claim, however, § 3625 precludes judicial review.

Though Plaintiffs could have attempted to bring a claim for unreasonable delay through § 706(1)—albeit, still subject to dismissal under § 3625—they did not do so. Defs.' Mem. 27. Plaintiffs concede as much and instead suggest that the Court could excuse this because of the "liberal standard for amending a complaint under Federal Rule of Civil Procedure 15." Pls.' Opp'n

---

[8] For these same reasons, Plaintiffs cannot satisfy the cohesiveness requirement of Federal Rule of Civil Procedure 23(b)(2). *See* Defs.' Mem. of P. & A. in Opp'n to Pls.' Mot. for Class Cert. 12-17, ECF No. 40.

37.  However, Plaintiffs have never sought leave to amend their complaint, so Rule 15 has no relevance here.  And "[i]t is well settled law that a plaintiff cannot amend his or her complaint by the briefs in opposition to a motion to dismiss." *Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 160 n.7 (D.D.C. 2014), *aff'd on other grounds sub nom. Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36 (D.C. Cir. 2016); *see also Kelleher v. Dream Catcher, L.L.C.*, 263 F. Supp. 3d 322, 327 n.1 (D.D.C. 2017) (Mehta, J.).

Even if they had brought such a claim, § 3625 expressly precludes review under the APA "of any determination, decision, or order under this subchapter."  Their challenge to allegedly delayed transfers of prisoners to prerelease custody falls squarely within § 3625's bar.  *See, e.g., Reeb v. Thomas*, 636 F.3d 1224, 1227 (9th Cir. 2011) ("plain language" of § 3625 "specifies that the judicial review provisions of the APA . . . do not apply to any determination, decision, or order made pursuant to 18 U.S.C. §§ 3621-3624") (citation omitted).

Plaintiffs try to skirt § 3625 by attempting to convert their challenge to the discrete allegedly untimely transfers of individual prisoners to prerelease custody into a challenge to a purported "policy of not applying First Step Act Earned Time Credits," *see* Pls.' Opp'n. 21, but they cannot do so.  A challenge to an agency's alleged "failure to act" is limited to "circumscribed, discrete, agency actions."  *SUWA*, 542 U.S. at 62-63.  It precludes "broad programmatic attacks on agency behavior, *id*. at 67, or efforts to seek "wholesale improvement of [an agency] program by court decree."  *Lujan*, 497 U.S. at 891.  In *SUWA*, the Supreme Court was concerned with "protect[ing] agencies from undue judicial interference with their lawful discretion and to avoid judicial entanglement in abstract policy disagreements."  *SUWA*, 542 U.S. at 66.  If courts were to become involved in broad programmatic challenges, they, rather than the agency, would be responsible for "work[ing] out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management."  *Id*. at 66-67.  As this Court has observed, courts are not the appropriate entity to address programmatic failure—the places to seek those fixes are "the offices of the Department or the halls of Congress, where programmatic improvements are normally

made." *Bannister v. U.S. Parole Comm'n*, No. 18-cv-01397 (APM), 2020 WL 85229, *3 (D.D.C. Jan. 7, 2020) (quoting *Lujan*, 497 U.S. at 891).

Broad programmatic failure is seemingly how Plaintiffs now describe their challenge to the non-transfer of individual prisoners. *See* Pls.' Opp'n 21. However, Plaintiffs' new formulation of their claim, that BOP has a "policy of not applying First Step Act Earned Time Credits," *id.,* is not even consistent with the allegations in their Complaint. In the Complaint, Plaintiffs acknowledge that BOP is applying the maximum number of FSA time credits to supervised release for all eligible inmates and that BOP is applying FSA time credits to transfer eligible prisoners to prerelease custody. *See* Compl. ¶¶ 17, 27-30. Plaintiffs do not allege that BOP always fails to apply all FSA time credits toward prerelease custody, just that in some circumstances and for some eligible prisoners, BOP is not transferring them on the first date they become eligible. Ultimately, it is not clear what policy Plaintiffs allegedly challenge—beyond an amorphous allegation that BOP sometimes (but not always) applies some (but not all) time credits. While challenges to discrete delayed transfers would be actionable if not for § 3625, Plaintiffs cannot use the APA to assert a claim seeking to improve BOP's compliance with the FSA on a programmatic basis. *See Lujan*, 497 U.S. at 891 (noting that "programmatic improvements" cannot be sought through the APA). And accordingly, Plaintiffs cannot use the supposed existence of a policy to circumvent § 3625's bar on APA review.

### C.    BOP Is Complying With Any Statutory Mandate.

As discussed, § 3632(d)(4)(C) is best read not to displace BOP's discretion over the placement of prisoners in prerelease custody. *See supra* Part III.A. However, even it does, BOP is complying with the plain language of the statute, as it applies the maximum permissible amount of time credits toward supervised release for eligible prisoners while also applying time credits toward prerelease custody. *See* Defs.' Mem. 29-30. Plaintiffs contend that Congress could have expressly given BOP the option of not applying some time credits, *see* Pls.' Opp'n 30, but Congress did not specify the amount of time credits that must be applied. The only instance in which Congress specified an amount of time credits at all is in capping the number of time credits that

can be applied to supervised release, *see* 18 U.S.C. § 3624(g)(3).  For that reason, Plaintiffs' labored florist analogy, which is premised on an express instruction as to the number of roses to be delivered, Pls.' Opp'n 29, is inapt.

## IV. PLAINTIFFS CANNOT SEEK NONSTATUTORY REVIEW OF ALLEGED DELAYED TRANSFERS TO PRERELEASE CUSTODY.

Plaintiffs disclaim bringing a nonstatutory *ultra vires* claim.  *See id.* at 33.  Instead, they posit that language from the Supreme Court's decision in *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2013) allows them to assert a freestanding claim under the Court's inherent equitable power that is distinct from both a duplicative APA claim (which they concede is unpled, *see* Pls.' Opp'n 37), and a nonstatutory *ultra vires* claim.  They are mistaken.

Plaintiffs base the existence of this species of claim in *Armstrong*'s recognition that "federal courts may in some circumstances grant injunctive relief . . . with respect to violations of federal law by federal officials."  575 U.S. at 326-27.  But the Supreme Court grounded that principle in *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902), *see Armstrong*, 575 U.S. at 327, a pre-APA case where the Court held that "courts generally have jurisdiction to grant relief" when a federal official "violates the law to the injury of an individual," *McAnnulty*, 187 U.S. at 108.

The D.C. Circuit has described *McAnnulty* as "the wellspring of nonstatutory review of agency action."  *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022); *Trudeau v. FTC*, 456 F.3d 178, 190 n.21 (D.C. Cir. 2006) (crediting *McAnnulty* as "the font of the nonstatutory review doctrine").  And the D.C. Circuit has made equally clear that nonstatutory review under *McAnnulty* is limited to *ultra vires* actions, which apply only:

> where (i) there is no express statutory preclusion of all judicial review; (ii) "there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory."

*Fed. Express Corp.*, 39 F.4th at 763 (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)); *Trudeau*, 456 F.3d at 190 (similar); *see also Nat'l Ass'n of Postal*

*Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) (recognizing that "[r]eview for *ultra vires* acts rests on the longstanding principle" found in *McAnnulty*); *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) (describing "the *McAnnulty* doctrine of review" as "the review of *ultra vires* actions"). In the face of this controlling D.C. Circuit authority, Plaintiffs' reliance on *Mathis v. U.S. Parole Commission*, 749 F. Supp. 3d 8, 23 (D.D.C. 2024)—which Plaintiffs concede did not even discuss the relevant issue, Pls.' Opp'n 36—is unavailing. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)).

Plaintiffs also cite *Armstrong* for the proposition that a court's inherent authority to enjoin violations of federal law "trace[s] back to England." Pls.' Opp'n 33 (quoting *Armstrong*, 575 U.S. at 327). But that selectively quotes the relevant passage from *Armstrong*, the full text of which discusses "[t]he ability to sue to enjoin *unconstitutional* actions by state and federal officers." 575 U.S. at 327 (emphasis added). Plaintiffs' *ultra vires* claim is, of course, not a constitutional claim. *See Dalton v. Specter*, 511 U.S. 462, 473 (1994) ("[C]laims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims[] subject to judicial review.").

Accordingly, under controlling D.C. Circuit authority, Plaintiffs are simply wrong that their "inherent equitable power claim is different from an *ultra vires* claim." Pls.' Opp'n 34. If they weren't, and parties could, pursuant to a court's inherent equitable power, raise a claim that an agency action violated a statute shorn of the limitations of either the APA or *ultra vires* review, *see* Pls.' Opp'n 36, one wonders what those other doctrines would be for. *See Hernandez v. Mesa*, 589 U.S. 93, 109 (2020) ("It would be anomalous to impute a judicially implied cause of action beyond the bounds Congress has delineated for a comparable express cause of action." (cleaned up)). There would be little reason for any plaintiff to rely on the APA or a specific statutory judicial review provision if it were free to bring an implied equitable action based on the same theory without having to comply with any of the limitations Congress imposed on those review provisions. *See* 33 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. § 8307 (3d ed. Apr.

2020 update) (recognizing that if implied causes of action were always available to challenge agency action, it would "raise[] the question of why anyone would bother to use more limited causes of action created by special statutory review proceedings and the APA"). Nor would a plaintiff need to resort to the "exacting standard of review" for *ultra vires* actions, *Fed. Express Corp.*, 39 F.4th at 764, if an inherent equitable authority claim were always available. There is no reason to believe that *Armstrong* intended to supplant these longstanding avenues of review.

Thus, despite their protestations to the contrary, Plaintiffs are asserting a nonstatutory *ultra vires* claim challenging BOP's allegedly delayed transfers of prisoners to prerelease custody. As discussed, that challenge is unreviewable under § 3621(b) and § 3625. *See supra* Part III.B. But if Plaintiffs' challenge were justiciable, it could not be brought through *ultra vires* review. *See* Defs.' Mem. 31-33.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant Defendants' motion to dismiss the complaint for lack of subject matter jurisdiction.

Dated: March 19, 2025                  Respectfully submitted,

                                       YAAKOV M. ROTH
                                       Acting Assistant Attorney General
                                       Civil Division

                                       ANDREW I. WARDEN
                                       Assistant Branch Director

                                        /s/ Chetan A. Patil
                                       CHETAN A. PATIL (D.C. Bar No. 999948)
                                       Senior Trial Counsel
                                       SAMUEL B. BEAN (MD)
                                       Trial Attorney
                                       Civil Division, Federal Programs Branch
                                       P.O. Box 883
                                       Ben Franklin Station
                                       Washington, D.C. 20044
                                       Tel: (202) 305-4968
                                       chetan.patil@usdoj.gov

                                       *Attorneys for the United States of America*