UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————

|  |  |  |
|---|---|---|
| **VANESSA CROWE & GLEN GALEMMO,** *on behalf of themselves and others similarly situated***,** | ) ) ) ) |  |
| **Plaintiffs,** | ) ) |  |
| v. | ) ) | **Case No. 24-cv-3582 (APM)** |
| **FEDERAL BUREAU OF PRISONS, et al.,** | ) ) |  |
| **Defendants.** | ) ) |  |

———————————————————————

## <u>MEMORANDUM OPINION</u>

### I.    INTRODUCTION

Through the First Step Act, Congress established a system of earned time credits that enables federal inmates who participate in recidivism reduction programming to decrease the number of days of their sentence that they spend in prison.  As relevant to this case, the First Step Act provides that "[t]ime credits earned . . . *shall* be applied toward time in prerelease custody or supervised release," and the "Director of the Bureau of Prisons *shall* transfer eligible prisoners . . . into prerelease custody or supervised release."  18 U.S.C. § 3632(d)(4)(C) (emphasis added).

Vanessa Crowe and Glen Galemmo ("Named Plaintiffs"), on behalf of themselves and all others similarly situated (together with Named Plaintiffs, "Plaintiffs"), filed this class action lawsuit claiming that Defendants Federal Bureau of Prisons ("BOP") and its Director William K. Marshall III[1] are not moving eligible inmates out of prison within the time required by the First Step Act.  According to Plaintiffs, Congress's use of the word "shall" in § 3632(d)(4)(C) leaves no

---

[1] The court substitutes Director Marshall for Defendant Colette Peters, the former Director of the Bureau of Prisons.  *See* Fed. R. Civ. P. 25(d).

room for discretion.  It means that Defendants *must* transfer all eligible inmates to prerelease custody or supervised release when their earned time credits equal the remaining time on their sentences.  They seek a preliminary injunction that orders the BOP to timely transfer all eligible inmates.

Defendants see things differently.  According to them, the First Step Act does not mandate *when* the BOP must transfer an inmate from a prison setting to prerelease custody or supervised release.  It retains discretion when making that decision.  Defendants thus oppose preliminary relief and class certification, and they have moved to dismiss the complaint.

For the reasons that follow, the court denies Plaintiffs' Motion for Preliminary Injunction and grants Defendants' Motion to Dismiss.  The court finds that, because Named Plaintiffs' individual claims are now moot and because a provisional class cannot be certified as to their claim seeking to compel agency action, that claim must be dismissed.  The court, however, will certify a provisional class as to Plaintiffs' contrary-to-law claim, thereby avoiding mootness, but nonetheless dismisses that cause of action for failure to state a claim.

## II.    BACKGROUND

### A.    Legal Landscape Before the First Step Act

Individuals "sentenced to a term of imprisonment" in federal court "shall be committed to the custody of the Bureau of Prisons until the expiration of the term imposed, or until earlier released for satisfactory behavior."  18 U.S.C. § 3621(a).  It is up to the BOP to "designate the place of the prisoner's imprisonment," and the BOP "may designate any available penal or correctional facility that meets minimum standards" that it "determines to be appropriate and suitable."  *Id.* § 3621(b).  In making that assessment, Congress directed the BOP to consider a host of factors, including: (1) "the resources of the facility contemplated," (2) "the nature and

circumstances of the offense," (3) "the history and characteristics of the prisoner," (4) "any statement by the court that imposed the sentence," and (5) "any pertinent policy statements issued by the Sentencing Commission."  *Id.*  Recognizing the broad discretion inherent in this determination, Congress shielded it from judicial review.  It provided that "a designation of a place of imprisonment . . . is not reviewable by any court."  *Id.*  Congress further stated that the provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 554, 555, 701–06, "do not apply to the making of any determination, decision, or order" under 18 U.S.C. §§ 3621–26, which encompasses the section governing the BOP's placement designations.  18 U.S.C. § 3625.

Congress enacted the Second Chance Act of 2007 to "assist offenders reentering the community from incarceration to establish a self-sustaining and law-abiding life by providing sufficient transitional services."  Pub. L. No. 110-199, § 3(a)(5), 122 Stat. 657 (2008).  One way Congress sought to achieve that objective was to expand federal inmates' access to "prerelease custody," which means placement in a Residential Reentry Center ("RRC"), commonly known as a "halfway house," or home confinement.  18 U.S.C. § 3624(c)(1)–(2).  The legislation directed the BOP, "to the extent practicable, [to] ensure" that prisoners "spend[] a portion of the final months" of their term of imprisonment in prerelease custody, not to exceed 12 months.  *Id.* § 3624(c)(1).  In authorizing such early transfers from incarceration, Congress wished to afford prisoners "a reasonable opportunity to adjust to and prepare for reentry . . . into the community."  *Id.*  Transfer to prerelease custody under the Second Chance Act was explicitly subject to the BOP's general discretion over placement designations under § 3621(b).  *Id.* § 3624(c)(4).

### B.    The First Step Act's Earned Time Credits System

In 2018, Congress passed the First Step Act ("FSA"), which sought to expand prisoners' access to non-custodial placement.  *See* Pub. L. No. 115-391, 132 Stat. 5194 (2018) (codified at

18 U.S.C. §§ 3621, 3624, 3631–35). Congress hoped to both reduce recidivism and prepare prisoners for reentry into the community. *See* 164 Cong. Rec. S7745 (2018) (statement of Sen. Blumenthal) (noting that "draconian prison terms provide few incentives for prisoners to prepare for reentry, and that is the gap the [FSA] seeks to address"); 164 Cong. Rec. S7642 (2018) (statement of Sen. Cornyn) (noting that the Act sought to "allow[] prisons to help criminals transform their lives . . . so that we are not perpetuating the cycle of crime that continues to plague communities across the country").

To that end, Congress established an incentive-based system that encourages federal inmates to participate in "evidence-based recidivism reduction" ("EBRR") programs and "productive activities" ("PAs"). 18 U.S.C. §§ 3621(h), 3632(d). Congress required the Attorney General to develop "a risk and needs assessment system" to enable the BOP to evaluate an individual's unique profile, recidivism risk, and needs. *Id.* § 3632(a). The Attorney General did so in 2019, releasing the Prisoner Assessment Tool Targeting Estimated Risk and Needs ("PATTERN"). *See* U.S. Dep't of Justice, *The First Step Act of 2018: Risk and Needs Assessment System* (July 19, 2019), https://perma.cc/67KT-KZG2. Thereafter, the FSA required the BOP to conduct an initial risk and needs assessment of every prisoner in its custody and then begin assigning prisoners to appropriate EBRR programs and PAs. 18 U.S.C. § 3621(h)(1)(A). The BOP periodically reassesses each prisoner's PATTERN profile and classifies the prisoner as having a minimum, low, medium, or high risk of recidivism, tailoring EBRR programs and PAs to this determination. *Id.* § 3632(a)(1), (4), (5).

Inmates who participate in EBRR programs and PAs can earn "incentives and rewards for successful participation." 18 U.S.C. § 3632(a)(6). This includes time credits, which can be used to shorten the time spent in prison unless the prisoner is convicted of certain enumerated federal

offenses.  *See id.* § 3632(d)(4)(A), (C).  Prisoners "who successfully complete" qualified programming "shall earn time credits" of ten days for every 30 days of participation and, for prisoners deemed minimum or low risk, an additional five additional days for every 30 days of participation.  *Id.* § 3632(d)(4)(A).

The accrual of time credits can result in early release from a prison setting.  The FSA provides that "[t]ime credits earned . . . by prisoners who successfully participate in" EBRR programs or PAs "shall be applied toward time in prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C).  Further, "[t]he Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release."  *Id.* Section 3624(g), in turn, defines an eligible prisoner as one who:

(1) "has earned time credits" under § 3632 "in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment;"

(2) "has shown through the periodic risk reassessments a demonstrated recidivism risk reduction or has maintained a minimum or low recidivism risk, during the prisoner's term of imprisonment;"

(3) "has had the remainder of the prisoner's imposed term of imprisonment computed under applicable law;" and

(4) "has been determined . . . to be a minimum or low risk to recidivate pursuant to the last 2 reassessments of the prisoner" or "has had a petition to be transferred to prerelease custody or supervised release approved by the warden of the prison" after determining that "the prisoner would not be a danger to society if transferred," "has made a good faith effort to lower their recidivism risk through participation in" EBRR programs or PAs, and "is unlikely to recidivate," if the prisoner is to be placed in prerelease custody; or

(5) "has been determined . . . to be a minimum or low risk to recidivate pursuant to the last reassessment of the prisoner," if the prisoner is to be placed in supervised release.

*Id.* § 3624(g)(1).

If a prisoner satisfies the above criteria, their time credits must be applied toward placement into one of three different settings.  *See* 18 U.S.C. § 3624(g)(2)(A).  The first is home confinement, which is subject to certain mandatory conditions, including 24-hour location monitoring,

remaining within the residence with limited exceptions, and any other conditions the BOP "determines appropriate." *Id.* The second is an RRC "subject to such conditions" as the BOP "determines appropriate." *Id.* § 3624(g)(2)(B). Congress instructed the BOP to "ensure there is sufficient prerelease custody capacity to accommodate all eligible prisoners." *Id.* § 3624(g)(11). And the third is supervised release, if imposed by the sentencing court. *See id.* § 3624(g)(3). Transfer to supervised release cannot exceed more than the last 12 months of a person's sentence. *Id.*

So, say a prisoner has (1) earned 350 days of First Step Act credits, (2) a history of reduced recidivism risk, and (3) a most recent PATTERN assessment indicating a minimum or low risk to recidivate. When there are 350 days remaining on the sentence, the prisoner may be released to supervised release provided there is such a term. The same prerequisites apply for release to home confinement or an RRC, except the prisoner's two most recent PATTERN assessments must yield a minimum or low risk to recidivate, or the warden of the prison must approve the transfer.

In January 2022, the BOP promulgated a regulation codifying its "procedures regarding the earning and application of time credits as authorized by the First Step Act." FSA Time Credits, 87 Fed. Reg. 2705, 2705 (Jan. 19, 2022). The regulation, titled "Application of FSA Time Credits," states that the BOP "*may* apply FSA Time Credits toward prerelease custody or supervised release" when certain conditions are met. 28 C.F.R. § 523.44(a)(1) (emphasis added); *accord id.* § 523.44(c)–(d).

## C.    BOP's Practice Administering the Time Credits System

The current process to transfer an inmate from a secure BOP facility to prerelease custody involves multiple levels of review. *See* Defs.' Combined Mot. to Dismiss and Opp'n to Pls.' Mot. for Prelim. Inj., ECF No. 34 [hereinafter Defs.' Mot. to Dismiss], Decl. of Bianca Shoulders,

ECF No. 34-1 [hereinafter Shoulders Decl.], ¶ 16; *see also* Shoulders Decl., Ex. A, ECF No. 34-2 (copy of BOP Program Statement 7310.04). The prison staff responsible for the inmate's programming must first recommend a prerelease custody placement to the warden. Shoulders Decl. ¶ 16. If the warden agrees, they will forward the referral to the BOP's regional Residential Reentry Management Branch ("RRMB") office that oversees the geographic area where the prisoner is to be placed into prerelease custody. *Id.* This referral is submitted to the office at least 60 days prior to the inmate's "FSA Conditional Placement Date." *Id.* That is the date on which an inmate's time credits equals the remainder of their sentence. *Id.* ¶ 15.

The BOP has used two policies to determine the FSA Conditional Placement Date. Until October 2024, it made that determination based on only the time credits the prisoner had earned as of the date of referral. *Id.* ¶ 23. The estimated placement date did not account for any time credits the prisoner might accrue *after* the referral. *See id.* For example, if an inmate completed 30 days of EBRR programming after the referral, the FSA provides an additional 10 days of time credits, *see* 18 U.S.C. § 3632(d)(4)(A)(i), but those days would not be reflected in the FSA Conditional Placement Date. Since October 2024, BOP has modified its approach to reflect both the FSA earned credits at the time of the referral *and* all FSA credits that the inmate is projected to earn in the future, assuming no changes to the inmate's behavior, program participation, and eligibility. Shoulders Decl. ¶ 23*; see also* Shoulders Decl., Ex. C, ECF No. 34-4 (memorandum explaining FSA planning dates). That date could change, however, if the inmate were to lose time credits. *See* Shoulders Decl. ¶ 15. The BOP provides FSA Conditional Placement Dates to inmates "for planning purposes," but does not consider them final "until the time credits are applied and a prerelease placement is approved." *Id.*

The BOP's staff develops and administers contracts for RRCs and home confinement. Shoulders Decl. ¶ 4. The BOP does not own or operate any RRCs. *Id.* Inmates on home confinement are usually monitored by contract employees of those RRCs but, in some cases, may be monitored by U.S. Probation and Pretrial Services. *Id.* ¶¶ 11, 13. Each contract has a maximum number of inmates that can be placed in the RRC or on home confinement. *Id.* ¶ 12.

"The primary considerations for RRC placement are geography, bed space availability, and safety." *Id.* ¶ 18. The BOP tries to place inmates in the geographic area where they will be ultimately released. *Id.* So, say, an inmate intends to live in Baltimore, Maryland. The BOP will try to place them in prelease custody there, but if bed space is lacking at a nearby RRC and if, for whatever reason, home confinement is not an option, the BOP will not place that inmate in an open space somewhere far flung. *See id.*

Further, "[a] primary safety concern when making prerelease custody placements is whether the RRC has any current residents that are a danger to the transferring inmate, or vice versa." *Id.* In such a situation, the BOP deems the RRC unavailable. *Id.* Further, some RRC contracts contain offense-specific restrictions. *See id.* ¶ 22. For example, in the State of Florida, only one RRC, located in Tampa, accepts sex offenders. *Id.* The BOP admits that it does not have sufficient prerelease custody capacity to accommodate every inmate's needs in the desired geographic area. *Id.* ¶ 24.

These competing factors can result in the denial or delay of a prisoner's placement in prerelease custody, even when the prisoner is statutorily eligible for transfer. *See id.* ¶ 19. In practice, the BOP advises staff "to explore all available options prior to denying or delaying a placement, and RRMB staff also seek to maximize the use of home confinement to free up RRC beds whenever possible." *Id.* Since the FSA was enacted, the BOP has added 1,200 slots to its

prerelease custody capacity. *Id.* ¶ 24. The BOP also is seeking to expand RRC capacity in line with the FSA's mandate but is hindered by limited funding and rising operational costs. *Id.* ¶¶ 24–27. Though these constraints affect placement in prerelease custody, the BOP is transferring prisoners to supervised release to the maximum extent allowed under the FSA by applying the first 365 days of time credit towards early supervised release. *Id.* ¶ 14.

The BOP has publicly acknowledged delays in making transfers to prerelease custody. Former BOP Director Colette Peters was asked during a congressional hearing if it was accurate that more than 60,000 FSA-eligible inmates are facing 3- to 12-month delays in transfers. *See* Pls.' Mot. for Class Cert., ECF No. 2, [hereinafter Class Cert. Mot.], Decl. of Clio Gates, ECF No. 2-3 [hereinafter Gates Decl. I], Ex. 2, ECF No. 2-5 (video testimony of Peters). She responded that she "want[ed] to confirm . . . the accuracy of those numbers but anecdotally that is what [she's] hearing." *Id.*

### D.    Procedural Background

The named plaintiffs in this action are Vanessa Crowe and Glen Galemmo. At the time they filed their Complaint, Crowe was serving a federal sentence at FCI Marianna in Florida. Compl., ECF No. 1, ¶ 3. She was eligible to earn time credits under the FSA, and the BOP had deemed her a low risk to recidivate since December 2018. *Id.* As of December 24, 2024, Crowe's time credits were equal to the remainder of her sentence, and she received an FSA Conditional Placement Date to that effect. *Id.*; Gates Decl. I, Ex. 5, ECF No. 2-8, at 2 (October 2024 FSA Time Credit Assessment for Crowe). But the BOP informed her that she would not be moved to an RRC until May 7, 2025. *See* Compl. ¶ 3.

Galemmo faced similar circumstances. When this litigation began, he was serving a federal sentence at FCI Williamsburg in South Carolina. *Id.* ¶ 4. He was eligible to receive time credits

under the FSA, and the BOP had deemed him a minimum risk to recidivate since December 2018. *Id.* Galemmo's time credits were equal to the remainder of his sentence as of February 26, 2025, and he received an FSA Conditional Placement Date to that effect. *See id.*; Gates Decl. I, Ex. 8, ECF No. 2-11, at 2 (October 2024 FSA Time Credit Assessment for Galemmo). The BOP, however, informed him that he would not be moved into prerelease custody until May 22, 2025. *See* Compl. ¶ 4.

Named Plaintiffs filed suit on December 20, 2024, on behalf of themselves and a similarly situated class. They allege that "[b]oth as a matter of practice and by written policy, the BOP is disregarding the commands of the First Step Act and imprisoning people longer than legally permissible." Pls.' Mot. for Prelim. Inj. & Provisional Class Cert., ECF No. 16 [hereinafter Prelim. Inj. Mot.], at 9. Plaintiffs assert that the BOP *must* transfer prisoners to supervised release or prerelease custody on the first day of eligibility under the FSA—the day when their earned time credits equal the remainder of their sentence. *See* Compl. ¶ 26. Plaintiffs acknowledge that the BOP is applying the maximum amount of statutorily permissible earned time credits—365 days— toward early supervised release. *Id.* ¶ 17. Plaintiffs' challenge is thus to the BOP's failure to place eligible individuals into prerelease custody who have *more than* 365 days of earned credits. *See id.* ("When people earn more than 365 credits, the BOP must apply those time credits toward prerelease custody[.]").

Plaintiffs advance two claims: one pursuant to the APA, 5 U.S.C. § 706(2)(A), (C), and the other under the court's "inherent equitable power." *See* Compl. ¶¶ 41–51. Their APA claim challenges the BOP's "Application of Earned Time Credits" *regulation* as contrary to the FSA because the regulation improperly affords the BOP discretion on when to effect a transfer to prerelease custody, when Congress gave it none. *See id.* ¶¶ 23–24; *compare* 28 C.F.R.

§ 523.44(a)(1), *with* 18 U.S.C. § 3632(d)(4)(C) (substituting the word "may" for "shall").  Their "inherent equitable power" claim challenges the BOP's systematic failure to ensure that eligible prisoners are transferred out of prison within the time mandated by the FSA, and Plaintiffs seek an order compelling the BOP to make timely transfers going forward.  Compl. ¶¶ 16, 49.

In parallel with their Complaint, Plaintiffs filed a Motion for Class Certification, ECF No. 2.  They seek to certify a class consisting of:

> All incarcerated people who have earned or will earn time credits under the First Step Act, who meet or will meet the prerequisites for prerelease custody in 18 U.S.C. § 3624(g)(1), and who have not been or will not be moved out of prison on or before the date when their time credits equal their remaining sentences.

*Id.* at 1.  Plaintiffs' proposed class thus includes not only inmates presently eligible but not yet transferred to prerelease custody, but also persons who will face that circumstance in the future.

Soon after initiating this action, in January 2025, Plaintiffs filed a Motion for Preliminary Injunction and Provisional Class Certification, ECF No. 16.  Defendants opposed Plaintiffs' motion and cross-moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  *See generally* Defs.' Mot. to Dismiss.  The parties also fully briefed the Motion for Class Certification.[2]

After Named Plaintiffs filed suit, their circumstances changed.  The BOP gave each a new FSA Conditional Placement Date.  Crowe's was January 15, 2025, and the BOP transferred her to an RRC on that date.  *See* Shoulders Decl. ¶ 29.  President Biden later granted Crowe clemency, causing her release to supervision on April 17, 2025.  *Id.*  The clemency did not affect Crowe's term of supervised release.  *Id.*  As for Galemmo, his new prerelease custody date was February

---

[2] For reasons that will become clear, this opinion concerns only Plaintiffs' Motion for Preliminary Injunction and Provisional Class Certification, ECF No. 16, and Defendants' Motion to Dismiss, ECF No. 34.  It does not address Plaintiffs' Motion for Class Certification, ECF No. 2.

26, 2025, and the BOP timely transferred him to home confinement on that day. *See id.* ¶ 28. According to Defendants, the BOP revised Named Plaintiffs' estimated placement dates based on the updated policy guidance, which takes account of projected earned time credits post-dating the referral. *See id.* ¶¶ 28–29.

## III.    LEGAL STANDARD

### A.    Preliminary Injunction

Preliminary injunctive relief is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal quotation marks and citations omitted). A court may grant the "extraordinary remedy . . . [only] upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). The preliminary injunction factors are well established: plaintiffs must show that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Id.* at 20 (citations omitted). Where the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Prior to the Supreme Court's decision in *Winter*, the D.C. Circuit "allowed . . . a strong showing on one factor" to "make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The D.C. Circuit has since repeatedly suggested that this "sliding scale" approach does not remain good law after *Winter*, but it has not squarely said so. *See, e.g., id.*; *Davis v. Pension Benefit Guaranty Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009); *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014); *Changjii Esquel Textile Co. v. Raimondo*, 40 F.4th

716, 726 (D.C. Cir. 2022); *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1235–36 (D.C. Cir. 2025).  It has emphasized that "the first and most important" of these four factors is whether the movant "ha[s] established a likelihood of success on the merits."  *Aamer*, 742 F.3d at 1038. If a plaintiff cannot show a likelihood of success on the merits, "there is no need to consider the remaining factors."  *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1088 (D.C. Cir. 2011).  "[T]he 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction."  *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015).

**B.    Motion to Dismiss**

*1.    Rule 12(b)(1)*

A court must dismiss a case pursuant to Rule 12(b)(1) when it lacks subject matter jurisdiction.  The plaintiff bears the burden of establishing jurisdiction.  *Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017) (citation omitted).  This includes the elements of standing. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  A plaintiff must show that they meet the "irreducible constitutional minimum" of: (1) injury in fact, (2) causation, and (3) redressability.  *Lujan*, 504 U.S. at 560–61.  An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."  *Id.* at 560 (quotation marks and internal citations omitted).  To establish standing at the motion to dismiss stage, "a plaintiff is required only to state plausibly that each standing element exists."  *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1063 (D.C. Cir. 2019).

Mootness is another basis for dismissal for lack of subject matter jurisdiction.  *See Indian River Cnty. v. Rogoff*, 254 F. Supp. 3d 15, 18 (D.D.C. 2017) ("A motion to dismiss for mootness is

properly brought under Rule 12(b)(1) because mootness itself deprives the court of jurisdiction."). "Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (internal quotation marks omitted). "A case is moot when the challenged conduct ceases such that there is no reasonable expectation that the wrong will be repeated in circumstances where it becomes impossible for the court to grant any effectual relief whatever to the prevailing party." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1135 (D.C. Cir. 2009) (internal quotation marks omitted). Stated differently, a case becomes moot when "the court can provide no effective remedy because a party has already obtained all the relief that it has sought." *Conservation Force*, 733 F.3d at 1204 (alteration and internal quotation marks omitted).

2.    *Rule 12(b)(6)*

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 344–45 (D.C. Cir. 2018) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim satisfies the plausibility standard "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).

## IV.    ANALYSIS

### A.    Plaintiffs' Claims for Relief and the Court's Equitable Jurisdiction

Before proceeding to the numerous issues before it, the court finds it necessary to first clarify Plaintiffs' claims and the relief that they seek. Plaintiffs assert two causes of action. The first is straightforward; the second requires more explanation.

Count I alleges that the BOP violated the APA, 5 U.S.C. § 706(2)(A), (C), because its "Application of FSA Time Credits" regulation cannot be squared with the plain text of the FSA. Compl. ¶¶ 41–46.  The regulation provides that the BOP "*may* apply FSA Time Credits toward prerelease custody or supervised release." 28 C.F.R. § 523.44(a)(1) (emphasis added); *see also id.* § 523.44(c), (d).  The FSA, in contrast, states that the BOP "*shall*" apply earned time credits "toward time in prerelease custody or supervised release" and that it "*shall* transfer eligible prisoners . . . into prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C) (emphasis added).  Plaintiffs argue that this textual change, from mandatory to discretionary, is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "in excess of [the BOP's] statutory . . . authority."  *See* 5 U.S.C. § 706(2)(A), (C).

Count II is styled "First Step Act, via inherent equitable relief."  Compl. at 16.  According to Plaintiffs, the BOP is systematically failing to transfer eligible prisoners into prerelease custody in accordance with the FSA, and the court can enjoin this persistent action by exercising its "equitable power."  *Id.* ¶¶ 50–51 (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015).  Seems clear enough.  But in their motion for injunctive relief, Plaintiffs propose that, "[a]lternatively, this Court can, under the Administrative Procedure Act, require the BOP to transfer eligible people as required by the [FSA]" as "agency action unlawfully withheld" under 5 U.S.C. § 706(1).  Prelim. Inj. Mot. at 20.  Plaintiffs have not, however, advanced such an APA claim in their Complaint.  They nevertheless believe that the court may consider it because "a complaint need not pin plaintiff's claim for relief to a precise legal theory."  Pls.' Combined Opp'n to Defs.' Mot. to Dismiss & Reply in Supp. of Pls.' Mot. for Prelim Inj., ECF No. 41 [hereinafter Pls.' Mot. to Dismiss Opp'n], at 37–38 (quoting *Skinner v. Switzer*, 562 U.S. 521, 530 (2011)).

This position raises two questions.  First, is Plaintiffs' standalone claim for equitable relief cognizable?[3]   Second, if it is not, can the court entertain the § 706(1) claim, even though not asserted in the Complaint?

Beginning with the former question, the Supreme Court in *Armstrong* observed that "federal courts may in some circumstances grant injunctive relief . . . with respect to violations of federal law by federal officials."  575 U.S. at 327 (citing *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902)).  Such power, however, "is subject to express and implied statutory limitations," making inherent equitable relief available only in a "proper case."  *Id.* at 327–28 (internal quotation marks omitted).  "[S]tatutes implicitly displace equity jurisdiction in only two scenarios: (1) where Congress has provided a 'detailed and exclusive remedial scheme,' . . . or (2) where a statute contains an alternative remedy and the right at issue is 'judicially unadministrable.'"  *Mathis v. U.S. Parole Comm'n*, 749 F. Supp. 3d 8, 23 (D.D.C. 2024) (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 647 (2002) and *Armstrong*, 575 U.S. at 328)).

Plaintiffs argue that neither of those scenarios applies here.  As to the first, they maintain that the APA, the alternative statute available for their claims, "does not contain such intricate procedures as to suggest Congress intended to displace courts' traditional equitable powers."  Prelim. Inj. Mot. at 19.  As to the second, they admit that though "the APA contains an alternative remedy, the right at issue—timely transfers into prerelease custody—is not judicially unadministrable."  *Id.*  The court is unpersuaded.  Plaintiffs do not explain why the APA is not a "detailed and exclusive remedial scheme" for purposes of *Armstrong*.  They also fail to cite any

---

[3] The court acknowledges that this first question sounds like a Rule 12(b)(6) inquiry.  But as will become apparent, properly framing Plaintiffs' second cause of action is critical, as it informs whether to provisionally certify a class as to that claim.

case in this Circuit, and the court has found none, where a plaintiff was allowed to invoke the court's equitable jurisdiction despite the admitted availability of a cause of action under the APA for the same conduct sought to be enjoined.

Plaintiffs rely heavily on *Mathis v. United States Parole Commission*, Pls. Mot. to Dismiss Opp'n at 36, but that case is inapposite. The *Mathis* court was faced with a claimed violation of the Rehabilitation Act for which there was no private cause of action, and it held that its equitable jurisdiction was available to afford relief. *Mathis*, 749 F. Supp. 3d at 17–22. Other cases have recognized the court's equitable jurisdiction to impose injunctive relief in similar circumstances. *See, e.g., D.C. Ass'n of Chartered Public Schools v. Dist. of Columbia*, 930 F.3d 487, 493 (D.C. Cir. 2019) (assuming a federal common law claim under *Armstrong*); *Delaware Riverkeeper Network v. FERC*, 895 F.3d 102, 107 (D.C. Cir. 2018) (recognizing an "implied action for prospective relief" under *Armstrong*), *overruled in part on other grounds by Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020); *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 366–85 (D.D.C. 2020) (finding that a claim existed under *Armstong* for equitable relief when no cause of action existed under the APA). Here, on the other hand, as shall be discussed later, the FSA does not foreclose § 706(1) review under the APA. *See infra* Section IV.B.3.

Exercising the court's inherent equitable jurisdiction in this case also would be contrary to the longstanding "doctrine of equity jurisprudence that courts should not act . . . when the moving party has an adequate remedy at law . . . ." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (internal quotation marks and citations omitted); *cf. J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *34 n.29 (D.C. Cir. Mar. 26, 2025) (Walker, J., dissenting) ("Though 'we have long held that federal courts may in some circumstances grant injunctive relief . . . with respect to violations of federal law by federal officials,' that cause of action is not available when

a habeas petition is available." (quoting *Armstrong*, 575 U.S. at 326–27)).[4]  Plaintiffs concede that

the relief they seek in equity is equally available under § 706(1) of the APA.  *See* Prelim. Inj. Mot.

at 20.  To rely on the court's equitable jurisdiction in such a circumstance would not be appropriate.

But that is only half of the story.  Plaintiffs' Complaint makes no mention of § 706(1), and

Plaintiffs have not moved to amend their pleading to include such a claim.  Still, they insist, the

court can consider it without amendment.  The court agrees.

"Federal pleading rules call for 'a short and plain statement of the claim showing that the

pleader is entitled to relief;' they do not countenance dismissal of a complaint for imperfect

statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby, Miss.*,

574 U.S. 10, 11 (2014) (quoting Fed. Rule Civ. P. 8(a)(2)).  So long as the defendant has been

"given 'fair notice' of the plaintiff's claim," "a lack of specificity is not fatal."  *Arent v. Shalala*,

70 F.3d 610, 618 (D.C. Cir. 1995).

These principles permit the court to treat Plaintiffs' Count II as asserting a § 706(1) claim.

In their Complaint, Plaintiffs allege that "[t]he [FSA] requires that people who are incarcerated in

the custody of the BOP and who have earned time credits and satisfied other prerequisites *must be*

*transferred* to prerelease custody or supervised release no later than the date on which their earned

time credits are equal to the time remaining on their sentences."  Compl. ¶ 47 (emphasis added).

Plaintiffs further claim that the BOP is "systematically failing to ensure that Plaintiffs and all those

similarly situated will be transferred to supervised release or prerelease custody within the time

required by the FSA."  *Id.* ¶ 49.  Plaintiffs seek as relief, among other things:

> [I]njunctive relief ordering Defendants to ensure, consistent with the
> First Step Act, that Plaintiffs and class members are transferred to

---

[4] In *J.G.G.*, the D.C. Circuit declined to issue an emergency order staying a temporary restraining order ("TRO") entered by the District Court.  *See J.G.G.*, 2025 WL 914682, at *1.  The Supreme Court later vacated the TRO, agreeing with Judge Walker that the claims asserted were only cognizable in habeas.  *Trump v. J.G.G.*, 604 U.S. ---, 145 S. Ct. 1003, 1005–06 (2025).

> supervised release or to prerelease custody no later than the date
> upon which their earned time credits are equal to the remainder of
> their sentence.

*Id.* at 17.  Plaintiffs thus effectively allege that the BOP failed "to take a *discrete* agency action

that it is *required to take*," as is necessary for a § 706(1) claim, *Norton v. S. Utah Wilderness All.*,

542 U.S. 55, 64 (2004) ("*SUWA*"), and they seek to compel such action.

These allegations were sufficient to place Defendants on notice of a § 706(1) claim.  And

Defendants clearly understood the Complaint in that way.  Their opposition and motion papers

assert that relief is not available under the standards applicable to § 706(1) claims.  *See* Defs.' Mot.

to Dismiss at 32–36.  The court thus deems it appropriate to construe Count II as a claim under

§ 706(1) of the APA.

### B.    Threshold Issues

Having properly framed the claims, the court now turns to Defendants' threshold

contentions.  According to Defendants, (1) Named Plaintiffs lack standing, (2) their individual

claims are moot, and (3) the court is foreclosed by statute from reviewing the BOP's

implementation of the FSA.  The court takes up these issues in that order.

### 1.    Standing

Standing "is the threshold question in every federal case, determining the power of the

court to entertain the suit."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  That is true in the class

action context, on a motion to dismiss, or on a motion for preliminary injunction.  *See, e.g., In re*

*Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 108 (D.C. Cir. 2002) ("The question of

constitutional standing . . . is a prerequisite to Rule 23 class certification."); *R.I.L-R v. Johnson*,

80 F. Supp. 3d 164, 177–78 (D.D.C. 2015) (evaluating standing before the merits on a motion to

dismiss and a motion for preliminary injunction).  The court thus looks to the familiar tripartite

inquiry: "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 149 (2010)).  Plaintiffs must have standing "for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  And "when considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her claim." *Tanner-Brown v. Haaland*, 105 F.4th 437, 445 (D.C. Cir. 2024) (internal quotation marks omitted).

"Because the elements of standing are 'not mere pleading requirements but rather an indispensable part of the plaintiff's case,'" plaintiffs must support each element of Article III standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 19 (D.C. Cir. 2011) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  On a motion for preliminary injunction, plaintiffs "must show a substantial likelihood of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (internal quotation marks omitted).  And, for purposes of class certification, at least one class representative must have standing.  *See J.D. v. Azar*, 925 F.3d 1291, 1324 (D.C. Cir. 2019).  On a motion to dismiss, a plaintiff's standing must be plausible.  *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015).  Here, the court evaluates Named Plaintiffs' standing under the stringent preliminary injunction standard and concludes that they have adequately demonstrated a substantial likelihood of standing.  That conclusion necessarily defeats Defendants' contention that the absence of standing requires dismissal.  *Cf. Food & Water Watch*, 808 F.3d at 912–14.

"An allegation of future injury may suffice if the threatened injury is 'certainly impending' or there is a '*substantial risk*' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (emphasis added) (quoting *Clapper*, 568 U.S. at 414 n.5). Named Plaintiffs' claimed injuries are *future* injuries, namely, the prospect of untimely transfers to prerelease custody. Both received Conditional Placement Dates, but the BOP told them repeatedly, including on administrative review, that their actual placement would occur months later. *See* Class Cert. Mot., Decl. of Vanessa Crowe, ECF No. 2-1 [hereinafter Crowe Decl. I], ¶ 2; Gates Decl. I, Ex. 5, ECF No. 2-8, at 2 (FSA Conditional Placement Date for Crowe); Class Cert. Mot., Decl. of Glen Galemmo, ECF No. 2-2 [hereinafter Galemmo Decl. I], ¶ 2; Gates Decl. I, Ex. 8, ECF No. 2-11, at 2 (FSA Conditional Placement Date for Galemmo). Crowe brought this case a mere four days before her Conditional Placement Date and Galemmo two months before his. Compl. ¶¶ 27–28.

These contentions are sufficient to establish injury in fact. The BOP's insistence that the FSA does not entitle Named Plaintiffs to a mandatory transfer on the date of eligibility caused "both (i) a substantially increased risk of harm and (ii) a substantial probability of harm with that increase taken into account." *Food & Water Watch*, 808 F.3d at 914 (internal quotation marks omitted); *see also Sierra Club v. Jewell*, 764 F.3d 1, 8 (D.C. Cir. 2014) (statements of companies' own expectations to carry out mining in protected area coupled with their mining in adjacent areas sufficed to establish imminent injury). Put another way, Named Plaintiffs have standing because, when they filed suit, the BOP's position on non-mandatory transfer and the communications they received as to their transfer dates made it substantially more likely that they would remain jailed past their Conditional Placement Dates. *See Wheaton College v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012) ("[S]tanding is assessed at the time of filing.").

Defendants counter that the mere prospect of an untimely transfer does not suffice as an injury in fact because it is both hypothetical and speculative, as "a chain of possibilities" lay "between [Named Plaintiffs] and their anticipated injury." Defs.' Mot. to Dismiss at 11. According to Defendants, Named Plaintiffs' suit was premature—and they thus lacked standing—because their Conditional Placement Dates remained subject to change when they filed suit. For their original dates to hold, each Plaintiff needed to:

> (1) stay in FSA time credit earning status until their eligibility date; (2) not incur any time credit reductions through penalties; (3) have a recidivism risk rating of minimum or low at the time [their] FSA time credits equal the time remaining on [their] sentence; and (4) have BOP fail to transfer [them] to prerelease custody on or before their eligibility date.

Defs.' Mot. to Dismiss. at 15. Because these circumstances were not fully within Named Plaintiffs' control, Defendants contend, the "chain of possibilities [that would need to occur] . . . is too speculative to establish a certainly impending injury." *Id.* (citing *Clapper*, 568 U.S. at 410).

The court disagrees. After all, Crowe filed suit a mere *four days* before her Conditional Placement Date. By that time, she had continuously earned FSA time credits for nearly six years. *See* Gates Decl. I, Ex. 5, ECF No. 2-8, at 1. She apparently had never received a time credit reduction through penalties. *See id.* (displaying no disallowed program dates). And she had maintained a low recidivism risk level since the FSA's enactment. *See* Compl. ¶ 3 (stating that Crowe has maintained a low recidivism risk since December 2018). The prospect that, in the four days after filing suit, some adverse event would affect her eligibility was exceedingly remote. She thus has shown a substantial risk that the BOP would not timely transfer her to prerelease custody and therefore established a likelihood of success as to standing.[5]

---

[5] The court need not consider whether Galemmo's injury is too speculative, as he filed suit two months before his Conditional Placement Date. Only one plaintiff need have standing for the claims to proceed. *See J.D*, 925 F.3d at 1324.

2.    *Mootness*

Mootness presents a more complex obstacle.  After Plaintiffs brought this action, the BOP transferred Crowe to an RRC on January 15, 2025, and Galemmo to home confinement on his FSA Conditional Placement Date of February 26, 2025.  *See* Shoulders Decl. ¶¶ 28–29.  Defendants contend that their transfers out of prison constitute "all the relief they could have won in this suit," rendering their individual claims moot.  Defs.' Mot. to Dismiss at 17.

A case becomes moot when "the court can provide no effective remedy because a party has already obtained all the relief that it has sought."  *Conservation Force*, 733 F.3d at 1204 (internal quotation marks and alteration omitted).  Plaintiffs admit that Galemmo's individual claim has been rendered moot by his on-time transfer to home confinement.  *See* Hr'g Tr., ECF No. 50 [hereinafter Tr.], at 9:12-22.  However, they argue that: (1) Crowe's individual challenge to the BOP's implementing regulation (Count I) is not moot, and (2) the class claims remain live because the "inherently transitory" exception applies, which allows Crowe to continue as a class representative, even if her individual claim is moot.  *See* Pls.' Mot. to Dismiss Opp'n at 10–15.[6]

As to the first argument, Crowe contends that, because she was "overheld" by three weeks, her contrary-to-law APA claim (Count I) remains live because she "may request that her sentencing court reduce her term of supervised release to account for the injustice of the BOP over-incarcerating her."  Pls.' Mot. to Dismiss Opp'n at 11–12 (citing *United States v. Epps*, 707 F.3d 337, 345 (D.C. Cir. 2013); *In re Sealed Case*, 809 F.3d 672, 674 (D.C. Cir. 2016)).  She says that "[v]acatur of the regulation and a declaration that BOP's administration of the earned time credit program violates the First Step Act would be compelling support for Ms. Crowe's motion to reduce her term of supervised release."  *Id.* at 12.  That is far too thin a reed to overcome mootness.

---

[6] Because Galemmo was timely transferred, he arguably is no longer a member of the class and thus cannot represent it.

The D.C. Circuit has said that "if a plaintiff challenges both a specific agency action and the *policy* that underlies that action, the challenge to the policy is not necessarily mooted merely because the challenge to the particular agency action is moot." *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1428 (D.C. Cir. 1994). However, to mount such a challenge, the plaintiff must have "standing to attack future applications of that policy." *Id.* at 1430. Crowe clearly lacks such standing, given the subsequent commutation of her sentence, *see supra* at 11.

Nor does the decision in *Epps* help her. In that case, the D.C. Circuit determined that the defendant's completion of his prison sentence did not moot his challenge to that sentence because "reduction of [his] term of imprisonment would . . . enhance his prospect for securing a similar reduction in his term of supervised release." 707 F.3d at 343. The key to that ruling was "the relationship between a prison sentence and supervised release." *Id.* at 345; *see also In re Sealed Case*, 809 F.3d at 674–75 (similar). No similar relationship exists here. Crowe contests not the length of her sentence, but only what portion of it had to be served in prerelease custody under the FSA. It is far too speculative to presume that her sentencing judge would reduce her term of supervised release merely because the BOP released her to a halfway house allegedly three weeks too late. Her individual claim as to Count I is thus moot.

There remains the question whether the class claims remain live. Usually, "at least one named plaintiff must keep [their] individual dispute live until certification, or else the class action based on that claim generally becomes moot." *J.D.*, 925 F.3d at 1307 (citing *United States v. Sanchez-Gomez*, 584 U.S. 381, 386 (2018)). But "there exists [an] exception that can save class action claims that become moot *even before* the district court acts on the motion to certify a class: the 'inherently transitory' exception." *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 191 (D.D.C. 2024) (citation omitted). "[W]here a named plaintiff's claim is 'inherently transitory,' and

24

becomes moot prior to certification, a motion for certification may 'relate back' to the filing of the complaint." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 n.2 (2013) (quoting *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 (1991)). Defendants do not contest that the "inherently transitory" exception applies in this case. *See* Defs.' Reply at 6 n.3. And the court concurs.

For the inherently transitory exception to apply, the court must determine "(i) whether the individual claim might end before the district court has a reasonable amount of time to decide class certification, and (ii) whether some class members will retain a live claim at every stage of litigation." *J.D.*, 925 F.3d at 1311. Both Crowe and Galemmo were transferred out of prison and into prerelease custody within weeks of filing suit. That supports the first element of the inherently transitory exception. *See J.D.*, 925 F.3d at 1311 (claims were inherently transitory where average time in custody was between 41 and 90 days); *Lewis*, 743 F. Supp. 3d at 194 (claims were inherently transitory where plaintiffs had parole terminated within six months of being named as plaintiffs); *R.I.L-R*, 80 F. Supp. 3d at 183 (claims were inherently transitory where the "period of allegedly unlawful detention . . . is weeks or months").

As to the second, Named Plaintiffs have cited sworn congressional testimony of the BOP director that 60,000 prisoners are suffering delays in transfer. Gates Decl. I, Ex. 2, ECF No. 2-5 (video testimony of Colette Peters). The delays range from three to 12 months. *Id.*; *see J.D.*, 925 F.3d at 1311 (noting that both a "one-year immigration detention" and a full term of pregnancy may be too fleeting). And Defendants themselves provided evidence that, at the time of argument, (1) there were 300 eligible prisoners not yet transferred to prerelease custody; (2) roughly 143 of those 300 do not yet have a transfer date, and (3) 4,236 prisoners were transferred to either prerelease custody or supervised release between January 1, 2025, and April 26, 2025. Tr. at 72:9–

74:5.  Given this evidence, the court has little trouble concluding that some class members will have live claims at every stage of litigation.

Accordingly, though Named Plaintiffs' individual claims have been mooted, they have shown "that their claims have an unpredictable and potentially very short shelf life, and that there are others like them who will have live claims throughout the dispute if their proposed class is ultimately certified." *Lewis*, 743 F. Supp. 3d at 197.  The court evaluates in Section IV.C whether provisional class certification is appropriate.

3.    *Statutory Restrictions on Reviewability*

As their final threshold defense, Defendants maintain that there are statutory barriers to the court's exercise of jurisdiction.  Section 3621 of Title 18 is titled "Imprisonment of a convicted person," and it authorizes the BOP to "designate the place of the prisoner's imprisonment" based on a variety of factors.  18 U.S.C. § 3621(b).  Subsection (b) provides that "[n]otwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is *not reviewable by any court*."  *Id.* (emphasis added).  Section 3625 additionally makes the APA inapplicable "to the making of any determination, decision, or order" under Title 18, Part II, Chapter 229, Subchapter C, which includes § 3621.  Defendants assert that these two subsections bar judicial review of Plaintiffs' claims.   The court holds otherwise.

First, "[c]ourts have stated that § 3625 bars review of individualized housing determinations, not . . . challenge[s] to a broad policy that informs the designation." *Love v. Bureau of Prisons*, No. 24-cv-2571 (APM), 2025 WL 105845 (D.D.C. Jan. 15, 2025) (citing *Richmond v. Scibana*, 387 F.3d 602, 605 (7th Cir. 2004) ("A placement decision itself is not open to challenge under the APA, *see* 18 U.S.C. § 3625, but [the plaintiff] does not contest his current placement; he contests only the rules that will be used to decide where he should serve the last few months of his

time."); *Martin v. Gerlinski*, 133 F.3d 1076, 1079 (8th Cir. 1998) (stating that "§ 3625 precludes judicial review of agency adjudicative decisions but not of rulemaking decisions"); *Jasperson v. Fed. Bureau of Prisons*, 460 F. Supp. 2d 76, 84 (D.D.C. 2006) (finding APA claim cognizable under 18 U.S.C. § 3625 where Plaintiff "challenges the rulemaking leading to the BOP policy that informed his confinement determination, rather than challenging the determination itself"); S. Rep. No. 98-225, at 149 (1983) ("The phrase 'determination, decision, or order' is intended to mean adjudication of specific cases as opposed to promulgating of generally applicable rules.")). Here, Plaintiffs are not challenging their own individual housing determinations, but rather the BOP's policy and practice of exercising discretion in deciding when to transfer eligible prisoners to prerelease custody. And further, these claims are based fundamentally on the language of § 3632, which is not in the relevant subchapter. *Compare* Title 18, Part II, Chapter 29, Subchapter C—Imprisonment (encompassing § 3621 to § 3626), *with* Title 18, Part II, Chapter 229, Subchapter D—Risk and Needs Assessment System (encompassing § 3631 to § 3635).

Second, with respect to § 3621(b), though that subsection "strips the court of jurisdiction to consider [a plaintiff's] *individual* challenge, it does not preclude review of all challenges that might implicate individual designation decisions." *Ahmad v. Jacquez*, 860 Fed. App'x 459, 462 (9th Cir. 2021) (emphasis added) (citing *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991)). Thus, a court has "jurisdiction to decide whether the Bureau of Prisons acted contrary to established federal law, violated the Constitution, or exceeded its statutory authority when it acted pursuant to 18 U.S.C. § 3621." *Rodriguez v. Copenhaver*, 823 F.3d 1238, 1242 (9th Cir. 2016). In this case, Plaintiffs argue that the BOP's regulation and practice are in direct contravention of the FSA. Such a claim does not fall within the jurisdiction-stripping purview of § 3621(b). Other courts fielding similar challenges to the BOP's application of FSA earned time credits have

concluded the same. *See, e.g., Kuzmenko v. Phillips*, No. 25-cv-663, 2025 WL 779743, at *4 (E.D. Cal. Mar. 10, 2025); *Martinez v. Gutierrez*, No. 22-cv-505, 2023 WL 6466490, at *4 (D. Ariz. July 14, 2023), *report and recommendation adopted,* No. 22-cv-505, 2023 WL 6464850 (D. Ariz. Oct. 4, 2023).

### C.    Provisional Class Certification

The court has held that the class claims are not moot. Those claims can proceed to the merits, however, only if a class can be provisionally certified. In evaluating whether to provisionally certify a class, "the Court must still satisfy itself that the requirements of Rule 23 have been met." *R.I.L-R*, 80 F. Supp. 3d at 179–80.

A plaintiff must show that the proposed class satisfies all four requirements of Rule 23(a) and one of the requirements of Rule 23(b). *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). Rule 23(a) permits certification only if: "(1) the class is so numerous that joinder of all members is impracticable"; "(2) there are questions of law or fact common to the class"; "(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and "(4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). As for Rule 23(b), Plaintiffs here move under subsection (b)(2), which allows certification of a class if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart*, 564 U.S. at 350. Thus, a district court must undertake a "rigorous analysis" to see that

the requirements of the Rule have been satisfied. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). This, at times, requires the court to peek at the merits as "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 160 (internal quotation marks and citation omitted). However, as the court looks at this class's suitability for *provisional* certification, its "analysis is tempered . . . by the understanding that such certifications may be altered or amended before the decision on the merits." *Damus v. Nielsen*, 313 F. Supp. 3d 317, 329 (D.D.C. 2018) (internal quotation marks and citation omitted).

### 1.    *Class Definition*

The court begins with the proposed class definition. Plaintiffs ask to provisionally certify the following class:

> All incarcerated people who have earned or will earn time credits under the First Step Act, who meet or will meet the prerequisites for prerelease custody in 18 U.S.C. § 3624(g)(1), and who have not been or will not be moved out of prison on or before the date when their time credits equal their remaining sentences.

Prelim. Inj. Mot. at 30; *see also* Class Cert. Mot. at 1. The proposed class thus consists of prisoners, both present and future, who will be eligible for transfer "when their [FSA] time credits equal their remaining sentences."

Defendants assert in passing that Plaintiffs' suggested class is "substantially overbroad, as it could even reach prisoners who are currently years away from their FSA Conditional Placement date." Defs.' Mem. of P&A in Opp'n to Class Cert. Mot., ECF No. 40 [hereinafter Defs.' Class Cert. Opp'n], at 16 n.5. In so arguing, they read in a "definiteness" requirement—that plaintiffs must "be able to establish [that] 'the general outlines of the membership of the class are determinable at the outset of the litigation.'" *Pigford v. Glickman*, 182 F.R.D. 341, 346 (D.D.C. 1998) (quoting 7A Charles Alan Wright et al., *Federal Practice & Procedure* § 1760).

This argument, however, overlooks that "[t]he level of precision required varies depending on the type of class action sought to be certified." *Thorpe v. Dist. of Columbia*, 303 F.R.D. 120, 139 (D.D.C. 2014) (cleaned up) (internal quotation marks and citation omitted). "[W]here certification of a (b)(2) injunctive class is sought, actual membership of the class need not be precisely delimited because . . . the defendant will be required to comply with the relief ordered no matter who is in the class." *Id.* (internal quotation marks and alterations omitted). The D.C. Circuit's decision in *J.D. v. Azar* illustrates the point. There, the court upheld the district court's class definition of "all pregnant unaccompanied minor children . . . who are *or will be* in the legal custody of the federal government," and even suggested that future class members could be included in Rule 23(a)'s numerosity requirement. *See J.D.*, 925 F.3d at 1305, 1322 (emphasis added).

Other courts similarly have certified classes that include unknown future members. *See A.B. v. Hawaii State Dep't of Education*, 30 F.4th 828, 838 (9th Cir. 2022) ("The inclusion of future class members is not itself unusual or objectionable, because when the future persons referenced become members of the class, their claims will necessarily be ripe.") (internal quotation marks and alterations omitted); *R.I.L-R*, 80 F. Supp. 3d at 180 (class consisting of eligible migrant mothers or children who "have been or will be" detained in ICE detention facilities and determined to have a credible fear of persecution, but "have been or will be" denied release on bond); *Damus*, 313 F. Supp. 3d at 329 (class of asylum-seekers who "are found to have a credible fear of persecution or torture . . . who are or will be detained by ICE . . . after having been denied parole"); *Davis v. U.S. Parole Comm'n*, No. 24-cv-1312, 2025 WL 457779, at *8 (D.D.C. Feb. 11, 2025) (ordering certification of a class consisting of "all people with a disability who are on or will be on parole or supervised release . . . and who need accommodations to have an equal opportunity

to succeed on parole or supervised release.")  As a leading class action treatise has noted about Rule 23(b)(2) classes, "[c]ourts usually will approve class definitions that focus on the defendant's alleged conduct and not the ease or difficulty of identifying class members before liability determinations."  1 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 4:2 (21st ed.).

In view of these authorities, the court finds that Plaintiffs have presented a class that is "administratively feasible for the court to determine whether a particular individual is a member." *Pigford*, 182 F.R.D. at 347 (internal quotation marks omitted).  Further, by ensuring that the future members of the class are eligible for transfer to prerelease custody or supervised release under 18 U.S.C. § 3624(g)(1), "their claims will necessarily be ripe" when they "become members of the class."  *A.B.*, 30 F.4th at 838; *see also Bynum v. Dist. of Columbia*, 214 F.R.D. 27, 32 (D.D.C. 2003) ("[A]n individual would be able to determine, simply by reading the definition, whether he or she was a member of the proposed class.").  Plaintiffs' class definition is thus sufficiently "definite" for a Rule 23(b)(2) provisional class.

### 2.    Section 706(1) Claim

"[C]lass certification is not an all-or-nothing proposition," as "[c]ertification may be appropriate as to some of the class's claims but not others."  *Simpson v. Dart*, 23 F.4th 706, 713 (7th Cir. 2022); 1 *McLaughlin on Class Actions* § 3:12 ("In an action in which multiple claims are alleged, consideration of class certification should proceed on a claim by claim basis, with reference to the elements of and remedies for each claim.").  The court thus evaluates provisional certification as to each claim.

Up first is Count II, which, as discussed above, the court treats as an APA claim to compel agency action under § 706(1).  *See* Compl. ¶ 49; *see also* 5 U.S.C. § 706(1) (allowing a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed").

31

The court's discussion begins and ends with the element of commonality. Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Supreme Court has explained that commonality requires that the plaintiffs' claims "depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. "A plaintiff's burden is to 'bridge the gap' between her individual claim and 'the existence of a class of persons who have suffered the same injury as that individual.'" *Moore v. Napolitano*, 926 F. Supp. 2d 8, 29 (D.D.C. 2013) (quoting *Falcon*, 457 U.S. at 157–58). Because any question can be crafted "at a sufficiently abstract level of generalization . . . to display commonality," *Love v. Johanns*, 439 F.3d 723, 729–30 (D.C. Cir. 2006) (quoting *Sprague v. General Motors Corp.*, 133 F.3d 388, 397), the key inquiry is whether "a class-wide proceeding [will] generate common *answers* apt to drive the resolution of the litigation," *Wal-Mart*, 564 U.S. at 350 (citation and internal quotation marks omitted). A plaintiff need only show that one issue is common to all proposed class members to satisfy the requirement. *See Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

Defendants' argument that Plaintiffs cannot satisfy the commonality requirement for their § 706(1) claim is intertwined with the merits to some extent. *See Falcon*, 457 U.S. at 160 ("[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." (citation and internal quotation marks omitted)). According to Defendants, "Plaintiffs' challenge to their allegedly delayed transfers . . . is governed by the six-factor test in *Telecommunication Research and Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*")." Defs.' Class Cert. Opp'n at 10. Because evaluation of the *TRAC* factors is "ordinarily a complicated and nuanced task requiring consideration of the particular facts and

circumstances before the court," Defendants say the § 706(1) claim is not amenable to class-wide resolution. *Id.* at 10 (quoting *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003)).

Plaintiffs insist that the *TRAC* factors have no relevance to their claim. Theirs is a claim of agency action "unlawfully withheld," not "unreasonably delayed," and according to Plaintiffs, the *TRAC* factors apply only to the latter category of APA claims. Pls.' Reply in Supp. of Mot. for Class Cert., ECF No. 45 [hereinafter Pls.' Class Cert. Reply], at 5; Pls.' Mot. to Dismiss Opp'n at 38–41. For that proposition, they rely exclusively on out-of-circuit precedent. Pls.' Class Cert. Reply at 5 (citing *South Carolina v. United States*, 907 F.3d 742, 760–61 (4th Cir. 2018); *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 n.11 (9th Cir. 2002); *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190–91 (10th Cir. 1999)). According to the Tenth Circuit, for instance, "the distinction between agency action 'unlawfully withheld' and 'unreasonably delayed' turns on whether Congress imposed a date-certain deadline on agency action." *Babbitt*, 174 F.3d at 1190. Where an agency only has general timing provisions under which it is to act, such as the admonition in the APA that agencies conclude matters presented to them "within a reasonable time," 5 U.S.C. § 555(b), "a court must compel only action that is delayed unreasonably." *Id.* The *TRAC* factors apply to such claims. *See id.* at 1191. "Conversely, when an entity governed by the APA fails to comply with a statutorily imposed absolute deadline, it has unlawfully withheld agency action and courts, upon proper application, *must* compel the agency to act," without regard to the *TRAC* factors. *Id.*; *see also South Carolina*, 907 F.3d at 760 (noting that "the 'unreasonably delayed' provision in § 706(1) injects discretion into the district court's analysis by using reasonableness as its touchstone[,]" but that there is "no basis for applying discretionary factors that normally govern claims for unreasonably delayed actions to claims for unlawfully withheld

actions"); *Badgley*, 309 F.3d at 1177 n.11 ("Congress has specifically provided a deadline for performance . . . so no balancing of factors is required or permitted.").

Unfortunately for Plaintiffs, the D.C. Circuit has said otherwise. In *In re Barr Laboratories*, the petitioner sought a writ of mandamus to compel the Food and Drug Administration ("FDA") to adjudicate its new drug applications. *In re Barr Lab'ys, Inc.*, 930 F.2d 72, 73 (D.C. Cir. 1991). Congress provided a deadline of 180 days to rule on the applications, which the FDA had violated repeatedly. *Id.* at 74. But the court explained that "[e]quitable relief, particularly mandamus, does not necessarily follow a finding of a violation." *Id.*; *see also SUWA*, 542 U.S. at 63–64 (noting that § 706(1) carried forward the requirements of writs of mandamus under the All Writs Act). Instead, the pertinent question was "whether we should exercise our equitable powers to enforce the deadline." *In re Barr Lab'ys*, 930 F.2d at 74. The court turned to the six *TRAC* factors to make that determination. *Id.* at 74–76; *see also In re Center for Auto Safety*, 793 F.2d 1346, 1353–54 (D.C. Cir. 1986) (evaluating a § 706(1) claim with reference to the *TRAC* factors even where Congress "designate[d] a specific deadline for agency issuance of [safety] standards"); *Agua Caliente Band of Cahuilla Indians v. Mnuchin*, No. 20-cv-1136 (APM), 2020 WL 2331774, at *4–8 (D.D.C. 2020) (applying the *TRAC* factors in the context of a preliminary injunction where the agency admittedly violated the 30-day statutory deadline). Thus, unlike *Babbitt, Badgley*, and *South Carolina*, under D.C. Circuit precedent, an order compelling agency action does not necessarily follow from a mere violation of a statutory deadline. *See Babbitt*, 174 F.3d at 1190–91 (disagreeing with the D.C. Circuit's decision in *In re Barr Lab'ys*).

So how does this legal framework relate to commonality?  Because the *TRAC* factors govern the § 706(1) inquiry, whether the BOP is liable to any particular class member will require consideration of six factors:

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999) (quoting *TRAC*, 750 F.2d at 80).  Consideration of those factors will make each class member's case unique. Whether equitable relief is warranted for a particular plaintiff "cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful, but will depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency."  *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1102.  Claims resting on "flexible, multi-factor balancing test[s]" such as *TRAC* are "not as easily susceptible to class-wide treatment."  *Lightfoot v. Dist. of Columbia*, 273 F.R.D. 314, 328 (D.D.C. 2011).

The court finds instructive the decision in *Casa Libre/Freedom House v. Mayorkas*, No. 22-cv-1510, 2023 WL 3649589 (C.D. Cal. May 25, 2023).  In that case, representative plaintiffs sought to challenge how the Department of Homeland Security and U.S. Citizenship and Immigration Services handle and process Special Immigrant Juvenile ("SIJ") petitions.  *Id.* at *1.

35

The implementing statute required the agencies to adjudicate SIJ petitions within 180 days of filing. *Id.* (citing 8 U.S.C. § 1232(d)(2)). Plaintiffs sought to challenge the agencies "policy and practice of routinely delaying the adjudication" of these petitions for longer than the statutory deadline. *Id.* at *11. Proceeding under § 706(1), the court found that, because the *TRAC* factors applied, the claim "d[id] not raise common issues for the purpose of class certification." *Id.* at *12–13. "[S]everal of the individual *TRAC* factors require individualized inquiries"—"[f]or example, under the 'rule of reason' approach, a delay of three weeks beyond a statutory deadline is more reasonable than a delay of three months." *Id.* at *13. Other courts have declined to certify a class in similar circumstances. *See, e.g.*, *LaMarche v. Mayorkas*, No. 23-cv-30029, 2024 WL 2502929, at *8–9 (D. Mass. May 22, 2024) (declining to certify a class whose claims were dependent on the *TRAC* factors); *Tony N. v. U.S. Citizenship & Immigration Servs.*, No. 21-cv-8742, 2021 WL 6064004, at *7 (N.D. Cal. Dec. 22, 2021) (same).

Here, the court inevitably would have to look to the length of the delay for each class member. Of course, the timetable supplied by Congress "may supply content for th[e] rule of reason" by which the agency's delay must be evaluated, *TRAC*, 750 F.2d at 80, but "[t]he rule of reason demands inquiry into by *how much* the agency missed the deadline." *Agua Caliente Band of Cahuilla Indians*, 2020 WL 2331774, at *6. For example, Crowe was "overdetained" by roughly three weeks beyond her Conditional Placement Date—arguably not categorically unreasonable. *See* Shoulders Decl., ¶¶ 28–29. Moreover, even if *TRAC* Factors Three and Five, which look at the interests prejudiced by the delay, weigh in favor of the inmate class members, *see, e.g.,* Crowe Decl. I ¶¶ 5–32; Galemmo Decl. ¶¶ 5–10, the court must also consider competing agency priorities, of which the BOP has identified many, *see generally* Shoulders Decl.

Pushing back, Plaintiffs claim that their "common contention" uniting the claims of all class members is whether "the First Step Act require[s] the BOP to transfer people out of prison when their earned time credits equal the remaining time on their sentences[.]"  Pls.' Class Cert. Reply at 4.  But that "common" contention boils down to an allegation that "they have all suffered a violation of the same provision of law."  *Wal-Mart*, 564 U.S. at 350.  Because *TRAC* governs Count II, a timetable set by Congress—if any—is one of the many factors that this court would have to consider in determining whether relief is warranted for each class member.  Thus, the aggregation-enabling features of this claim do not overcome the aggregation-defeating features of the *TRAC* factors.  With Count II faltering at commonality, provisional class certification is not appropriate.  And with no provisional class to save the claim from mootness, it must be dismissed.

### 3.    *Section 706(2) Claim*

The court reaches a different conclusion as to Plaintiffs' § 706(2) claim in Count I.  Recall, this claim challenges the promulgation of the BOP regulation, "Application of FSA Time Credits," 28 C.F.R. § 523.44, as not in accordance with law and in excess of the BOP's statutory authority. Compl. ¶ 46; 5 U.S.C. § 706(2)(A), (C).  Plaintiffs allege that the regulation unlawfully allows the BOP to systematically keep prisoners in a jail setting beyond the date on which they become eligible for mandatory transfer under the FSA.  *See* Compl. ¶¶ 43–45.  As explained below, this claim satisfies the requirements of Rule 23.

### a.    Numerosity

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Numerosity does not "impose[] [an] absolute limitation[]," but rather "requires examination of the specific facts of each case."  *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980).  Courts in this District generally find that numerosity is satisfied

and that joinder is impracticable where a proposed class has at least 40 members. *See Cohen v. Chilcott*, 522 F. Supp. 2d 105, 114 (D.D.C. 2007); *Bynum*, 214 F.R.D. at 32–33. Plaintiffs need not provide the exact number of potential class members to satisfy the requirement but can provide an estimate supported by a reasonable basis to believe its accuracy. *Bynum*, 214 F.R.D. at 32–33.

Defendants do not contest that the proposed class is sufficiently numerous to satisfy Rule 23(a)(1). *See* Defs.' Class Cert. Opp'n at 9 n.3. In fact, Defendants have proffered that, as of May 1, 2025, there were 300 prisoners who were eligible but not yet transferred to prerelease custody. Tr. at 72:9-12. The court has little trouble concluding that numerosity is satisfied.

### b.    Adequacy of Representation

Rule 23(a)(4) requires a finding that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). That element is satisfied here, and Defendants do not contest it. Named Plaintiffs continue to vigorously press the class's claims and are represented by very capable counsel from the American Civil Liberties Union and Jenner and Block LLP, who have marked experience in this sort of class litigation. *See* Mot. for Class Cert., Decl. of Elizabeth Henthorne, ECF No. 2-33; Mot. for Class Cert., Dec. of Scott Michelman, ECF No. 2-34; Mot. for Class Cert., Decl. of Emma Andersson, ECF No. 2-35.

### c.    Commonality and Typicality

As discussed, commonality requires that "there are questions of law or fact common to the class," and that the class claims depend on "a common contention . . . [that] is capable of classwide resolution." *Wal-Mart*, 564 U.S. at 350. Typicality, on the other hand, ensures that "the class representatives have suffered injuries in the same general fashion as absent class members." *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C. 2002) (internal quotation marks omitted). Rule 23(a)(3) requires a finding that "the claims or defenses of the representative parties are typical

of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[T]ypicality is ordinarily met 'if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory.'" *J.D.*, 925 F.3d at 1322 (quoting 7A Wright et al., *Federal Practice & Procedure* § 1764). "The commonality and typicality requirements often overlap because both serve as guideposts to determine whether a class action is practical and whether the representative plaintiffs' claims are sufficiently interrelated with the class claims to protect absent class members." *R.I.L-R*, 80 F. Supp. 3d at 181 (internal quotation marks omitted). "While commonality requires a showing that the members of the class suffered an injury resulting from the defendant's conduct, the typicality requirement focuses on whether the representatives of the class suffered a similar injury from the same course of conduct." *Bynum*, 214 F.R.D. at 34.

Defendants' challenge to commonality and typicality hinges solely on their argument that *TRAC* applies to the § 706(1) claim. *See* Defs.' Class Cert. Opp'n at 9–12. They make no argument specific to the § 706(2) claim, to which *TRAC* does not apply. In any event, Plaintiffs have satisfied both requirements. All class members face the same claimed injury: "overdetention" under an implementing regulation that allegedly ignores the FSA's mandate that eligible prisoners "shall" be transferred to prerelease custody or supervised release upon eligibility. 18 U.S.C. § 3632(d)(4)(c). The class members are bound together by a common question of law—whether the regulation is consistent with the FSA—whose resolution will establish liability (or not) in one fell swoop, and all seek the same remedy—invalidation of the regulation—if they were to prevail. "Because the [regulation] exposes all putative class members"—including Crowe—"to the same [alleged] deprivation of their statutory right," "the proposed class satisfies Rule 23(a)'s requirements of commonality and typicality." *O.A. v. Trump*, 404 F. Supp. 3d 109, 156 (D.D.C.

2019); *see also DL v. Dist. of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013) (finding that commonality is satisfied when there is "a uniform policy or practice that affects all class members"); *Thorpe*, 303 F.R.D. at 147 (similar); *N.S. v. Hughes*, 335 F.R.D. 337, 354 (D.D.C. 2020) (typicality satisfied where "the class representative's claim is based on the same allegedly unlawful conduct").

### d.    Rule 23(b)(2)

Finally, the court concludes that Plaintiffs have satisfied Rule 23(b)(2) as to their § 706(2) claim. Rule 23(b)(2) applies if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360 (internal quotation marks and citations omitted).

Once more, Defendants' primary response to the proposed Count I class is that it requires an individualized inquiry under *TRAC*. *See* Defs.' Class Cert. Opp'n at 13–14. It does not. Plaintiffs challenge a regulation "generally applicable to the class" and the remedy they seek is applicable to the whole and indivisible. They ask the court (1) to declare that Defendants' administration of the earned time credit program violates the FSA and (2) to set aside the regulation pursuant to this declaration.[7]    This claim satisfies the requirements of Rule 23(b)(2).

---

[7] The court does not read Plaintiffs' Complaint to request an injunction in addition to vacatur as to Count I. *See* Compl. ¶¶ 41–45; *see also* Tr. at 8:12–9:6. The Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless doing so would "have [a] meaningful practical effect independent of its vacatur." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). This is because "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course" or where "a less drastic remedy . . . [is] sufficient to redress" the plaintiff's injury. *Id.* At the hearing, Defendants represented that they would abide by the court's interpretation of the First Step Act if the court were to vacate the regulation and issue a declaratory judgment. *See* Tr. at 58:7–61:17.

*See, e.g.*, *O.A.*, 404 F. Supp. 3d at 157–58 (finding Rule 23(b)(2) satisfied where the plaintiffs sought a declaration that the Rule was unlawful and vacatur and set aside of the rule); *Damus*, 313 F. Supp. 3d at 334–35 (finding Rule 23(b)(2) satisfied where the plaintiffs were not asking "to remedy discrete errors in their parole determinations" but rather wanted to "address an alleged systematic harm"); *R.I.L-R*, 80 F. Supp. 3d at 182 (finding Rule 23(b)(2) satisfied where a suit challenges a "policy 'generally applicable' to all class members").

*    *    *

Accordingly, the court will grant Plaintiffs' Motion for provisional class certification as to their § 706(2) claim. That class claim therefore is not moot under the inherently transitory exception.

**D.    Preliminary Injunction and Motion to Dismiss**

The court at last comes to the merits of the parties' motions. Plaintiffs' argument as to Count I is simple and appealing in its simplicity: "shall" means "shall." Pls.' Mot. to Dismiss Opp'n at 1. The FSA provides that time credits "shall be applied toward time in prerelease custody or supervised release," and that the BOP "shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). According to Plaintiffs, Congress's use of the word "shall" imposes a mandate to transfer an eligible prisoner on the day he first becomes eligible—at the moment when his time credits "equal . . . the remainder of [his] imposed term of imprisonment." Prelim. Inj. Mot. at 13; 18 U.S.C. § 3624(g)(1)(A). And since the FSA puts a one-year limit on transfer to supervised release, *see* 18 U.S.C. § 3624(g)(3), which Plaintiffs concede is happening to the maximum extent permitted, any time credits above 365 days *must* be applied to prerelease custody. *See* Pls.' Mot. to Dismiss Opp'n at 29 ("[I]f an eligible person has 500 credits and 500 days remaining on his or

her sentence, . . . the person must be transferred to prerelease custody for at least 135 days, because that is the only way for the BOP to satisfy the statutory command that it 'shall transfer' the 'eligible prisoner[].'").  Because the BOP's regulation imports discretion where there is none, it contradicts the FSA and must be vacated.  Prelim. Inj. Mot. at 25 (citing *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 43 (D.D.C. 2020)).

Plaintiffs are, of course, correct that "the word 'shall' usually connotes a requirement." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016).  But courts must look to context to confirm whether "shall" imposes a mandatory obligation or whether instead "the context of a particular usage . . . require[s] the construction of . . . 'shall' as permissive." *In re Nat'l Nurses United*, 47 F.4th 746, 754 (D.C. Cir. 2022) (quoting *LO Shippers Action Comm. v. ICC*, 857 F.2d 802, 806 (D.C. Cir. 1988)); *see also Me. Cmty. Health Options v. United States*, 590 U.S. 296, 310–11 (2020) (looking to adjacent provisions of a statute to confirm the text's mandatory language).  Context here shows that Congress's use of the word "shall" did not convey that the BOP must transfer a prisoner into prerelease custody by no later than the date of eligibility.

First, § 3632(d)(4)(C) does not displace the statutory discretion that the BOP has to designate a place of imprisonment.  Section 3621(b) states that the BOP "shall designate the place of the prisoner's imprisonment."  Plaintiffs concede that prerelease custody, whether in an RRC or on home confinement, qualifies as a "place of imprisonment" within the meaning of § 3621(b).  Tr. at 18:8-10; *see also Griffis v. Segal*, No. 23-cv-1525 (JRT/DLM), 2023 WL 5755779, at *2 (D. Minn. June 6, 2023) ("Federal courts consider claims related to a prisoner's placement in home confinement or at an RRC as claims concerning the *place* of the prisoner's confinement."), *report and recommendation adopted*, No. 23-cv-1525 (JRT/DLM), 2023 WL 5447282 (D. Minn. Aug. 24, 2023).  This concession is important, as nothing in § 3632(d)(4)(C) (or § 3624(g), which

determines a prisoner's eligibility) negates the BOP's discretion in making housing decisions under § 3621(b).  Indeed, "[a]s with all designations, any proposed transfer to a RRC or Home Confinement necessarily implicates section 3621(b)."  *Frey v. Martinez*, No. 23-cv-822, 2024 WL 3264823, at *5 (W.D. La. June 3, 2024), *report and recommendation adopted*, No. 23-cv-822, 2024 WL 3257126 (W.D. La. July 1, 2024).  And § 3621(b) requires the BOP to consider a host of factors, including "(1) the resources of the facility contemplated; (2) the nature and circumstances of the offense; [and] (3) the history and characteristics of the prisoner."  18 U.S.C. § 3621(b). It also requires the BOP, to the extent possible consistent with prisoner needs, security concerns, and resource constraints, to "place the prisoner in a facility as close as practicable to the prisoner's primary residence."  *Id.*  Nothing in § 3621(b) supports the notion that the BOP must designate a prisoner to prelease custody by a date specific.

Plaintiffs argue that "BOP's discretion under § 3621(b) to determine *where* to place someone—in which halfway house or as between home confinement and a halfway house—is categorically different from *whether* to transfer someone out of prison under § 3632(d)(4)(C)." Pls.' Mot. to Dismiss Opp'n at 27.  But that is a false distinction.  *Whether* to transfer a prisoner necessarily depends on *where* the prisoner might be appropriately placed.  Section 3621(b) requires the BOP to consider, among other things, the availability of RRC bed space and monitoring capacity in the geographic region appropriate for that prisoner; the presence of any safety or security considerations at an RRC or on home confinement; and the applicability of state or local laws that might limit the availability of an RRC.  *See* 18 U.S.C. § 3621(b) (identifying as factors, among others, "bed availability," "the resources of the facility contemplated," the "history and characteristics of the prisoner," and "practicab[ility]" of placement at a facility within 500 miles of the prisoner's primary residence); Shoulders Decl. ¶¶ 18–22.  Section 3624(g)'s "shall transfer"

language cannot reasonably be construed to mean that the BOP must disregard the multitude of factors contained in § 3621(b) when designating a "place of imprisonment" for a prisoner who is eligible for transfer under the FSA.

Second, Plaintiffs' "shall-means-shall" argument overlooks that § 3632(d)(4)(C) does not specify *when* a prisoner must be transferred to prerelease custody. Instead, it provides that the BOP "shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). Section 3624(g), in turn, establishes the criteria for eligibility. Neither § 3632(d)(4)(C) nor § 3624(g) says that the BOP must transfer a prisoner immediately upon achieving eligibility. Section 3632(d)(4)(C) is best read as a directive that identifies what group of prisoners the BOP must transfer into prerelease custody, not as establishing an immutable date by which the BOP must effectuate individual transfers.

Third, § 3624(c), titled "Prerelease Custody," expressly acknowledges the BOP's discretion when placing a prisoner into prerelease custody. Section 3624(c)(4) provides that "[n]othing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621." Congress enacted that provision as part of the earlier Second Chance Act. Pub. L. No. 110-199, 122 Stat. 657, § 251(a) (Apr. 9, 2008). There is nothing in § 3632(d)(4)(C), passed as a provision of the FSA, that would signal that Congress intended to walk back its reaffirmance of the BOP's broad designation authority under § 3624(c)(4) for the purpose of placement in prerelease custody. Surprisingly, Plaintiffs argue that § 3624(c) actually reinforces the mandatory nature of § 3632(d)(4)(C) because it directs the BOP to transfer a prisoner into prerelease custody "to the extent practicable" in the final 12 months of their term. 18 U.S.C. § 3623(c)(1). The absence of comparable "to the extent practicable" language in § 3632(d)(4)(C), Plaintiffs argue, should be understood to make that section's transfer directive mandatory. Prelim.

Inj. Mot. at 14–15.  But to read these statutory provisions as Plaintiffs do would require the court to ignore the principle that courts must read statutes as a whole.  Section 3624(c) concerns "Prerelease Custody."  So, too, does § 3632(d)(4)(C).  It would be a mistake to think that Congress meant for the latter to, in effect, supersede the former, when there is no indication of such intent.  Release into prerelease custody, no matter under the FSA or Second Chance Act, must conform with the BOP's requirements in designating places of imprisonment under § 3621.

Fourth, Plaintiffs' reading ignores that § 3624(g)'s eligibility requirements contain within them some discretionary elements regarding *how* a prisoner may be placed into prerelease custody.  *See id.* § 3624(g)(2) ("A prisoner *shall* be placed in prerelease custody as follows . . . .").  For instance, with regard to home confinement, BOP must ensure that (1) there is 24-hour location monitoring of the prisoner; (2) the prisoner remains in his home except for certain approved activities, and (3) the prisoner complies "with such other conditions as the Director determines appropriate."  *Id.* § 3624(g)(2)(A).  RRC placement also contain discretionary elements.  "A prisoner . . . who is placed at a [RRC] shall be subject to such conditions as the Director of the Bureau of Prisons determines appropriate."  *Id.* § 3624(g)(2)(B).  Both of these sections not only provide the BOP with some leeway to determine the requirements of prerelease custody, but also *limit* when and how the BOP can transfer a person into prerelease custody.  Only when these statutory conditions are satisfied can the BOP place a prisoner into prerelease custody.  Section 3632(d)(4)(C) cannot strip the BOP of discretion when the eligibility requirements upon which that section relies call upon the BOP to exercise judgment in placement.

Finally, contrary to Plaintiffs' suggestion, the court sees no conflict between preserving the BOP's discretion in designating a place of imprisonment and the FSA's purpose of incentivizing participation in EBRR programs and PAs.  Plaintiffs argue that "[l]eaving it up to the BOP to

decide not only when but whether to apply earned time credits and transfer eligible people out of prison renders the incentive that is the linchpin of the earned time credit program—early release—significantly weaker." Prelim. Inj. Mot. at 16. But in promulgating the FSA, Congress sought both to incentivize participation in recidivism reduction programs *and* to better prepare prisoners for reintegration into the community upon their release. *See, e.g.,* 164 Cong. Rec. S7739 (statement of Sen. Schumer) ("It is in the interest of both currently incarcerated individuals and the communities to which they eventually return to ensure we are doing everything in our power to set them up for successful reintegration into our society so that they don't commit another crime."). To require the BOP to transfer prisoners on the day of eligibility, without regard to the person's safety at an RRC placement or the realities of potential home confinement, would undermine one of the FSA's core purposes. *See NextEra Energy Resources, LLC v. FERC*, 118 F.4th 361, 371 (D.C. Cir. 2024) (noting that "courts should prefer textually permissible readings that would advance statutory . . . goals over ones that would frustrate them"). *See, e.g.*, Shoulders Decl. ¶ 20 ("When assessing whether home confinement is possible, BOP must first consider whether home confinement is appropriate for an inmate. Inmates may not have a suitable home where they could return or remain during the entirety of their term in prerelease custody.").

In reaching this decision, the court recognizes that some district courts have held in the habeas context that the FSA requires the BOP to transfer an individual prisoner to prerelease custody once they become eligible. *Compare, e.g.*, *[Redacted] v. Fed. Bureau of Prisons*, No. 23-cv-5965, 2023 WL 9530181, at *5 (S.D.N.Y. Dec. 28, 2023) ("shall" is mandatory), *report and recommendation adopted sub nom. Doe v. Fed. Bureau of Prisons*, No. 23-cv-5965, 2024 WL 455309 (S.D.N.Y. Feb. 5, 2024), *and Adepoju v. Scales*, --- F. Supp. 3d ---, 2025 WL 1392287, at *8–10 (E.D. Va. May 14, 2025) (similar), *with Williams v. Warden, Allenwood-Low*, No. 24-cv-

1321, 2024 WL 4204277, at *5 (M.D. Pa. Sept. 16, 2024) (FSA does not override BOP's discretion), *and Hassan v. Hijar*, No. 23-cv-41, 2023 WL 1769207, at *3 (W.D. Tex. Feb. 3, 2023) (similar). None of these cases, however, presented the argument made here by Plaintiffs, which is that the FSA compels the BOP to transfer *every* prisoner on the date of eligibility. The only published circuit authority that Plaintiffs cite is *Valladares v. Ray*, 130 F.4th 74 (4th Cir. 2025), which addressed disqualification from earn time credits under § 3632(d)(4)(D) based on the commission of certain enumerated offenses. In passing, the Fourth Circuit observed that "the award and computation of time credits is mandatory," citing § 3632(d)(4)(A). *Valladares*, 130 F.4th at 79. But *Valladares* had nothing to say about whether the FSA imposes a mandatory obligation to transfer prisoners to prerelease custody once they become so eligible.

Congress surely knew when it drafted the FSA that it had long ago granted the BOP broad discretion in designating where convicted individuals will serve out their sentences. *See Thye v. United States*, 109 F.3d 127, 129–30 (2d Cir. 1997) (noting that the BOP has "extensive latitude in assigning prisoners to correctional facilities"). The "shall" provisions of § 3632(d)(4)(C) did not alter that authority. The BOP's decision where—and thus when—to transfer a prisoner to prerelease custody remains subject to the same array of considerations that Congress set forth in § 3621(b). The challenged BOP regulation, which provides that the BOP "may apply FSA Time Credits toward prerelease custody or supervised release," 28 C.F.R. § 523.44(a)(1), is consistent with the governing statutory scheme. *See Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 609 (2013) ("[R]egulations, in order to be valid, must be consistent with the statute under which they are promulgated." (internal quotation marks omitted)). It is therefore not contrary to law, and the BOP did not exceed its statutory authority in promulgating it. Accordingly, Plaintiffs have not

established a likelihood of success on the merits, and dismissal of their facial challenge to the regulation is warranted.

***

For the foregoing reasons, the court grants provisional class certification in part, denies Plaintiffs' Motion for Preliminary Injunction, ECF No. 16, and grants Defendants' Motion to Dismiss, ECF No. 34. A final, appealable Order accompanies this Memorandum Opinion.

Dated: June 9, 2025

Amit P. Mehta
United States District Judge